**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | |
|---|---|
| CITY OF BRISTOL PENSION FUND, Individually and on Behalf of All Others Similarly Situated,<br><br>               Plaintiff,<br><br>   v.<br><br>3D SYSTEMS CORPORATION, ABRAHAM N. REICHENTAL, and DAMON J. GREGOIRE,<br>              Defendants. | No.  0:15-cv-02393-MGL<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>JURY TRIAL DEMANDED |

Plaintiff City of Bristol Pension Fund ("Plaintiff"), by and through the undersigned attorneys, alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge.  Plaintiff's information and belief is based upon, among other things, counsel's investigation, which includes, without limitation: (i) a review and analysis of regulatory filings made by 3D Systems Corporation ("3D" or the "Company") with the United States Securities and Exchange Commission ("SEC"); (ii) a review and analysis of press releases and media reports issued and disseminated by 3D; and (iii) a review of other publicly available information concerning 3D.

**SUMMARY OF THE ACTION AND OVERVIEW**

1.      This is a securities class action on behalf of all persons or entities who purchased or otherwise acquired 3D's securities between October 29, 2013 and October 22, 2014, inclusive (the "Class Period").  Plaintiff seeks to pursue remedies against 3D and certain of its officers for violations of §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act").

1

2.      South Carolina-based 3D is an international 3D printing company that provides 3D printers, print materials, custom-parts, and software.

3.      During the Class Period, Defendants drove up 3D's stock price by issuing false and misleading statements concerning the Company's (i) ability to increase the capacity of its metal printing business; (ii) demand for its consumer products; (iii) the value of multiple companies it was acquiring; and (iv) expected earnings.

4.      For example, on October 29, 2013, 3D's CEO and President, Defendant Reichental, proclaimed that the Company had "decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct metal 3D printer models."  Defendant Reichental also touted the strategic value of the Company's recent acquisitions.  In addition, on February 28, 2014, Reichental also represented that "our plan is [to] quadruple [direct metal printing] sales over the next 12 to 18 months."

5.      However, contrary to Defendants' positive statements concerning the Company's growth, Defendants had no basis to represent that the Company would be able to triple its metal printing capacity and/or quadruple direct metal printing sales.

6.      Specifically, as was later disclosed, many of the Company's acquisitions were not strategically acquired in an effort to boost revenue through acquisition and would require significant additional investment to integrate into 3D.

7.      3D's inflated share price allowed Defendants to receive over-sized profits from the sale of 3D stock.  For example, on May 29, 2014, 3D offered 5,950,000 shares of its stock, netting approximately $300 million.  Similarly, the Individual Defendants sold approximately $4.5 million in 3D stock during the Class Period. 3D could not conceal its serious problems indefinitely.  On July 31, 2014, 3D issued its second quarter results whereby the Company

missed analysts' expectations and reported revenue of $151.5 million on delays in the rollout of new products and disappointing guidance. On this news, the Company's share price fell nearly 11%. The truth was finally revealed on October 22, 2014, when the Company surprised the market when by announcing disappointing preliminary Q3 results and guided lower full year revenue and earnings. In a press release, the Company blamed its disappointing results on capacity constraints for its direct metal printers. On this news, 3D shares plummeted over 15% on high volume.



8.    As a result of Defendants' wrongful acts and omissions, 3D shares traded at artificially inflated prices during the Class Period, and Plaintiff and other Class members suffered significant losses and damages. Accordingly, Plaintiff hereby brings claims against 3D and certain of the Company's senior executives and Directors that exercised control over the Company during the Class Period. Plaintiff's claims arise under Sections 10(b) and 20(a) of the Exchange Act and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

9.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R.

§240.10b-5). This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

10.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b) and §27(c) of the Exchange Act (15 U.S.C. §78aa(c)). Many of the acts complained of herein, including the dissemination of materially false and misleading statements and reports prepared by or with the participation, acquiescence, encouragement, cooperation, or assistance of Defendants occurred, at least in part, in this District. Additionally, Defendant 3D is headquartered in this District.

11.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## PARTIES

12.    Plaintiff City of Bristol Pension Fund, as set forth in the accompanying Certification, incorporated by reference herein, purchased 3D shares during the Class Period and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

13.    Defendant 3D is an international 3D printing company that provides 3D printers, print materials, custom parts and software, headquartered in Rock Hill, South Carolina. 3D shares are traded on the New York Stock Exchange ("NYSE") under the symbol "DDD."

14.    Defendant Abraham N. Reichental ("Reichental") is and has been the Chief Executive Officer ("CEO") and President at 3D since September 19, 2003.

15.    Defendant Damon J. Gregoire ("Gregoire") was an Executive Vice President of Mergers & Acquisitions at 3D since November 11, 2014. Gregoire served as the Chief Financial

Officer ("CFO") of 3D from April 25, 2007 to November 11, 2014, and served as its Senior Vice President & Principal Accounting Officer until November 11, 2014.

16.     Defendants Reichental and Gregoire are referred to herein as the "Individual Defendants."    The Individual Defendants, because of their positions with the Company, possessed the power and authority to control the contents of 3D's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.    The Individual Defendants made specific false and misleading statements and/or reviewed and approved the Company's reports and press releases alleged herein to be misleading prior to, or shortly after their issuance, and had the ability and opportunity to prevent their issuance or cause them to be corrected.    Because of their positions and access to material non-public information available to them, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

17.     Each Individual Defendant's primary liability and controlling person liability arises from the following facts, among others: (i) the Individual Defendants were high-level executives at the Company during the Class Period and members of the Company's management team or had control thereof; (ii) the Individual Defendants, by virtue of their responsibilities and activities as senior officers of the Company, were privy to and participated in the creation, development, and reporting of the Company's internal budgets, plans, projections, and/or reports; (iii) each Individual Defendant enjoyed significant personal contact and familiarity with the other Individual Defendants and were advised of, and had access to, other members of the Company's management team, internal reports and other data and information about the

Company's finances, operations, and sales at all relevant times; and (iv) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew and/or recklessly disregarded was materially false and misleading.

18.    3D and the Individual Defendants are collectively referred to herein as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

19.    The 3D printing process starts with a digitized 3D image of the part to be made. The printers then apply layer upon layer of materials to fabricate a physical object.  As their capabilities rose and their prices fell, 3D printers gained greater acceptance in many industries, including dental and prosthetics.  And now 3D Systems ("3D") and others make 3D printers for consumers.  3D and Stratasys are the dominant 3D printer players in the industry.

20.    3D, founded in 1986, initially developed expensive 3D printers used in aerospace and automotive manufacturing to develop prototype parts, in what was then a niche market.  3D, through its subsidiaries, develops, manufactures, and markets 3D printers, print materials, on-demand custom parts services, and 3D authoring-solutions for professionals and consumers.

21.    3D Systems makes content-to-print solutions – 3D printers, materials, and on-demand custom parts services.  It also provides content creation and design productivity software platforms.  Its products are most often used in commercial settings like the aerospace/defense, healthcare and automotive industries, as well as consumer applications and hobbies.

**Materially False and Misleading**
**Statements Issued During the Class Period**

22.    On October 29, 2013, the Company issued a press release.  Defendant Reichental, 3D's President and CEO, stated the following regarding its printer demand growth:

We are very pleased to report another record revenue quarter on unprecedented printer units demand that more than tripled last year's unit sales.

\* \* \*

Stronger materials sales, increased advanced manufacturing activities and meaningful consumer products revenue contribution fueled our growth.

23.    On the same day, the Company held its Q3 2013 Earnings Call.  Defendant CEO

Reichental represented the following regarding its direct metal capacity:

Specifically, we sold out our current direct metal printers manufacturing capacity and ***decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct metal 3D printer models***.

\* \* \*

***Specifically, to the direct metal question, the plan is afoot to expand our capacity in every quarter.  It's a multipronged approach to do that, and our expectation is to get ourselves into a position where we can manufacture over the next 12 months three times the amount that we were able to manufacture in 2013***.

\* \* \*

We think that metal printers as a category is and will continue to be accretive to our printers' margins.  And we certainly expect metal materials to be accretive to our materials margins.   And we believe that the kind of investments we're undertaking in metals and in also fast tracking a group of nearly half a dozen new printers that we plan to introduce in the next few months, many of which are groundbreaking advanced manufacturing printers, will significantly enhance our recurring revenue generation capacity post those periods, namely materials at increasingly higher margins.

[Emphasis added.]

24.    Reichental stated the following regarding the Company's numerous acquisitions:

During the third quarter, we completed several acquisitions in support of our strategic growth initiatives. CRDM expands our global quick parts footprint and extends our U.K. presence. TeamPlatform, a powerful online collaboration tool, strengthens our consumer and professional design and communications capabilities, and the Sugar Lab speeds up our entry into food printing.

We also acquired 82% of Phenix Systems, adding proprietary direct metal printing capabilities to our advanced manufacturing portfolio. We believe that our

accelerated growth rate reflects the strength of our diversified portfolio, the productivity of our channels, and the effectiveness of our strategic initiatives.

* * *

The acquisition of TeamPlatform strengthens our consumer and professional design and communication capabilities with unique and powerful online collaboration tools and the Sugar Lab accelerates our food printing development and marketing initiatives.

25.    After the Company made such rosy statements regarding its products, 3D stock soared.  By mid-November 2013, 3D shares were up over 40% to as high as $80 per share on November 18, 2013.

26.    On January 15, 2014, despite its competitors' lower estimates, 3D Systems said in presentation slides at the 2014 Needham Conference, made available in an SEC regulatory filing, that it expects to be able to **double its revenue "over the next couple of year powered by about 30% organic growth**."

[Emphasis added.]

27.    On January 22, 2014, Defendant Reichental sold 25,000 shares at a weighted average price of $80.91 for more than $2 million in gross proceeds.  On February 28, 2014, after announcing the Company's Q4 and full year 2013 results, 3D's shares climbed after the Company projected a doubling of revenue—up to $1 billion in revenue in 2015, up from $513 million in 2013.  In slides released in conjunction with its Q4 results, 3D Systems predicted that it would generate $1 billion of revenue in FY15.  For FY14, the Company reiterated its previous revenue guidance of $680 million - $720 million and its prior FY14 EPS view of 73 cents – 85 cents.  On these representations, shares of 3D surged 6.8%, carrying the stock to $79.77 after opening at $75.96 a share.

28.    On the same day, during the Company's Q4 2013 Results Earnings Call, Defendant Reichental made the following representations regarding 3D's acquisitions:

We expect the recent acquisition of Village Plastics to bolster our consumer material development and margins and the alliances and partnerships with demand experts in toys and food to position us for leadership in those categories. Furthermore, we expect the acquisitions of Gentle Giant and Digital Playspace to enhance our brand publishing capabilities and the attractiveness of our consumer and retail platform.

29. Also during the Q4 2013 Results Earnings Call, Defendant Reichental reiterated the Company's confidence in its direct metal capacity:

Based on our current lineup of direct metal printers, customer demand and planned capacity expansions, we expect our direct metals business to generate between $25 million and $50 million of revenue in 2014. For metals, this represents the beginning.

Some may view this as a small niche, however, **we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years and our plan is as much as quadruple sales over the next 12 to 18 months**. We believe that plan is fully consistent with the growing demand of our expanding direct metal lineup.

[Emphasis added.]

30. On the same day, analyst Canaccord Genuity raised 3D's price target to $100 from $75, citing the Company's guidance and the potential for multiple expansion given the Company's expectations for positive leverage in 2015. Citigroup also raised 3D's price target to $90 from $78.

31. On April 29, 2014, during the Company's Q1 2014 Results Earnings Call, Reichental also continued to tout the Company's direct metal sales and expanding capacity in stating the following:

Growing Direct Metal 3D printer sales, again outstripped our manufacturing capacity during the first quarter, even as we continued to add capacity and from previous year to our increased total printers backlog.

* * *

In the first quarter, 3D printers and other products revenue grew 53% to $60.8 million and made up 41% of total revenue. 3D printers alone contributed $50.7 million growing some 60% over the 2013 quarter. All our printer

categories experienced strong demand and our effective sales of marketing Direct Metal printers campaign continue to produce greater demand, once again outpacing our manufacturing capacity even as we continue to add capacity.

* * *

We continue to expand manufacturing capacity across our portfolio including accelerated expansion of our Direct Metals manufacturing as demand from industrial companies continues to outpace our capacity.  Healthcare**,** it remains one of our fastest growing verticals as we continually focus on expanding our applications and reach.  Inline with that in April, we acquired Medical Modeling, a leading provider of 3D printing enabled patient-specific medical devices and personalized surgical treatments including proprietary, virtual, surgical planning and clinical transfer tools.

* * *

We entered the second quarter of 2014 with positive sales momentum and increased backlog driven by continued strong demand for advanced manufacturing activities across all of our categories.  As our new faster and more advanced 3D printers and material gain traction, we expect accelerated revenue growth through the second half of this year.  ***We continue to view direct metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple direct metal printer sales over the next 12 to 18 months***.

[Emphasis added.]

### The Individual Defendants' Insider Sales

32.    During the Class Period, the Individual Defendants sold millions of dollars worth of 3D stock as detailed below.

| Individual Defendant | Shares Sold | Date | Price | Total Proceeds |
| --- | --- | --- | --- | --- |
| Abraham Reichental | 66,700 shares | 3/14/2014 | $60.11 | $4,009,337 |
| Damon Gregoire | 22,500 shares | 3/14/2014 | $49 | $1,102,520 |
| Damon Gregoire | 50,000 shares | 8/27/2014 | $52.72 | $2,636,000 |
| Abraham Reichental | 52,300 shares | 8/29/2014 | $53.20 | $2,782,360 |

| | | | | |
|---|---|---|---|---|
| | | | | |
| Damon Gregoire | 45,000 shares | 11/19/2014 | $35.33 | $1,589,850 |

33.     The foregoing statements were false and misleading because Defendants did not have a reasonable basis for forecasting a tripling of metal printing production capacity or a quadrupling of metal printing sales.  Moreover, many of the Company's recent acquisitions had been haphazardly acquired in an effort to boost revenue through acquisition and would require significant additional investment to integrate into 3D.

### The Truth Finally Emerges

34.     On July 31, 2014, 3D stock fell the most in two months after second-quarter results missed analysts' estimates on delays in the rollout of new products and disappointing guidance.  On this news, the Company's share price fell nearly 11%.

35.     According to *Business Insider*, Q2 EPS came in at $0.16 a share versus forecasts for $0.18.   Revenue hit $151.5 million against the Company's expected $162.3 million.  Inventory climbed to $90 million versus $86 million forecast, and gross margin came in at 47.8% versus 51% forecast.

36.     In the Company's July 31, 2014 press release, Reichental stated the following:

While transitional forces temporarily pressured our gross profit margin, a detailed examination of the specific drivers, confirms that the fundamentals of our business are intact and our gross profit margins are poised to rebound and resume their expansion trajectory. . . .  As we advance our market leadership and scale in key verticals through our increased investments, our progress is ahead of schedule and our enterprise-wide synergies are already generating substantial cash from operations . . . .  Consistent with our historical performance, we expect to generate a higher portion of our revenue during the second half on rebounding margins. Record bookings for our design and manufacturing printers together with rising orders for our consumer products provides us with confidence in our ability to achieve our 2014 guidance.

37.    Notably, ***organic growth sunk to 10% from 30% in previous quarters***.  Organic growth was just 10% compared to 28% growth in Q1, while the materials revenue increased 30%, which is a slowdown from 41% growth in Q1.  Consumer revenue was $7.4 million compared to $9.7 million in Q1 as delayed products availability held consumer revenue growth down, although bookings grew by $7.7 million.  3D shares dropped 11% to $50.13 at the close, their biggest one-day decline since May 28.

38.    On October 22, 2014, the Company again surprised investors with preliminary third-quarter results that were below expectations.  3D warned that continued manufacturing capacity constraints for its direct metal printers would dent its third-quarter results.  The Company also lowered its 2014 revenue forecast by roughly 7%.  The shortfall was blamed on problems with manufacturing direct metal printers and "delayed availability" of some consumer products.

39.    In the third quarter, 3D expected revenue to come in between $164 million-$169 million, below Wall Street expectations for approximately $186 million according to *Business Insider*.  3D also said it expected adjusted EPS in the third quarter to be $0.16-$0.19, below expectations for $0.21, and cut its full-year revenue and profit outlook, saying that it expected revenue to total $650 million - $690 million, below Wall Street expectations for approximately $708 million.

40.    In its October 22, 2014 press release, 3D stated, "[s]trengthening sales of the company's design, manufacturing and healthcare products and services were not enough ***to overcome the revenue shortfall from the continued manufacturing capacity constraints for its direct metals printers and delayed availability of its newest consumer products***."
[Emphasis added.]

41.    Reichental stated the following regarding 3D's capacity:

We are disappointed that we failed to fully capitalize on the robust demand for our direct metal and consumer products during the quarter.

While we worked very hard to deliver these products sooner, achieving manufacturing scale, quality and user experience targets took significantly longer than we had anticipated.

42.    Also on October 22, 2014, Troy Jensen, a Piper Jaffray analyst, stated that "[a] spree of acquisitions has clouded the extent of 3D Systems' growth," and "[w]e've been cautious on 3D for a while, they've had a fairly aggressive rollup strategy."

43.    Furthermore, according to the Company's Form 10-K, filed on February 26, 2015, direct metals revenue only increased by 178% in 2014.  3D did not triple its direct metal printing sales, let alone quadruple sales.  On the same day, during the Company's Q4 2014 Results Earnings Call, Reichental stated the following:

We are definitely disappointed that we were not able to fully capitalize faster on the strength of our portfolio and closed the revenue gap that was caused by delayed consumer product and direct metal capacity constraints.

## CLASS ACTION ALLEGATIONS

44.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of all persons or entities who purchased or otherwise acquired 3D securities between October 29, 2013 and October 22, 2014, inclusive.

45.    Excluded from the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

46.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are

hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by 3D or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

47.    Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law, which is complained of herein.

48.    Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

49.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)    whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)    whether statements made by Defendants to the investing public during the Class Period omitted and/or misrepresented material facts about the business, operations, and prospects of 3D;

(c)    whether the price of 3D shares were artificially inflated during the Class Period; and

(d)    to what extent the members of the Class have sustained damages and the proper measure of damages.

50.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## LOSS CAUSATION

51.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

52.    During the Class Period, Plaintiff and the Class purchased 3D shares at artificially inflated prices and were damaged thereby. When the misrepresentations that had been made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, the price of the Company's securities significantly declined, causing investors' losses.

## APPLICABILITY OF PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

53.    3D shares traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities, relying upon the integrity of the market price of 3D shares and the market information relating to 3D, and have been damaged thereby.

54.    During the Class Period, the artificial inflation of 3D shares was caused by the material misrepresentations and/or omissions particularized in this Complaint, causing the damages sustained by Plaintiff and other members of the Class. As described herein, during the Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about 3D's business, operations, and financial prospects. These material misstatements and/or omissions created an unrealistically positive assessment of 3D and its

business and financial condition, thus causing the price of the Company's securities to be artificially inflated at all relevant times and, when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's securities at such artificially inflated prices and being damaged as a result.

55.     At all relevant times, the market for 3D securities was an efficient market for the following reasons, among others:

> (a)     3D stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

> (b)     as a regulated issuer, 3D filed periodic public reports with the SEC and/on the NYSE;

> (c)     3D regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

> (c)     3D was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

56.     As a result of the foregoing, the market for 3D securities promptly digested current information regarding 3D from all publicly available sources and reflected such information in 3D's stock price. Under these circumstances, all purchasers of 3D securities

during the Class Period suffered similar injury through their purchase of 3D securities at artificially inflated prices, and a presumption of reliance applies.

## NO SAFE HARBOR

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions.  In addition, to the extent certain of the statements alleged to be false may be characterized as forward looking, they were not identified as "forward-looking statements" when made, and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge, or was reckless in not knowing, that the forward-looking statement was materially false or misleading and/or the forward-looking statement was authorized or approved by an executive officer of 3D who knew, or was reckless in not knowing, that the statement was false when made.

## COUNT I

### Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, the Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) deceive the investing

public, including Plaintiff and other Class members, as alleged herein; and (ii) cause Plaintiff and other members of the Class to purchase 3D securities at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the Defendants took the actions set forth herein.

60.    Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for 3D securities in violation of §10(b) of the Exchange Act and Rule 10b-5. Defendants are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

61.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mail, engaged and participated in a continuous course of conduct to conceal adverse material information about 3D's business, operations, and financial performance and prospects, as specified herein.

62.    Defendants employed devices, schemes, and artifices to defraud while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of 3D's value, performance, and continued substantial growth. These acts included the making of, or the participation in the making of, untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made about 3D and its business, operations, and financial prospects in light of the circumstances under which they were made, not misleading. As set forth more particularly herein, Defendants further engaged in transactions, practices, and a course of

business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period. Defendants had actual knowledge of the misrepresentations and/or omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and disclose such facts, even though such facts were available to them. Individual Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing 3D's financial condition from the investing public and supporting the artificially inflated price of its securities. As demonstrated by Defendants' misstatements and/or omissions concerning the Company's business, operations, financial well-being, and prospects throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and/or omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

63.    As a result of the dissemination of the materially false and/or misleading information and/or failure to disclose material facts, as set forth above, the market price of 3D securities was artificially inflated during the Class Period. In ignorance of the fact that market prices of the Company's securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by the Defendants, or upon the integrity of the market in which the securities trade, and/or in the absence of material adverse information that was known to or recklessly disregarded by the Defendants, but not disclosed in public statements by the Defendants during the Class Period, Plaintiff and the other members of the Class acquired 3D securities during the Class Period at artificially high prices and were damaged thereby.

64.    At the time of said misrepresentations and/or omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Plaintiff

and the other members of the Class and the marketplace known the truth regarding 3D and its business and prospects, which was not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their 3D securities, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices that they paid.

65.    By virtue of the foregoing, Defendants have violated §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

66.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's securities during the Class Period.

## COUNT II

### Violation of §20(a) of the Exchange Act
### Against the Individual Defendants

67.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

68.    The Individual Defendants acted as controlling persons of 3D within the meaning of §20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, ownership and contractual rights, participation in and/or awareness of the Company's operations, and/or intimate knowledge of the false statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings, and other

statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

69.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

70.     As set forth above, 3D and the Individual Defendants violated §10(b) and Rule 10b-5 by their acts and/or omissions as alleged in this Complaint.  By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

<u>**PRAYER FOR RELIEF**</u>

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure with Plaintiff serving as a class representative;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2015
                     s/Chris Moore
Terry E. Richardson, Jr. (FBN 3457)
Daniel Scott Haltiwanger (FBN 7544)
Chris Moore (FBN 10445)
RICHARDSON, PATRICK, WESTBROOK &
BRICKMAN, LLC
1730 Jackson Street
Barnwell, South Carolina 29812
Telephone: 803.541.7850

**Pending *pro hac vice* admission:**

Joseph P. Guglielmo
Donald A. Broggi
Thomas L. Laughlin
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone: 212-223-6444
Facsimile: 212-223-6334
jguglielmo@scott-scott.com
dbroggi@scott-scott.com
tlaughlin@scott-scott.com

David R. Scott
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
156 South Main Street
P.O. Box 192
Colchester, CT  06415
Telephone:  (860) 537-5537
Facsimile:  (860) 537-4432
david.scott@scott-scott.com

*Counsel for Plaintiff*