**UNITED STATES DISTRICT COURT**
**DISTRICT OF SOUTH CAROLINA**
**ROCK HILL DIVISION**

| | | |
|---|---|---|
| KBC ASSET MANAGEMENT NV, Individually and on Behalf of All Others Similarly Situated, | ) ) ) | Civil Action No. 0:15-cv-02393-MGL |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | |
| | ) | |
| vs. | ) ) | |
| | ) | |
| 3D SYSTEMS CORPORATION, ABRAHAM N. REICHENTAL, DAMON J. GREGOIRE, and TED HULL, | ) ) ) | |
| | ) | |
| Defendants. | ) | |

**AMENDED CONSOLIDATED COMPLAINT FOR**
**VIOLATIONS OF THE FEDERAL SECURITIES LAW**

# TABLE OF CONTENTS

**Page**

I.     SUMMARY OF THE ACTION ..................................................................1

II.    JURISDICTION AND VENUE ................................................................7

III.   PARTIES ...............................................................................................8

    A.     Plaintiff ........................................................................................8

    B.     Defendants ...................................................................................8

IV.    SUBSTANTIVE ALLEGATIONS .........................................................12

    A.     Background of the Company .......................................................12

    B.     The Company's Industry Dominance Became Threatened by Emerging Competitors ................................................................13

    C.     Pressured by Competitors, Defendants Embarked on an Acquisition Spree and Rushed to Introduce Dozens of New Products to Boost Revenue Growth............14

    D.     Defendants' Aggressive Growth Strategy Caused Severe Integration Problems ...................................................................16

    E.     The Company's Rapid Expansion Caused Manufacturing, Inventory and Shipping Problems that Slowed Growth and Inflated Costs.................................17

        1.     Manufacturing Problems Prevented Sales of the Company's Critical, In-Demand Products .....................................................17

            a.     Production Capacity and Quality Problems Hurt Sales of the Company's Critical Direct Metal Line ...........................................18

            b.     Quality Problems Hurt Sales of the Company's Highly Anticipated Consumer Printers.....................................................21

        2.     The Company's Aggressive Growth Strategy Contributed to Poor Inventory Control....................................................................22

            a.     The Company's Inventory Management Was Subpar Which Led to Costly Inventory Losses ....................................................23

            b.     The Company's Operations Suffered from Out of Stock and Obsolete Inventory.......................................................................25

        3.     The Company Was Forced to Write Off Inventory .................................25

**Page**

F.   Defendants Were Forced to Rush Shipments at the Ends of Quarters to Meet Their Unrealistic Revenue Growth Projections ....................................................26

   1.   The Company Was Forced to Discount Products and Relax Sales Terms ............................................................................................27

   2.   The Company Engaged in Questionable Shipping Practices....................28

G.   Numerous Facts Support Defendants' Knowledge of the Company's Undisclosed Financial and Operational Problems ...................................................30

   1.   The Individual Defendants Were Aware of and Responsible for the Desperate Measures Taken to Try and Meet Revenue Goals...................30

   2.   Defendants' Own Public Statements Confirm Their Knowledge of the Company's Problems..................................................................31

   3.   The Company's Problems Involved Core Operations of the Company, Supporting Defendants' Knowledge........................................................34

H.   Defendants Misled the Market and Failed to Disclose the Company's Pervasive Financial and Operational Problems ....................................................35

I.   The Company's Stock Price Ultimately Collapsed When the Market Learned of the True Extent of the Company's Problems....................................................37

V.   DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS ........................................................................................................41

A.   Defendants' False and Misleading Statements and Omissions from October 29, 2013 Through February 4, 2014 .......................................................42

   1.   Press Release, SEC Filing, and Conference Call Regarding the Company's Third Quarter 2013 Financial Results ...................................42

   2.   Needham Growth Conference....................................................................47

B.   Defendants' False and Misleading Statements and Omissions from February 5, 2014 Through April 28, 2014 ...........................................................50

   1.   Press Release and Conference Call Regarding the Company's Preliminary Fourth Quarter and Fiscal Year 2013 Financial Results........50

   2.   Stifel, Nicolas Technology, Internet & Media Conference ......................51

Page

3.      Press Release and Conference Call Regarding the Company's Fourth Quarter and Year End 2013 Financial Results ...............................52

4.      Piper Jaffray Technology, Media and Telecommunications Conference ................................................................................................56

C.      Defendants' False and Misleading Statements and Omissions from April 29, 2014 Through July 30, 2014 ...................................................61

1.      Press Release, SEC Filing, and Conference Call Regarding the Company's First Quarter 2014 Financial Results ......................................61

VI.     THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET .....................................................................67

A.      Defendants' Partial Revelations and False and Misleading Statements and Omissions from July 31, 2014 Through October 21, 2014 ....................................67

1.      Press Release, SEC Filing, and Conference Call Regarding the Company's Second Quarter 2014 Financial Results ................................67

2.      Needham Advanced Industrial Technologies Conference ........................72

B.      Defendants' Partial Revelations and False and Misleading Statements and Omissions from October 22, 2014 Through February 25, 2015 ...........................77

1.      Press Release and Conference Call Regarding the Company's Preliminary Third Quarter 2014 Financial Results ...................................77

2.      Press Release, SEC Filing, and Conference Call Regarding the Company's Third Quarter 2014 Financial Results ...................................81

3.      UBS Global Technology Conference .......................................................84

4.      Stifel, Nicolaus Technology, Internet & Media Conference ....................85

C.      Defendants' False and Misleading Statements and Omissions from February 26, 2015 Through April 23, 2015 ............................................89

1.      Press Release, SEC Filing, and Conference Call Regarding the Company's 2014 Fourth Quarter and Year End Financial Results ...........89

VII.    THE TRUTH IS MORE FULLY REVEALED .................................................94

A.      Press Release and Conference Call Regarding the Company's Preliminary First Quarter 2015 Financial Results ...................................................94

**Page**

B.      Press Release and Conference Call Regarding the Company's
        First Quarter 2015 Financial Results ....................................................99

VIII.   POST-CLASS PERIOD REVELATIONS .....................................................101

IX.     LOSS CAUSATION..........................................................................................108

        A.      July 31, 2014 Disclosure ........................................................109

        B.      October 22, 2014 Disclosure.........................................................111

        C.      April 24, 2015 Disclosure ........................................................114

        D.      May 6, 2015 Disclosure ........................................................116

X.      ADDITIONAL SCIENTER............................................................................120

        A.      Defendants Were Motivated and Acted with Scienter to Artificially Inflate the
                Company's Stock Price to Profit from Insider Sales of 3D Systems Stock.........121

        B.      Defendants Were Motivated and Acted with Scienter to Artificially Inflate
                the Company's Stock Price to Maximize the Company's Secondary Public
                Stock Offering.........................................................................122

XI.     PRESUMPTION OF RELIANCE ...............................................................123

XII.    NO SAFE HARBOR ......................................................................................125

XIII.   PLAINTIFF'S CLASS ACTION ALLEGATIONS.....................................127

COUNT I ..................................................................................................................
        VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5
        PROMULGATED  THEREUNDER AGAINST ALL DEFENDANTS .......................129

COUNT II ................................................................................................................
        FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST
        THE INDIVIDUAL DEFENDANTS.................................................................133

PRAYER FOR RELIEF .........................................................................................134

JURY TRIAL DEMANDED....................................................................................134

By and through its undersigned counsel, Lead Plaintiff KBC Asset Management NV ("Plaintiff") alleges the following against Defendants 3D Systems Corporation ("3D Systems" or the "Company") Abraham N. Reichental ("Reichental"), Damon J. Gregoire ("Gregoire"), and Ted Hull ("Hull") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation:  (a) review and analysis of public filings made by 3D Systems and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; (c) review of news articles and shareholder communications; (d) review of other publicly available information concerning 3D Systems, the other Defendants, and related non-parties; and (e) interviews with factual sources, including individuals formerly employed by the Company and its subsidiaries.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

I.      **SUMMARY OF THE ACTION**

1.      This is a federal securities class action against 3D Systems and certain of its officers for violations of the federal securities laws.  Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§78j(b) and 78t(a), and SEC Rule 10b-5 promulgated thereunder, 17 C.F.R. §240.10b-5, on behalf of itself and all persons or entities who purchased or acquired the publicly traded common stock of 3D Systems (the "Class") between October 29, 2013 and May 5, 2015, inclusive (the "Class Period").  Plaintiff alleges that, during the Class Period, Defendants engaged in a fraudulent scheme to artificially inflate the Company's stock price by both misrepresenting and concealing the true operational and financial conditions of the Company.

2.      3D Systems manufactures, sells, and offers three-dimensional ("3D") printing products and services.  3D printers employ an "additive" manufacturing process by depositing multiple layers of material (such as plastics or metals), one on top of another, to create 3D objects. This process differs from traditional subtractive processes which involve machining an object out of a solid block of material.  The Company refers to itself as a leading global provider of 3D printing solutions, and claims the most advanced and comprehensive range of 3D printing products in the industry.

3.      For years, the Company was the dominant player in the 3D printing industry and faced relatively little competition.  This began to change over time, as 3D printing technology became more widespread and accessible.  By the start of the Class Period, the Company faced strong competition from large, well-capitalized 3D printing companies, as well as a plethora of smaller start-ups.  These competitors threatened 3D Systems' industry dominance by bringing a diverse array of products and services to market.  Moreover, the technology supporting those products and services was often distinct from, and arguably better than, the technology pioneered and employed by the Company, which further challenged its leadership status.

4.      Defendants knew that growth was critical to keep pace with competitors and continue to perpetuate the market's perception of the Company as a leader in the 3D printing industry and a "first mover" in introducing new 3D printing technologies.  To counter the threat of emerging competitors, Defendants embarked on an aggressive strategy to boost the Company's revenue growth by expanding its products, services, and market share in a short period of time.

5.      Defendants fueled the Company's rapid growth by making scores of acquisitions and introducing a spate of new products within a short period of time.  From 2008 through May 2015, the Company made over 40 acquisitions, including a massive $700 million spending spree from

2012 to 2015. In addition, the Company introduced 39 new products in a single year, from the beginning of 2013 through the first week of January 2014.

6.      Defendants' rush to profit from new acquisitions and products created serious problems for the Company. Defendants struggled to integrate and manage the Company's sudden growth. They were forced to spend tremendous amounts of time, effort, and money incorporating dozens of diverse and far-flung acquisitions, while bringing new, complex products to market. This created critical operating inefficiencies, hurt productivity, and inflated operating costs. Simply put, Defendants' aggressive growth strategy spread the Company too thin.

7.      The Company's rapid growth caused manufacturing problems that prevented it from capitalizing on high demand for two key product lines - direct metal printers and consumer printers. Direct metal printers were large, expensive printers used by industrial customers in the advanced manufacturing process, while consumer printers were smaller, cheaper desktop printers used by consumers and small businesses. Both were in-demand products representing the newest frontier in 3D printing. Thus, Defendants repeatedly sung their praises to investors and analysts.

8.      However, both product categories suffered from severe manufacturing capacity and quality problems that delayed their release to the market. Manufacturing of direct metal printers was dependent on the Company's recently acquired French subsidiary, Phenix Systems ("Phenix"). However, Phenix's capacity was woefully inadequate, and could not be increased nearly as quickly as Defendants promised. Meanwhile, both direct metal and consumer printers were beset by severe quality problems, which were unfortunate byproducts of Defendants' rush to market.

9.      As a result of these capacity and quality issues, the Company lost critical sales and revenue growth, and suffered reputational damage among customers. The Company also suffered from heavy returns of its direct metal printers as a result of the quality issues.

10. Compounding these problems, poor inventory control was another consequence of the Company's thinly-stretched operations. These problems contributed to operating inefficiencies, elevated operating expenses, and ultimately led to inventory write-downs that compressed the Company's gross profit margins.

11. The Company's operating problems were further exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters. This led to a mad scramble, as Defendants strained to meet the Company's ultra-aggressive revenue projections at the end of each quarter. As a result, the Company experienced myriad quarter-end issues, including rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment plans, as well as other questionable shipping practices, with the goal of wringing out as much revenue as possible before the quarter closed.

12. The Individual Defendants (as defined herein) were intimately aware of the Company's mounting operational and financial problems during the Class Period. Indeed, Defendants Reichental and Gregoire were personally responsible for directing and approving the Company's quarter-end shipping. Defendants' knowledge is also evident from their own statements, made repeatedly in conference calls, press releases, and SEC filings, establishing the direct involvement, oversight, and responsibilities of the Individual Defendants with respect to the Company's growth strategy, acquisitions, consumer 3D printers, and direct metal 3D printers.

13. Defendants were highly motivated to conceal these problems to preserve the Company's carefully cultivated image as a fast-growing, cutting-edge leader of the 3D printing industry. Indeed, despite being fully informed of the Company's material operating, manufacturing, and product quality problems due to its aggressive acquisition and product growth strategies, Defendants failed to disclose these material facts to the market. Instead, Defendants trumpeted

heavy demand for their "breakthrough," "cutting edge," and "phenomenally" well-received direct metal and consumer printers, and the Company's ability to expand manufacturing capacity to meet such demand. For example, on April 29, 2014, despite severe quality and capacity problems affecting the Company's ability to meet demand for its direct metal printers, Defendant Reichental stated, "We continue to view Direct Metal printing as a very important and exciting manufacturing growth opportunity and plan to **quadruple** Direct Metal printer sales over the next 12 to 18 months." Further, Defendants repeatedly misled the market by boasting that the Company's organic revenue was growing at an explosive rate of "at least 30%," and the Company was poised to "double [its] revenue over the next couple of years." Defendants stressed their rosy growth story to investors by raising their revenue guidance twice during the Class Period.

14.    As a result, the Company's stock price was artificially inflated. Defendants personally cashed in on such artificial inflation by selling their personal shares of Company stock during the Class Period. They also leveraged the Company's artificially inflated stock price by selling shares in a secondary public stock offering and using the proceeds to finance their reckless growth strategy.

15.    By July 31, 2014, Defendants could no longer hide the Company's mounting problems. Before the market opened that day, Defendants surprised investors by revealing that the Company failed to increase manufacturing capacity quickly enough to meet demand for its direct metal printers, and delayed releasing its Cube 3 and CubePro consumer printers to "improve user experience." Defendants also announced compressed gross profit margin, reflecting an inventory write-off caused by the Company's "aggressive shift to multiple new products." In response to this news, the Company's stock price fell sharply, declining 14.5%, over a two-day period. The resulting stock decline would have been even greater, but Defendants continued to mislead the market about

the severity of their problems, failing to disclose the full adverse impact of Defendants' growth strategy, and suggesting that the problems would be resolved in short order.

16.     However, the Company revealed additional manufacturing problems before the market opened on October 22, 2014, including a "revenue shortfall from the continued manufacturing capacity constraints for our direct metal printers and delayed availability of our newest consumer products [Cube 3 and CubePro printers]."  On this news, the price of 3D Systems stock plummeted another 15.5% in a single trading day.  Once again, however, the stock decline would have been larger had Defendants revealed the full truth.  Instead, they continued to mislead the market by downplaying and failing to reveal the true extent of the issues affecting the Company.

17.     Then, on April 24, 2015, Defendants announced new quality issues affecting direct metal printers, compounded by lower customer demand.  Defendants also signaled that revenue growth had slowed, operating expenses had risen, and in sharp contrast to their earlier statements, the Company was scrapping its aggressive growth strategy in favor of "accelerated" planned integration, productivity, and efficiency measures.  Further, in contrast to Defendants' prior statements projecting organic revenue of 30%, they chose not to report the Company's organic growth rate for the first time during the Class Period.  However, Defendant Reichental announced that the combination of negative factors impacting the Company were "***not likely to result in organic growth for the first quarter***."  On this news, the Company's stock suffered another sharp decline, falling 16.2% over a two-day period.

18.     Finally, on May 6, 2015, the Company provided further explanation of the problems announced on April 24, 2015.  Where the Company had previously touted its organic growth rate, which had dropped to just 7% by February 26, 2015, Defendants revealed a decline in organic revenue of 7%, leaving the Company with a zero growth rate.  Defendants also revealed, for the first

time, that they were withdrawing their 2015 financial guidance given the uncertainties facing the Company. As a result, the Company's stock dropped once again, falling 5.4% in a single trading day. As a result of the revelations of Defendants' fraudulent conduct set forth herein, investors suffered millions of dollars in losses while Defendants profited.

19.    Shortly after this negative news was revealed, Defendant Hull was forced to step down from the Company on May 15, 2015.

20.    The truth regarding Defendants' dangerous growth strategy continued to be revealed after the close of the Class Period. In a subsequent call with analysts on August 6, 2015, Defendant Reichental expressed disappointment with the Company's financial results and admitted that the Company's rapid expansion had led to operating inefficiencies, quality problems, and high costs that the Company was still attempting to remedy:

> Overall, we were disappointed with our results. While a period of high growth enabled us to acquire strategic assets and build critical expertise, our rapid expansion permitted certain operating inefficiencies that we are currently addressing. Specifically, we're enhancing the quality of our products and services, accelerating synergy and cost reduction measures, driving process improvements, and working closely with our channel partners to improve our sales operations and worldwide coverage.

21.    Less than three months later, Defendant Reichental was forced to step down from the Company on October 29, 2015.

22.    The Company's revenue growth and stock price have not rebounded to date. On November 4, 2015, the Company announced that its organic revenue growth was ***negative 22%*** for the third quarter of 2015. The Company's stock price closed at $9.01 per share on November 27, 2015, ***over 90% lower*** than its Class Period high of $96.42 on January 3, 2014.

## II.    JURISDICTION AND VENUE

23.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t (a), and Rule 10b-5 promulgated thereunder by the SEC,

17 C.F.R. §240.10b-5. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

24.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. §78aa, and 28 U.S.C. §1391(b) because 3D Systems conducts substantial business in this District, and many of the acts and practices complained of herein occurred in substantial part in this District.

25.     In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     PARTIES

### A.     Plaintiff

26.     Plaintiff KBC Asset Management NV was appointed to serve as Lead Plaintiff in this action by Order of this Court dated October 1, 2015. Dkt. No. 65. As shown in the certification filed with the Court on August 14, 2015 [Dkt. No. 30-4] and incorporated herein, Plaintiff purchased or otherwise acquired 3D Systems common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's operating and financial condition were disclosed and the artificial inflation was removed from the price of 3D Systems stock.

### B.     Defendants

27.     Defendant 3D Systems Corporation is a Delaware corporation with a principal place of business located at 333 Three D Systems Circle, Rock Hill, South Carolina 29730-7811.

28.     Defendant Abraham N. Reichental served as 3D Systems' President and Chief Executive Officer ("CEO") during the Class Period, holding the position from September 19, 2003 until he left the Company on October 28, 2015.

29.     Defendant Damon J. Gregoire served as 3D Systems' Chief Financial Officer ("CFO") during part of the Class Period, holding the position from April 25, 2007 until November 11, 2014, when he became the Company's Executive Vice President of Mergers & Acquisitions.  He also served as the Company's Senior Vice President & Principal Accounting Officer until November 11, 2014.

30.     Defendant Ted Hull served as 3D Systems' CFO, replacing Defendant Gregoire, during part of the Class Period, from November 11, 2014 until May 15, 2015.  On May 15, 2015, the Company announced that Defendant Hull was leaving Company (as of the end of that day) "in order to meet company needs and to pursue his personal interests," and that the Company was appointing its then Chief Accounting Officer, David Styka ("Styka"), to the CFO position effective as of Defendant Hull's departure.

31.     Defendants Reichental, Gregoire, and Hull are collectively referred to herein as the "Individual Defendants."

32.     During and prior to the Class Period, the Individual Defendants, as senior executive officers of 3D Systems, were privy to confidential and proprietary information concerning 3D Systems, its operations, finances, financial condition, and present and future business prospects.  The Individual Defendants also had access to material adverse non-public information concerning 3D Systems, as discussed in detail below.  Because of their positions with 3D Systems, the Individual Defendants had access to non-public information about the Company's business, finances, products, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith.  Because of their possession of such information, the

Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

33.     The Individual Defendants are liable as direct participants in the wrongs complained of herein.  In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

34.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their executive and managerial positions with 3D Systems, each of the Individual Defendants had access to the adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these adverse facts rendered the positive representations made by or about 3D Systems and its business, which were issued or adopted by the Company, materially false and misleading.

35.     The Individual Defendants, because of their positions of control and authority as senior executive officers of the Company, were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, the Individual Defendants are responsible

for the accuracy of the public reports and releases detailed herein and are therefore primarily liable for the representations contained therein.

36.     Each of the above officers of 3D Systems, by virtue of their high-level position with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels, and was privy to confidential proprietary information concerning the Company and its business, operations, and financial condition, as alleged herein.  These Defendants were involved in drafting, producing, reviewing, and/or disseminating the false and misleading statements and information alleged herein, were aware or recklessly disregarded that these false and misleading statements were being issued regarding the Company and omitted material adverse facts regarding the Company, and approved or ratified these statements and failed to disclose these facts, in violation of the federal securities laws.

37.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's securities would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

38.     The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of the Company's publicly traded

securities by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of 3D Systems common stock, causing Plaintiff and other members of the Class to purchase 3D Systems common stock at artificially inflated prices.

39.     Defendants are liable for:  (a) making false and misleading statements; and/or (b) failing to disclose adverse facts known to them about 3D Systems.  Defendants' fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of 3D Systems common stock was a success, as it:  deceived the investing public regarding the Company's operating and financial condition; artificially inflated the price of 3D Systems common stock; and caused Plaintiff and other members of the Class to purchase 3D Systems common stock at artificially inflated prices.

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Background of the Company

40.     3D Systems designs, manufactures, and sells 3D printing products and services, including 3D printers and materials designed for use with such printers.  3D printers employ an additive manufacturing process in which successive layers of material build solid objects programmed with design software or scanning devices.  In other words, the printers "print" by depositing multiple layers of material, one on top of another, to create 3D objects.  This process differs from traditional subtractive design and manufacturing processes which involve machining an object out of a solid block of material.

41.     3D Systems claims to have pioneered 3D printing and digital manufacturing with the invention of a 3D printing technology (stereolithography) and an associated file format (.STL) by its co-founder, Chuck Hull, almost 30 years ago.  Today, the Company refers to itself as a leading global provider of 3D printing solutions for "everyone," and claims the most advanced and comprehensive range of 3D printing products within the additive manufacturing industry.  The

Company's 3D printers are available in several shapes and sizes and use a wide variety of materials such as plastics, metals, ceramics, and edibles.  For example, the Company markets smaller plastic jet printers to consumers for home, office, and classroom use, and markets larger direct metal printers to business customers for industrial use.  The Company states that its printers can print "almost anything," including medical devices, functional aerospace and automotive parts, personalized accessories and jewelry, and customized toys, art, and décor.

42.    The Company's end-user customers include individual consumers and businesses in a broad range of industries.  The Company sells its products and services to such customers both directly and indirectly through a channel of authorized resellers, who are managed and directed by the Company's channel sales managers.  With the exception of online sales and demand parts services, the Company primarily sells its products and services through resellers.

**B.    The Company's Industry Dominance Became Threatened by Emerging Competitors**

43.    For years, the Company was the dominant player in the 3D printing industry and faced relatively little competition.  This began to change over time, as 3D printing technology became more accessible to the Company's competitors and a broader market of customers began to recognize the advantages and potential of such technology.  The Company's competitors began to grow in both size and number leading up to the Class Period.  By the start of the Class Period, the Company faced strong competition from large, well-capitalized 3D printing companies, such as Stratasys Ltd. and voxeljet AG, and a plethora of smaller start-ups such as Formlabs, Printrbot, and Solidoodle.  These competitors threatened 3D Systems' industry dominance by bringing a diverse array of products and services to market.  Moreover, the technology supporting those products and services was often distinct from, and arguably better than, the technology pioneered and employed by the Company, which further challenged its leadership status.

- 13 -

**C.     Pressured by Competitors, Defendants Embarked on an Acquisition Spree and Rushed to Introduce Dozens of New Products to Boost Revenue Growth**

44.     To counter the encroachment of competitors, Defendants embarked on an aggressive strategy to expand its market share through enlargement of its product and service offerings. Defendants' fundamental objective was growth, which they knew was critical for the Company to maintain its self-proclaimed status as the leading global provider of 3D printing solutions for "everyone" that could print "almost anything" and the source of the "most advanced and comprehensive" mix of 3D printing products of any company in the market. Moreover, Defendants knew that showing a continuing revenue growth trajectory was critical to portraying success to the market, thereby keeping the Company's stock price artificially inflated.

45.     Organic revenue growth – *i.e.*, growing its existing businesses and products – was not enough for Defendants. Rather, they sought to rapidly accelerate their expansion by buying dozens of smaller 3D printing companies and assets at a breathtaking pace. From 2008 through the end of the Class Period on May 5, 2015, the Company made over 40 acquisitions. The majority of these acquisitions occurred during a frenetic three-year period from 2012 to 2015, costing a massive sum of approximately $700 million in cash. The Company's acquisitions were global and diverse, located throughout the United States, Mexico, South America, Europe, and Asia. With these new companies came a wide range of newly acquired products and services such as direct metal printers, collectibles, medical imaging products, computer-aided design software, scanners, and on-demand custom parts.

46.     At the same time, the Company sought growth by releasing dozens of new 3D printing products to the market in an incredibly short period of time. These products were diverse in nature, targeting different types of technologies, price ranges, and customers. Some came from newly acquired companies and others originated from the Company's long-term manufacturing

facilities in Rock Hill, South Carolina.  With these products, the Company sought "near term significant growth" and a "first mover" advantage, in bringing cutting edge 3D printing technologies to market that had potential to expand revenue growth exponentially, before its competitors could catch up.

47.    Throughout the Class Period, Defendants repeatedly boasted of their growth strategy, and the increases in market share and revenue growth achieved and anticipated from that strategy.  In particular, Defendants continually touted the success of their five key "growth initiatives" – Manufacturing, Metals, Medical, Materials, and Mainstreet – fueled by new products, acquisitions, and other growth drivers (such as extended sales channels and increased demand from consumers and advanced manufacturers).  For example, at the beginning of the Class Period on October 29, 2013, Defendant Reichental was effusive about the Company's "record revenue" growth highlighting the role its new products and acquisitions played:

> Let me start by saying that we are very pleased to report record revenue for both the quarter and the year. . . .
>
> *        *        *
>
> Since the beginning of this year, we commercialized 12 new products. And the best is yet to come as we plan to launch just as many new products, including several breakthrough advanced manufacturing printers and professional scanners at EuroMold 2013 this December and cutting-edge consumer printers and scanners at CES 2014 this coming January.
>
> During the third quarter, we completed several acquisitions in support of our strategic growth initiative[s]. . . . We believe the power accelerated growth rate reflects the strength of our diversified portfolio, the productivity of our channels, and the effectiveness of our strategic initiatives.
>
> *        *        *
>
> Compared to the first half of 2013, third-quarter consumer products and services revenue nearly doubled . . . .
>
> *        *        *

Putting all of the pieces together, we are convinced that this is a unique moment for our business. The level of inbound interest is at an all-time high across both the advanced manufacturing and consumer sectors. Specifically, we sold out our current direct metal printers manufacturing capacity and decided to triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct-metal 3D printer models.

*          *          *

And to further extend our first mover advantage in key verticals, we decided to compress our plans to commercialize a number of significant new product, including several breakthrough advanced manufacturing printers and professional scanners before year end this year.

*          *          *

Armed with increased investments, we expect to expand our market share faster and enhance our competitive advantage further.

48.     In such a way, from the start of the Class Period onward, Defendants led the market to believe that its strategic growth initiative would lead to significant revenue growth with minimal downside. In reality, the Company's ambitious acquisition spree and product introductions created a host of serious problems for the Company, which rendered Defendants' touted revenue growth illusory.

**D.     Defendants' Aggressive Growth Strategy Caused Severe Integration Problems**

49.     Behind the scenes, Defendants struggled to integrate systems and operations of the many new companies they had acquired in a short time period. The Company also grappled with unique problems and limitations inherited from the new companies. Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating dozens of new and disparate acquisitions, compounded by the introduction of dozens of new products at the same time. This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company.

50.     3D Systems' growth-by-acquisition strategy had significant adverse effects on its operational and financial condition.  In essence, it became a roll-up business – a company built primarily through the acquisition of smaller companies with common services or products – and the companies it acquired were overpriced.  Additionally, as a result of this strategy, the Company had grown to a size where its personnel were spread too thin.  Indeed, despite the size of 3D Systems, it was being run as if it were a mom and pop company.  Moreover, 3D Systems had not been willing to put the effort into the backend of the Company and was more concerned with how the Company looked on the outside than on the inside.

**E.     The Company's Rapid Expansion Caused Manufacturing, Inventory and Shipping Problems that Slowed Growth and Inflated Costs**

51.     Defendants' aggressive and reckless growth strategy, which involved acquiring and introducing dozens of new companies and products in a severely compressed timeframe, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  The strategy also caused severe operational problems related to inventory and shipping.  As a result of these problems, expenses rose sharply, and the Company's sales and revenue growth took massive hits.  Ultimately, these problems forced Defendants to abandon their bullish revenue growth projections fueled by the Company's reckless expansion, and embark on an accelerated reorganization plan to improve efficiency, productivity, and costs.  The Company's stock plummeted when these problems were finally revealed to the market in a serious of negative announcements.

**1.     Manufacturing Problems Prevented Sales of the Company's Critical, In-Demand Products**

52.     During the Class Period, the Company's primary and overriding strategic objective was growth, largely fueled by acquiring new companies and releasing new products. Two categories of Company products – consumer and direct metal – factored heavily into the Company's strategic

growth initiatives (Manufacturing, Metals, Medical, Materials, and Mainstreet), and thus were critical to the Company's overall growth strategy. Indeed, at the start of the Class Period, Defendant Reichental told the market that "[t]he level of inbound interest is at an all-time high across both the advanced manufacturing and consumer sectors."

53.     However, Defendants' haphazard growth strategy hindered the production of their two key product lines. The direct metal and consumer printers suffered from severe manufacturing capacity and quality problems that badly delayed their release to the market. The Company lost critical sales dollars and revenue growth, damaging its reputation among customers. Investors were also disappointed, given that Defendants had relentlessly promoted the Company's direct metal and consumer printers throughout the Class Period.

<b>a.      Production Capacity and Quality Problems Hurt Sales<br>of the Company's Critical Direct Metal Line</b>

54.     The Company's "Metals" strategic initiative focused on the manufacture and sale of direct metal printers, which were "advanced manufacturing" printers used by business customers to create metal objects using an additive 3D printing process. 3D Systems acquired its direct metal printer business through its purchase of a 95% stake in Phenix, a manufacturer based in Riom, France, on July 15, 2013. In a press release announcing its completion of the Phenix acquisition, the Company boasted that Phenix "strengthens 3D Systems offerings and immediately positions it at the heart of these rapidly growing direct manufacturing opportunities." Defendant Reichental added in the press release that Phenix is "a strategic and differentiated addition to our extensive 3D content-to-print portfolio and we are thrilled to deliver these powerful solutions to our customers. Our proven track record in advanced manufacturing, combined with Phenix Systems extensive metals technology and expertise represents a true game-changer that empowers our customers to manufacture the future."

55.    A few months later, Defendants unveiled a new direct metal printer, the Pro X 300, at a major European trade show called EuroMold 2013 from December 3 - 6, 2013.  In a press release dated December 3, 2013 regarding a number of new product unveilings at EuroMold 2013, the Company touted the "[i]mmediate availability of the ProX 300 direct metal printer, the only industrial grade direct metal platform that was specifically designed for the most demand[ing] manufacturing floor conditions, delivering high density, metal printed parts from a large choice of materials and to very accurate precision.  The ProX 300 is the first Phenix system to be rebranded as part of [3D Systems'] rapidly expanding [direct metals] 3D printers family."  The Company added that it was also "immediately beginning to ship" its rebranded ProX 100 and ProX 200 direct metal printers acquired in the Phenix deal.  The following year, the Company showcased a new direct metal printer, the ProX 400, at EuroMold 2014 from November 25-28, 2014, which the Company described as "set[ting] the standard for high-capacity metal 3D printing, producing precise parts in a multitude of alloys."

56.    Throughout the Class Period, the Company continued to promote its direct metal printer offerings as highly demanded vehicles for immediate explosive growth and its ability to quickly ramp up manufacturing capacity to meet such demand.

57.    In reality, the Company was experiencing severe, undisclosed manufacturing problems that rendered such statements false and misleading.  The Company's manufacturing of direct metal printers was heavily dependent on its recently acquired French subsidiary, Phenix.  However, Phenix was a small company that was woefully unprepared for large-scale production.  Its manufacturing capacity was inadequate and could not be increased as rapidly as the Company represented to the market.

- 19 -

58.     Indeed, direct metal printers were hot products on the market, and as a result, the Company had no problem obtaining sales orders for direct metal printers.  However, the Company was unable to capitalize on these orders because capacity constraints and operational issues prevented it from manufacturing an adequate supply.  At no time during the Class Period could the Company build the machines fast enough to meet sales demand.

59.     The Company was unable to expand manufacturing capacity for direct metal printers for several reasons.  First, expanding manufacturing capacity was frustrated by operational problems at Phenix.  Following the acquisition, Phenix was overwhelmed trying to meet demand for the machines because it was receiving far more orders than before 3D Systems acquired it.  Phenix fell so far behind that neither it nor the Company ever caught up.  Moreover, the direct metal printers were very complex, highly-customized machines, involving a lot of intellectual property.  Thus, it was not possible to quickly expand or ramp up manufacturing.

60.     Despite these problems, to obtain sales orders, sales personnel were directed to tell customers that the Company would deliver direct metal printers in only six to twelve weeks.  In reality, the machines would actually be *quarters* away from delivery due to the Company's capacity problems.  The Company would wait to see which customers would cancel their orders, and then decide which were the most critical to fill.

61.     Capacity problems also strained the Company's relationships with resellers.  This happened because the Company could not fulfill resellers' direct metal printer orders despite the Company's prior demands that, to purchase direct metal printers, the reseller needed to purchase 3D Systems' laser-based printers as well.  Moreover, as the direct metal printers were not ready for sale in many ways, once they were finally released to the market, many of them were returned by customers.

**b.    Quality Problems Hurt Sales of the Company's Highly Anticipated Consumer Printers**

62.    During the Class Period, another hot product in the 3D industry was the consumer printer, a cheaper and smaller desktop unit marketed to consumers and small business owners rather than larger industrial customers.  Analysts and commentators predicted that consumer printers were poised to revolutionize the industry, targeting a huge, previously untapped source of sales revenue. To capture this anticipated demand, the Company heavily touted its consumer 3D printers during the Class Period, particularly its new and improved Cube 3 and CubePro printers.

63.    The Company trumpeted its new line of highly anticipated CubePro and Cube 3 printers at one of the world's largest trade shows attended by the Company's chief competitors, the Consumer Electronics Show ("CES"), on January 7-8, 2014, which was attended by Defendant Reichental and will.i.am, a popular entertainer hired by the Company to help promote its products. In a press release dated January 6, 2014, the Cube 3 was touted as "the first plug & play consumer 3D printer, priced under $1,000 for everyday use. . . .  [T]he new Cube prints at speeds that are up to 2X faster than other alternatives, and in expanded, finer resolution print modes and with greater materials selection."  In a separate press release on the same day, the Company touted the larger capacity CubePro as the first "professional quality" desktop printer available to consumers and prosumers (small business entrepreneurs and educators), offering "[f]aster, simultaneous printing in triple-color and multi-materials."  The Company continued to promote the Cube 3 and CubePro, signaling to investors that the Company was eminently poised to capture huge demand for those printers by releasing them to market in short order.

64.    In reality, significant problems also plagued the Company's consumer printers throughout the Class Period.  In particular, the CubePro was fraught with problems.  Everything was behind schedule in the Company's development and production of the CubePro.  There was not

enough time for a proper ramp-up by engineers working on the CubePro, and the resources and management allocated its development were inadequate. As a result, the CubePro's beginning shipment date was continually adjusted and moved as various issues arose.

65.     The CubePro and Cube 3 were not managed well by the Company, which failed to provide adequate written design requirements for those printers. Work on the printers was performed by a lot of independent groups who did not work well together. Defendant Reichental was pushing to get products out too fast (including new and big products at trade shows), which compromised design requirements and specifications. Marketing pushed development, resulting in subpar design jobs, which impacted both software and hardware designs. By way of example, the consumer printers were beleaguered by persistent software issues that required constant upgrades to the few beta models that had been shipped to some of the Company's larger customers for testing.

66.     Another quality issue the Company faced with respect to these printers, stemmed from the fact that, rather than scrap parts from its older line of CubeX printers, the Company used them in the CubePro, even though the CubeX parts were inferior to the upgraded parts that were supposed to be in the CubePro.

### 2.     The Company's Aggressive Growth Strategy Contributed to Poor Inventory Control

67.     Poor inventory control was an additional sign of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth. In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems. These problems caused operating inefficiencies, elevated expenses, and ultimately inventory write-offs that compressed gross profit margins.

68.     The Company experienced these substantial inventory problems at various facilities, including the Company's primary manufacturing facilities and corporate headquarters in Rock Hill,

South Carolina, where the Individual Defendants were based.  The Individual Defendants therefore had firsthand exposure to these problems, which were experienced on a severe and ongoing basis throughout the Class Period.

> **a.     The Company's Inventory Management Was Subpar Which Led to Costly Inventory Losses**

69.     3D Systems' overall inventory control was a mess during the Class Period.  The Company used an Oracle-based system to track inventory.  Problematically, the Oracle system was dependent on what inventory information was entered into it and there was no control over this process at the Company.  When an inventory discrepancy was discovered, users would change the Oracle system in an attempt to reflect the physical quantity on hand, but no explanation was provided as to why the amounts had changed or why the discrepancy had arisen.

70.     There were numerous discrepancies between the inventory numbers recorded in the Oracle system and the numbers physically held in the warehouse.  At the Company's Rock Hill, South Carolina warehouse, these problems prevented employees from finding parts that they needed to ship.  The Company's Oracle system would show that the warehouse had certain parts, but they were not located where they were supposed to be or could not be located at all.  And, at other times, parts were on hand that were not accounted for in the system.

71.     Other Company facilities were also plagued by inventory control problems.  For example, inventory was also a major headache for the Company's Andover facility, which it had acquired through the purchase of Z Corporation in January 2012.  The facility experienced a problem in which bills of materials failed to show all of the parts used in building the Company's printers.  This problem affected the accuracy of inventory counts, which were off by millions of dollars, as well as cost of goods accounting.  This problem persisted for three years following the acquisition of Z Corporation.

72.     Similarly, the Company had difficulty accounting for the value of inventory of one of its newly acquired companies, which had the majority of its operations in Israel.  This created difficulties in determining the ending balance of the acquired company, which impacted the amount of goodwill 3D Systems would assign to it.

73.     Additionally, the Company experienced significant returns of printers during the Class Period at its Rock Hill, South Carolina facility due to quality issues.  The Company experienced product returns all the time because its machines were constantly malfunctioning.  Product returns created serious problems in terms of both their volume and the Company's handling process.  In particular, the Company's older line of CubeX consumer printers were frequently returned, involving pallets upon pallets of returned products.  Such heavy returns resulted from the poor quality and lack of durability of the printers, which caused problems during shipping.  Heavy returns were a byproduct of the Company's culture of getting products out the door and dealing with the consequences later (*i.e.*, returned products).

74.     Upon return, products were taken apart, and some parts were returned to inventory for reuse.  Teardowns generally took place before the returns were processed into the Company's inventory system.  As a result, these parts were not properly accounted for in 3D Systems' inventory management system.  Rather, the Company simply hoped to reconcile any inventory discrepancies at the end of the year.

75.     In contrast to other companies, which used multiple teams to count and cross-check their physical inventory, 3D Systems simply undertook one physical count and compared it against information extracted from the Oracle system.  No second count was taken as a matter of course.  3D Systems' physical inventory counting process took considerable time to complete, upwards of three weeks.  Indeed, in January 2014, 3D Systems conducted its annual physical inventory at the finished

goods warehouse to verify amounts reported in the Company's system.  This physical count, which included some component inventory, failed to account for $2.5 million in inventory, which was increased to $3.0 million in a subsequent recount.

> **b.     The Company's Operations Suffered from Out of Stock and Obsolete Inventory**

76.     The Company also suffered from out-of-stock inventory near the ends of quarters.  On a regular and recurring basis, towards the ends of quarters, there were insufficient materials available with which to build certain of the Company's printers.  The reason various materials were out of stock was because 3D Systems did not pay its vendors until the beginning of a new quarter so that the Company's numbers for the preceding quarter would look better.  This made it difficult for assembly personnel, who were often tasked within the last several weeks of a quarter to work large amounts of overtime to build printers before a quarter's end, even though necessary materials were often out of stock.  Parts in short supply varied quarter to quarter and included shortages of the main chassis cart for machines, as well as heating blocks and circuit boards.  Sometimes the entire assembly process had to stop until the parts became available.

77.     Obsolete inventory was also  a problem at 3D Systems.  The Company never got rid of anything despite its lack of usefulness, and still counted it as active inventory in the Oracle system.

> **3.     The Company Was Forced to Write Off Inventory**

78.     3D Systems' pervasive inventory problems materially hurt the Company during the Class Period.   They created costly operating inefficiencies, and forced the Company to take inventory write-offs that compressed gross profit margins.   Specifically, on July 31, 2014, Defendants announced that the Company's gross profit margin had decreased, reflecting "the absorption of a one-time inventory write off from our aggressive shift to multiple new products,

which accounted for a 1.3 percentage points compression." Obscuring the Company's true inventory problems, Defendant Gregoire claimed that the write-off arose from an inventory increase driven by "the numbers of new [product] launches that we had." The Company's stock price declined sharply (14.5%) when this was revealed to the market, along with other significant operating problems detailed herein.

79.     Notwithstanding this "one-time" write-off, the Company's inventory problems persisted throughout the remainder of the Class Period. On August 6, 2015, Defendants announced that gross profit margin was again hurt by the need to write off inventory in the second quarter of 2015. Again failing to acknowledge the Company's significant inventory issues, Defendants blamed this second write-off on "manufacturing facility" consolidations as a result of its strategy to eliminate operating inefficiencies.

**F.     Defendants Were Forced to Rush Shipments at the Ends of Quarters to Meet Their Unrealistic Revenue Growth Projections**

80.     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters. Citing scores of new acquisitions and products, Defendants continually boasted to the market that the Company was experiencing explosive growth, and that such growth would be even greater in upcoming quarters:

> We firmly believe that these accelerated investments that already resulted in the announcement of 24 new products over the past nine weeks position the company to double its revenue over the next couple of years on organic growth of at least 30% going forward and to achieve greater earnings power and profitability over the long term.

*See, e.g.*, ¶143.

81.     These lofty projections kept the Company's stock price inflated, but were nearly impossible to meet in light of the Company's myriad operational issues. This led to a mad scramble at the end of each quarter to attempt to match the Company's aggressive revenue projections. As a

result, the Company experienced myriad quarter-end issues, including rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices.

**1.     The Company Was Forced to Discount Products and Relax Sales Terms**

82.     The Company's desire to bill as much as possible at the ends of quarters led to costly discounting, relaxed approvals and payment plans, and other customer-friendly terms.  There were inconsistencies as to which customer shipments were permitted at the ends of quarters versus other times of the year.  The Company was a lot less rigid during the ends of the quarters, especially about shipping orders to customers who were late in paying what they already owed to 3D Systems.  In some instances, such customers were in arrears by as much as 90 days.  The Company was willing to release orders even if the customer had, for example, an outstanding balance of $100,000 that it owed to 3D Systems but was now seeking to order another $100,000.  The Company also lifted credit holds at the ends of quarters to ship new orders to customers whose payments for prior orders were past due.

83.     The Company also offered discounting and relaxed, customer-friendly approvals and payment terms at the ends of quarters to achieve its goal of shipping as much as possible before quarter end.  Indeed, the Company was willing to offer customers good deals to purchase units, such as discounted prices and a few weeks to pay for the orders.  This was done for the purpose of driving sales so products could be shipped before the quarter end.  The Company also offered extended payment terms to close deals at quarter end.  For example, instead of 30-day payment terms, the Company might extend payments to 60, 90, or even 120 days.

84.     The Company also engaged in another form of discounting with respect to its resellers, with whom it had arrangements, whereby the resellers would purchase printers at a

discounted price with the ability to return some of the printers. For example, 3D Systems would sell two $100,000 printers to a reseller at a discounted price of $75,000 each on the condition that the reseller would buy four printers instead of two, and return the two printers they did not want. These arrangements mainly involved sales of 3D Systems' mid-level printers costing up to $300,000. As such, it was common for customers to place orders on the last day of the quarter, and then return some of the shipped products within a week.

### 2.      The Company Engaged in Questionable Shipping Practices

85.     Additionally, the Company engaged in a variety of other questionable shipping practices to ensure as much revenue as possible at the ends of quarters. For example, the Company shipped incomplete orders to customers (*i.e.*, ship short), such as five gallons of binder (the consumable portion of an order) without the actual printer that was ordered. Shipping the binder alone made little sense as it would be of no use to the customer if there was no printer. In some instances, the customer would be told missing parts had gotten lost.

86.     And, late at night at the end of every quarter, at least one or two machines would be shipped without being fully tested. For example, prior to shipping, all of the legacy Z Corporation machines were supposed to go through a final burn-in test, but sometimes this test was not adequately performed on machines shipped at the ends of quarters. Without the burn-in testing, it could not be guaranteed that the machines would work as they were supposed to when they reached a customer.

87.     At times, 3D Systems also engaged in a practice of shipping products past midnight local time of the last day of a given quarter and counting such products as having been shipped before the end of the quarter. The Company would continue shipping until 3:00 a.m. local time on the East Coast with the rationale that it was not yet midnight in California.

88.     In addition,  in some instances, the Company's end-of-quarter shipments were sent to an intermediary warehouse (operated by a freight forwarding company called Ceva), where the products would remain for a day or two days, or even as much as a week or two weeks, before they went to the customer.  This might be because not all of the paperwork for the order had been prepared and/or the customer might not be expecting delivery of the products so soon.  Products sent to this intermediary warehouse were still classified as shipped by 3D Systems so revenue could be recognized.  The Company had a dedicated truck trailer for such products sent to Ceva.

89.     The Company also reported printers as being sold in circumstances in which they were not subject to a real sale.  The Company sometimes would begin the shipping process to obtain a bill of lading for a transaction, but then tell the freight company to send the product back to the Company before it was actually delivered to the customer.  In other instances, 3D Systems would invoice customers for a sale that never occurred.

90.     And, the Company's pressure to book and ship as many orders as possible resulted in extremely long hours and overworked conditions at the ends of quarters.   Indeed, Company personnel had to work 18 to 20 hours per day and until the early hours of the morning to ship as much product (including replacement parts and printers) as possible at the ends of quarters – *i.e.*, so that everything could be reported as getting on a truck.  Employees would stay late to bill everything possible so that the Company could report as much revenue as possible at the ends of quarters.

91.     Ultimately, despite these desperate measures, the Company was not able to wring out the revenue necessary to meet Defendants' unreasonable projections.  As a result, Defendants were forced to lower the Company's bullish revenue guidance, causing the Company's stock price to drop precipitously when the market learned the truth.

G.     **Numerous Facts Support Defendants' Knowledge of the Company's Undisclosed Financial and Operational Problems**

92.     Defendants knew of, or at a minimum, were severely reckless in disregarding, the undisclosed problems caused by the Company's rush to acquire new companies and introduce new products, rendering the Company unable to capitalize on customer demand (due to severe quality and capacity issues affecting the Company's direct metal and consumer products) or resolve costly inventory and shipping problems.  This is supported by numerous additional indicia of Defendants' knowledge, including Defendants' intimate involvement with shipping and revenue recognition decisions, their own Class Period statements, and the fact that such issues affected core operations of the Company.

1.     **The Individual Defendants Were Aware of and Responsible for the Desperate Measures Taken to Try and Meet Revenue Goals**

93.     Defendants Reichental and Gregoire played a direct role in driving the Company's quarter-end shipping practices.  Both Defendants participated in quarter-end meetings held in the main conference room located at the front of the Company's Rock Hill facility to discuss orders and shipments with members of the Customer Service, Production, and Shipping Departments. Defendant Reichental was very hands on at the meetings, and would say "go ahead and ship" even when there were questions about whether to do so.  Sometimes Defendant Gregoire would disagree, and the two executives would argue back and forth before reaching a decision.  In some circumstances, Defendants Reichental and Gregoire would get together and decide to ship notwithstanding a credit hold on a customer's account.

94.     In addition to these meetings, Veronica McLamb, a Customer Service Manager, sometimes met with Defendants Reichental and Gregoire at the ends of quarters to discuss whether to ship certain orders, and to determine the priorities of shipments. Defendants Reichental and

Gregoire gave shipment approvals in the form of e-mails. Moreover, Defendant Gregoire was involved in daily calls at the ends of quarters to discuss shipments with the heads of every manufacturing operation in the Company. Defendant Reichental also participated in some of these calls, which were intended to go over the numbers needed to meet the quotas for the period in terms of the number of machines each division needed to ship. A term often used during such calls was "filling the pipeline."

95.    Defendants Reichental and Gregoire were also involved in deciding when and how the Company recognized revenue on customer orders. Defendant Gregoire was the person Company employees contacted for approvals as to what could be recognized as revenue.

96.    And, as detailed below, Defendants' own statements confirm their intimate involvement and awareness of the Company's acquisition strategy, growth initiatives, product development and launches, and product performance. They were hands-on executives during their tenure at the Company. Indeed, Defendant Reichental was a micromanager who fostered a "build, build, build" environment at the Company. Not only would Defendant Reichental visit the Company's production area, but he would ask highly detailed questions of production personnel (*i.e.*, why a production worker was using a particular type of wrench).

### 2.    Defendants' Own Public Statements Confirm Their Knowledge of the Company's Problems

97.    Defendants made numerous public statements in which they discussed the Company's acquisition and product-fueled growth strategy, their direct metal and consumer printers, and their shipping and inventory practices. In fact, Defendants were asked and answered detailed questions about at least one of those matters during every quarterly earnings call with securities analysts throughout the Class Period. In particular, Defendants boasted of the success and promise of their new acquisitions, the attractiveness and demand for their direct metal and consumer products, their

expanding manufacturing capacity (particularly with respect to direct metal printers), and the resulting revenue growth fueled by such factors. Defendants echoed these statements in numerous press releases and SEC filings of the Company. *See, e.g.*, ¶¶122-125, 142, 147-149, 164-165, 176-180, 194-195, 205-207, 219-221. These statements evidenced Defendants' personal knowledge of such matters.

98.     For instance, on August 7, 2014, Defendant Gregoire responded as follows to a question on the operational challenges generated by acquisitions, confirming Defendants' intimate involvement in the integration of such acquisitions:

> Operationally, when you're talking about like a financial integration and things that, (inaudible) and it happens very easily, very quickly. And ***operationally, we have a roadmap to get there quickly.*** The hardest thing is usually culture, right, and it's the thing to build in and bring people into our culture as quickly as we can and get everybody under a same company mentality, not as -- everybody says it can be difficult, but it's even more difficult at times than you may think. ***And we spent a lot of time focused on that to achieve that.*** Because you're never going to get any other synergies or growth until you have that in my mind.

99.     Defendants made the following additional statements during the Class Period, evidencing their personal knowledge and hands-on approach to understanding and diligently managing the Company's business, including decisions, actions, analyses, and testing related to the Company's direct metal and consumer printers.

- We believe that our portfolio's diversity, ranging from direct metal printers at the high end to desktop consumer printers at the low end, is best positioned to capture this unprecedented market opportunity, and expect that our decisive actions will extend our first mover advantage in key verticals. (Defendant Reichental, October 29, 2013 press release)

- We entered the fourth quarter with positive sales momentum driven by increased demand for advanced manufacturing and consumer activities. We expect the decisive steps we have taken to accelerate our growth rate and market share expansion to deliver continued success, and we expect to launch breakthrough products, including several advanced manufacturing printers and professional scanners at EuroMold 2013 early this December, and cutting-edge consumer printers and scanners at CES 2014 early this coming January. (Defendant Reichental, October 29, 2013 earnings conference call)

- [W]e together conducted under Damon [Gregoire]'s leadership, a very careful and complete analysis. We have fairly good visibility of the remainder of the year in terms of the puts and takes that could influence gross profit margins. And we concluded that, excluding these transitional factors and one-time items that Damon already talked about, the fundamentals are intact. (Defendant Reichental, July 31, 2014 earnings conference call)

- We conducted an extended data testing because we are focusing on how to mainstream, particularly the adoption of the new Cube 3 and the CubePro. And in the process, in very close communications with dozens of beta testers, we identified several user experience enhancements that we believe had the potential to competitively enhance our brand, and we decided to take time to incorporate them even at the expense of short-term revenue pressure. And we are happy to report that our rising orders suggest that we made the right call. (Defendant Reichental, July 31, 2014 earnings conference call)

- [I]t's important to note that in a concentrated new product launch period, the initial series of a new printer cost of goods is much higher than what happens as you normalize it into higher volumes. We have a period of pre-tooling series and other elements when we launch new products, which very quickly within a few periods, worked their way out into normalized cogs. And all of that is factored into the careful analysis that we did. And that's what gives us the confidence that margins not only will rebound, but will continue to expand. (Defendant Reichental, July 31, 2014 earnings conference call)

- So we have -- we've done most of [the integration of acquisitions] internally. We have a core team that does the identification, the negotiation, made up of Avi [Reichental], Damon [Gregoire], and Andy [Johnson] -- our CFO, CEO, and General Counsel. And then they bring in, depending on the acquisition, the other senior management teams to look at the business, to look at what's the underlying components of it. (Stacy Witten, 3D Systems' Investor Relations Director ("Witten"), March 12, 2014, Piper Jaffray Technology, Media and Telecommunications Conference)

- To be clear again, we have deliberately and in a very disciplined way resisted the temptation to introduce and make these consumer products available prematurely because we have the at-home audience in mind and we wanted to make sure that we have an incredibly easy to use plug and play user experience. . . . But we have received very favorable user responses that validate the decision. And we expect, not just in the fourth quarter, but going into next year we expect to realize increasingly growing revenue from our Consumer Products. (Defendant Reichental, October 22, 2014, earnings conference call)

100.    Defendants' repeated statements regarding those matters also supported their materiality to the Company's financial and operating results and prospects.  The Company's new acquisitions and products were vital to maintaining the Company's aggressive growth strategy and its broad market share as a provider of diverse 3D printing products for "everyone," including in-demand direct metal and consumer products.

101.    The materiality of those matters is further supported by securities analysts' focus on them during the Class Period.  For example, in October 2013, J.P.Morgan raised its estimates on the Company, noting "stronger than expected revenue, in part buoyed by acquisitions"; BB&T Capital Markets ("BB&T") noted 3D Systems' "blistering growth"; and Brean Capital, LLC expressed an "increased conviction" in its Company stock price target based on accelerated growth.  In February 2014, Deutsche Bank issued a report stating, "we expect revenue growth to remain solid" based on the Company's introduction of 24 new products; BB&T said, "[t]he silver lining is [the Company's] organic growth" estimates remaining at 30%; RBC Capital Markets ("RBC") expressed "comfort" in the momentum of the Company's "very robust" organic growth; and Canaccord Genuity, Inc. ("Canaccord") recommended that investors buy 3D Systems stock because of the "strong demand for DDD's Phenix metal printer line."  Clearly, Defendants' positive statements were material to analysts and the market.

### 3.    The Company's Problems Involved Core Operations of the Company, Supporting Defendants' Knowledge

102.    Similarly, Defendants' knowledge is further supported by the fact that the operating problems involved the Company's core operations, including its direct metal and consumer printers, its growth strategy via new acquisitions and products, and its shipping and inventory operations, which were vital functionalities of the Company.  This is evidenced by Defendants' own public statements emphasizing the importance of such products, strategy, and operations and the fact that,

as discussed above, these matters were frequent and repeated topics of discussion throughout the Class Period. *See* Section V. For instance, on February 28, 2014, Defendant Reichental specifically rejected the notion that direct metal printing was a "small niche" and emphasized that "direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years, and our plan is to as much as quadruple sales over the next 12 to 18 months. We believe that plan is fully consistent with the growing demand of our expanding direct metal lineup." In addition, the Company's annual and quarterly filings promote "Metals" and "Mainstreet" as two of its five key growth areas (encompassing direct metal and consumer 3D printers, respectively). Moreover, the core nature of the Company's acquisition growth strategy is supported by its massive expense – approximately $700 million within a brief three-year period just to close the acquisitions (not counting any subsequent costs to integrate them).

103.     During the Class Period, the Individual Defendants were the highest-ranking officers of the Company (Defendant Reichental was CEO, Defendant Gregoire was CFO, and then Defendant Hull was CFO). Thus, Defendants were heavily involved with such core operations and knew of material problems affecting them and the impact of such problems on the Company's financial results and prospects.

**H.     Defendants Misled the Market and Failed to Disclose the Company's Pervasive Financial and Operational Problems**

104.     Despite being fully informed that the Company was experiencing material operating, manufacturing, and product quality problems due to its aggressive acquisition and product growth strategies, Defendants failed to disclose these facts to the market. Instead, throughout the Class Period, as further detailed in Section V, below, Defendants repeatedly misled the market by boasting of the Company's strong growth rate, substantial demand, expanding manufacturing capacity, and new acquisitions and products, particularly their in-demand direct metal and consumer printers.

105.    For example, on October 29, 2013, the Company raised revenue guidance and boasted that "[f]or the third quarter in a row, the company expanded its manufacturing capacity to accommodate increasing demand for its products and services," while Defendant Reichental touted "*another record revenue quarter on unprecedented printer units demand that more than tripled last year's unit sales*."  The Company attributed this "record revenue" to "[n]ew products, extended channels, strong advanced manufacturing, and consumer demand and, to a lesser extent, acquisitions" and promoted the launch of "several breakthrough advanced manufacturing printers" and "cutting-edge" consumer printers in December 2013 and January 2014, respectively.  According to Defendant Reichental, the Company expected to triple manufacturing capacity over the next 12 months, enabling it to keep up with strong demand for direct metal printers.

106.    On February 28, 2014, Defendant Reichental once again touted "another record revenue quarter" fueled by strong demand (particularly with respect to direct metal printers), and announced lofty plans to "double our revenue over the next couple of years."  Defendant Reichental also expected that the Company's recently unveiled consumer products (including the CubePro and Cube 3) would "as much as triple" consumer revenue starting in the second half of 2014, boasting of the "overwhelmingly positive reception" of the Cube products at the 2014 CES.

107.    On April 29, 2014, the Company touted the fact that it had begun shipping its Cube 3 and CubePro consumer products, and that such shipments were expected to produce "accelerated growth in our consumer category in the second half of this year."  The Company also hyped demand for direct metal printers, and "very positive" gains in adding manufacturing capacity to capture such demand, leading to accelerated revenue growth.  For example, Defendant Reichental stated:

> We entered the second quarter of 2014 with positive sales momentum and increased backlog, driven by continued strong demand for advanced manufacturing activities across all of our categories. As our new, faster, and more advanced 3D printers and materials gain traction, we expect accelerating revenue growth through the second

half of this year. We continue to view Direct Metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple Direct Metal printer sales over the next 12 to 18 months.

Armed with our new, powerful products lineup, expanded channels, partnerships, and alliances, we believe that in the second half of this year consumer products and services could also represent a substantial upside.

108.     Moreover, Defendants downplayed and failed to disclose the true extent of operational problems caused by the Company's aggressive acquisition strategy. On August 27, 2014, Defendant Gregoire stated that "when you're talking about like a financial integration . . . it happens very easily, very quickly. And operationally, we have a roadmap to get there quickly." He said the hardest thing was "culture," but assured analysts that the Company had spent a lot of time to achieve it.

## I.     The Company's Stock Price Ultimately Collapsed When the Market Learned of the True Extent of the Company's Problems

109.     Defendants' bullish statements succeeded in propping up the Company's stock price throughout the Class Period. By July 31, 2014, however, Defendants could no longer hide the Company's mounting problems, which began to leak out in a series of public revelations. Before the market opened that day, the Company surprised investors by issuing a press release and earnings call statements with disappointing financial results for the second quarter of 2014. Defendants attributed these problems to an inability to increase manufacturing capacity quickly enough to meet demand for direct metal printers, and a delay in the release of its new Cube 3 and CubePro consumer printers to "improve user experience." As a result of these problems, Defendants reported drastically reduced revenue ($151.5 million vs. forecasted $162.3 million) and organic growth (10% vs. 28% the previous quarter), which stood in contrast to the 30% organic growth Defendants touted during the Class Period. Defendants also reported compressed gross margins (47.8% vs. forecasted 51%),

reflecting an inventory write-off resulting from the Company's "aggressive shift to multiple new products."

110.    In response to this news, the Company's stock price fell sharply.  After closing at $56.07 per share on July 30, 2014, the stock closed at $50.13 per share on July 31, 2014, on unusually high trading volume of nearly 13 million shares.  The stock dropped further on the following day, as the market continued to digest the news, and numerous analysts, including Citigroup, Piper Jaffray & Co. ("Piper Jaffray"), and RBC, downgraded their ratings or lowered their price targets for the stock.  The stock closed at $47.93 per share on August 1, 2014, on unusually high trading volume of nearly 6.5 million shares.  The total stock price decline over this period was 14.5%, or $8.14 per share.

111.    The Company's disclosures stood in stark contrast to Defendants' false and misleading Class Period statements described in Section V, below, which touted the Company's increasing manufacturing capacity, ability to meet sales demand, and continued revenue growth. The resulting stock decline would have been even greater had the Company revealed the full extent of the Company's operating problems.  However, Defendants continued to mislead the market as to their severity, implying that production improvements were right around the corner, and failing to disclose the full adverse impact of Defendants' acquisition strategy and product expansion.

112.    Contrary to these statements, the Company revealed continuing manufacturing problems before the market opened on October 22, 2014, when it disclosed preliminary earnings for the third quarter of 2014 in a press release and conference call with analysts.  Defendants announced a "revenue shortfall from the continued manufacturing capacity constraints for our direct metal printers and delayed availability of our newest consumer products [the Cube 3 and CubePro printers]."  During the call, Defendant Reichental remarked:

Quite frankly, we were very disappointed that we failed to fully capitalize on the robust demand for our direct metals and consumer products during the quarter.

While we worked very hard to deliver these products sooner, achieving manufacturing scale, quality and the user experience targets took us significantly longer than we had anticipated. At the end of the third quarter we did bring online a second direct metal 3D printer manufacturing line and are ramping up production for deliveries in the fourth quarter.

As we said previously, notwithstanding marketplace pressure, we elected to postpone shipments of our latest consumer product until we are fully satisfied with their performance capabilities and user experience and that contributed to the shortfall in the quarter. Now that we have effectively closed this product availability gaps we expect our revenue growth rates to increase.

As a result of these problems, the Company missed Wall Street expectations for revenue and earnings per share ("EPS"), and cut its full-year revenue and profit outlook.

113.    On this news, the price of 3D Systems stock plummeted once again and analysts such as Deutsche Bank and Needham & Company LLC ("Needham") downgraded their ratings for 3D Systems stock. After closing at $43.38 per share on October 21, 2014, the stock dropped 15.5% ($6.71) to close at $36.67 per share on October 22, 2014, on unusually high trading volume of more than 15 million shares. Once again, however, the stock decline would have been larger had the Company revealed the full truth to investors. But Defendants continued to downplay and mislead investors about the Company's operating and financial problems, suggesting they had resolved the issues affecting its consumer and direct metal printers, and would soon be in position to fully capitalize on demand.

114.    However, the bad news continued to leak out. The Company revealed additional problems before the market opened on April 24, 2015, in a press release and conference call announcing preliminary financial results for the first quarter of 2015. In addition to lower demand (blamed on economic factors), the Company disclosed more problems affecting its direct metal printers, stating that "certain metal and nylon applications and performance issues delayed the

company's ability to sell additional printers during the quarter." Defendant Reichental called this "disappointing," and emphasized that "we are investing a great deal to completely step up our quality and control systems as a result of this discovery [of direct metal printer issues] because it was very upsetting to us."

115.    During the April 24, 2015 announcements, the Company also signaled that revenue growth had slowed, operating expenses had risen, and the Company was "accelerating [its] planned integration, productivity and efficiency measures" to address problems stemming from the Company's acquisition strategy. Defendant Reichental stated:

> We had a clear case here in the quarter where our revenue wasn't on plan, but our cash operating expenses were on plan and got a little bit ahead of us. That is something that [we] can certainly control, plan to control and expect to control, but not at the expense of our future growth plan. So we will continue to invest in R&D, we will continue to add positions that are critical to our success and at the same time, we're going to continue to eliminate some of the duplication and redundancy that we acquired from acquisitions and turn our organization into highly productive and efficient organization. That's the plan. And the speed bumps that we encountered in the first quarter gives us even more clarity and impetus about accelerating all of these activities.

116.    On this news, the price of 3D Systems stock suffered another large decline and additional analysts, including Piper Jaffray, Canaccord, and UBS, downgraded their ratings and lowered their price targets for 3D Systems stock. After closing at $30.15 per share on April 23, 2015, the stock closed at $27.23 per share on Friday, April 24, 2015, on unusually high trading volume of nearly 7.2 million shares. As the market continued to digest the news, the stock continued to fall the following trading day, closing at $25.28 per share on Monday, April 27, 2015, on unusually high trading volume of nearly 5.9 million shares. The total stock price decline over this period was 16.2%, or $4.87 per share.

117.    Following these preliminary announcements, the Company announced its first quarter 2015 earnings before the market opened on May 6, 2015. Defendants disclosed that they would

finally kill their ill-fated acquisition strategy and shift their focus to integrating all of the Company's acquisitions, improving operational productivity and efficiency, and cutting operating expenses. Regarding the Company's direct metal printer issues, Defendant Reichental attempted to reassure analysts that Defendants were not in denial, and instead were "all over them." Defendants disclosed a decline in organic revenue of 9% and an increase in operating expenses of 46% (compared to the first quarter of 2014). Moreover, Defendants revealed for the first time that they had decided to withdraw financial guidance for the remainder of 2015, leaving investors completely in the dark about the Company's prospects.

118.    On this news, the price of 3D Systems stock fell once again. After closing at $24.21 per share on May 5, 2015, the stock dropped 5.4% ($1.31) to close at $22.90 per share on May 6, 2015, on unusually high trading volume of approximately 6.4 million shares.

119.    The Company's revenue growth and stock price failed to recover after the Class Period. On November 4, 2015, the Company announced that its organic revenue growth had fallen to *negative 22%* for the third quarter of 2015. At the close of trading on November 27, 2015, the Company's stock price stood at $9.01 per share, *over 90% lower* than its Class Period high of $96.42 on January 3, 2014.

## V.    DEFENDANTS' FALSE AND MISLEADING CLASS PERIOD STATEMENTS AND OMISSIONS

120.    Throughout the Class Period, Defendants repeatedly made positive statements about the Company's strong revenue growth, which they attributed to substantial customer demand and the numerous acquisitions and new products introduced by the Company. However, these statements did not provide a full picture of the true circumstances at 3D Systems. In reality, this mass acquisition strategy left 3D Systems in a state of disorganized chaos because the Company was unable to effectively integrate the acquisitions. Meanwhile, the Company's rush to acquire new

companies and introduce a large number of new products in such a short time period negatively impacted the ability to deliver quality products to the market.  As such, the Company was unable to meet customer demand, leading to sales losses that annihilated the Company's revenue growth.

121.    When Defendants elected to make such positive statements about their acquisitions, new products, strong customer demand, and revenue growth, they were under a duty to disclose the additional negative information about the Company and its operations and products that would have made such positive statements not misleading.  Specifically, they were under a duty to disclose the Company's inability to effectively integrate their acquisitions, capitalize on customer demand due to severe manufacturing quality and capacity issues affecting critical new products, or meet their lofty revenue growth projections.  This information was material because it would have altered the total mix of information made available to reasonable investors.  However, Defendants failed to reveal this information, and instead omitted and concealed it from investors.   In addition, many of Defendants' statements about their acquisitions, products, operations, and growth projections were explicitly and materially false and misleading in themselves.  Defendants' material omissions and false and misleading statements are detailed in this section.

A.    **Defendants' False and Misleading Statements and Omissions from October 29, 2013 Through February 4, 2014**

1.    **Press Release, SEC Filing, and Conference Call Regarding the Company's Third Quarter 2013 Financial Results**

122.    The Class Period begins before the market opened on October 29, 2013.  On that day, 3D Systems issued a press release announcing exceedingly positive financial results for the third quarter of 2013.  In the press release, Defendant Reichental touted a "record revenue quarter on unprecedented printer units demand that more than tripled last year's unit sales," specifically citing demand for advanced manufacturing and consumer products.  Specifically, the press release announced a 50% increase in overall revenue growth from the prior year (including a 30% increase

in organic revenue growth and a 76% increase in printers/products revenue growth). It also raised revenue guidance for the remainder of 2013, from $485-$510 million to $500-$530 million.

123.    The press release also boasted that the Company was well-positioned to meet customer demand, citing increased manufacturing capacity: "For the third quarter in a row, the company expanded its manufacturing capacity to accommodate increasing demand for its products and services." Further, Defendant Reichental confirmed that the Company was launching an accelerated growth strategy, largely driven by new acquisitions and products (including Phenix direct metal printers), and that such growth was expected to improve results in the coming periods.

124.    On the same day, October 29, 2013, 3D Systems filed a Form 10-Q with the SEC reporting its financial results for its third fiscal quarter ended September 30, 2013, as discussed in the Company's press release and during its earnings conference call on October 29, 2013, including increased revenue growth and gross profit. It stated that the Company "continued to execute on our strategic initiatives, including . . . accelerating 3D printer penetration . . . building 3D consumer and retail products and services and expanding our integrated 3D authoring solutions platform."

125.    Defendants Reichental and Gregoire each signed a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") that the Form 10-Q "fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934" and that "the information contained in the Form 10-Q fairly presents, in all material respects, the financial condition and results of operations of the Issuer."

126.    Also on October 29, 2013, Defendants hosted a conference call with securities analysts to discuss the Company's financial results. Defendants Reichental and Gregoire participated on the call on behalf of the Company. In his opening remarks, Defendant Reichental again touted "record revenue for both the quarter and the year" (including a near doubling of third

quarter revenue from consumer products and services) and the strength of the Company's many new acquisitions and products.  He boasted of strong demand, particularly for consumer and advanced manufacturing products, and the Company's plan to rapidly expand sales of consumer printers and direct metal printers:

> Putting all of the pieces together, we are convinced that this is a unique moment for our business. The level of inbound interest is at an all-time high across both the advanced manufacturing and consumer sectors. Specifically, we sold out our current direct metal printers manufacturing capacity and decided to ***triple our manufacturing capacity over the next 12 months***, as well as accelerate the development of additional direct-metal 3D printer models.

127.    Defendant Reichental further highlighted the Company's "[u]nprecedented demand for our professional and consumer printers," positive sales momentum, and decisive steps to accelerate growth and increase market share, including the imminent introduction of "***breakthrough***" products.  Specifically, he referred to "***cutting-edge***" consumer printers and several advanced manufacturing printers to be introduced at two major technology trade shows, the CES conference in January 2014 and the EuroMold conference in December 2013, respectively. Regarding advanced manufacturing products, he highlighted the role of direct metal printers, stating the "addition of direct metal printers to our portfolio positions us at the heart of the rapidly unfolding advanced manufacturing opportunity."

128.    Defendant Reichental stated that the Company would materially accelerate spending on R&D and marketing to accomplish this goal, creating "temporary" pressure on earnings, to go for "accelerated market-share expansion ahead of earnings-per-share expansion."  He added that such a move was supported by "[o]utcomes and results from our earlier investments . . . with year-to-date-revenue from new products rising an impressive 75%" and expected to "expand our market share faster and enhance our competitive advantage further."

129.    Echoing these comments, Defendant Gregoire expounded upon the Company's updated revenue guidance based on "[c]ontinued unprecedented demand for our advanced manufacturing [and] consumer products." He also touted the Company's plan to "***triple our metals printers manufacturing capacity and to fast-track additional printers development***" based on "significant marketplace interest in our direct metals 3D printers."

130.    During the question and answer session that followed, Defendant Reichental continued to tout demand for the Company's direct metal and consumer printers:

> What we decided to do here, is that given the near-term market opportunities and also the rapidly changing competitive landscape, we felt that now is a good time to forgo a single quarter photo-finish in favor of shoring up the next few years because what is new here is we have ***greater than expected demand for both our professional and consumer printers.***

131.    Defendant Reichental added that, as a result of higher demand, the Company had "sold out on our metal printers capacity."   Following this comment, he emphasized that the Company would rapidly expand capacity "in every quarter" to meet such demand:

> Specifically to the direct metal question, the plan is afoot to expand our capacity in every quarter. It is a multi-pronged approached to do that, and our expectation is to get ourselves into a position where ***we can manufacture over the next 12 months three times the amount*** that we were able to manufacture in 2013.

132.    Separately, when Defendant Reichental was asked about the manufacturing capacity expansion at Phenix, and whether it could triple or quadruple from an estimated 12-15 units to 50 units of production capacity in the next year, he confirmed that "***[i]n terms of capacity planning those would be reasonable numbers to think about, yes***."

133.    In response to another question about ramping up production of direct metal printers, Defendant Reichental highlighted "groundbreaking" printers expected to significantly enhance recurring revenue generation:

> We think that metal printers as a category is and will continue to be accretive to our printers margins and we certainly expect metal materials to be accretive to our

materials margin. And we believe that the kind of investment that we are undertaking in metals and in also fast-tracking a group of nearly half a dozen new printers that we plan to introduce in the next few months, many of which are ***groundbreaking advanced manufacturing printers, will significantly enhance our recurring revenue generation capacity*** post those periods, namely materials at increasingly higher margins.

134.     Defendant Reichental was also questioned about the Company's multi-year organic growth rate, and whether it would accelerate from 20%-30% to a point greater than 30% going forward. He answered affirmatively: "we believe that we can accelerate the growth rate. And by definition, accelerating growth rates would be primarily organically driven."

135.     During the call, Defendant Gregoire assured an analyst that, despite higher operating expenses, "[w]e absolutely don't expect gross profit margin pressure in expanding our gross profit margin for [the fourth quarter of 2013] . . . . [T]his year we've continued to expand our gross profit margin and continue to expect that to occur."

136.     Analysts lauded 3D Systems' positive announcements of revenue growth, strong demand for direct metal and consumer printers, and the decision to triple manufacturing capacity. For example:

(a)     In a report dated October 29, 2013, Janney Capital Markets noted that the Company's "demand will expand faster than in the past in our estimation," and revised its fair value stock price estimate to $68 (up from $60); and

(b)     On October 29, 2013, Canaccord issued a report stating that "with the company expecting to triple production capacity for Phenix over the next 12 months, we are modeling 30 Phenix units in 2014. . . .  In addition, consumer surprised to the upside and looks to be a bigger driver of revenue than previously expected . . . ."

137.     The Company's stock price increased following Defendants' statements, rising from a close of $56.98 on October 28, 2013 to a close of $59.53 on October 29, 2013 (the day of such

statements).  The stock continued to climb on the following day, closing at $60.93 on October 30, 2013 for a total increase of 7% ($3.95) over the two-day period.  3D Systems stock continued to rise sharply over the next few weeks, reaching $80.60 on November 18, 2013.

138.     On January 3, 2014, 3D Systems stock reached an artificially inflated Class Period high of $96.42.

### 2.     Needham Growth Conference

139.     On January 15, 2014, Defendant Reichental participated in the Needham Growth Conference on behalf of 3D Systems.  During the conference, he touted the Company's growth and diversified offerings fueled by its ability to "quickly leverage" new acquisitions and quickly grow revenue from a large array of recently announced products (24 announced or launched in the past five weeks).  He also singled out consumer printers as key drivers of growth:  "we decided to fast-track our consumer offering and show it at CES 2014 because we learned that we have to own easy, we have to deliver easy, easy to own, easy to operate, easy to use, fun to deliver."

140.     Defendant Reichental concluded his comments by reiterating the Company's expectation that 3D Systems was poised to significantly increase its revenue:  "our expectation that is the trajectory for us is going to be ***doubling our revenue*** over the next few years and doing it with ***at least 30% organic growth***."

141.     The above statements from the Company's press release, Form 10-Q, and earnings conference call on October 29, 2013, and the Needham Growth Conference on January 15, 2014 were materially false and misleading and omitted material facts because:

(a)     Defendants struggled to integrate systems and operations of the many new and diverse acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies.  Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded

by the costly introductions of dozens of new products at the same time (including "24 new products and several key alliances during the past five weeks").  This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

        (b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to "fuel growth" through acquisitions and new product introductions was successfully growing the Company's "record revenue" (*e.g.*, "doubling our revenue over the next few years and doing it with at least 30% organic growth"), and maintaining its industry leadership position and "first mover advantage in key verticals," while presenting little downside other than temporary earnings and margin compression (*e.g.*, "[w]e absolutely don't expect gross profit margin pressure"), and temporary increases in investment-related operating expenses (¶¶122-135, 139-140);

        (c)     Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  Specifically, the Company did not have adequate manufacturing capacity to produce direct metal printers on a scale sufficient to meet consumer demand.  Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

        (d)     Defendants failed to reveal these manufacturing capacity and quality problems to investors.  Instead, they misleadingly stated that the Company would be able to meet "[c]ontinued unprecedented demand for our advanced manufacturing [and] consumer products" by aggressively rolling out products and dramatically increasing manufacturing capacity during the

Class Period (*e.g.*, "triple our manufacturing capacity over the next 12 months, as well as accelerate the development of additional direct-metal 3D printer models"). They also misleadingly boasted of the positive attributes, successful introduction, and strong customer reception of such printers, including the "groundbreaking" and "cutting edge" quality of direct metal and consumer printers (¶¶122-135, 139-140);

(e)     Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and achieving such projections. Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)     Poor inventory control was a consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth. In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems. These problems contributed to the Company's operating inefficiencies and elevated operating expenses, and ultimately led to inventory write-offs. However, Defendants failed to fully disclose these inventory-related problems to the market (¶¶67-79);

(g)     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters, to meet Defendants' aggressive revenue projections. This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters. These

problems contributed to the Company's operating inefficiencies and elevated operating expenses (¶¶80-91);

    (h) Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period, and claimed that such projections were justified by customer demand.  Defendants did not have a reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶122-135, 139-140); and

    (i) The Company's Form 10-Q for the third quarter of its fiscal year 2013 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

  **B.**  **Defendants' False and Misleading Statements and Omissions from February 5, 2014 Through April 28, 2014**

    **1.**  **Press Release and Conference Call Regarding the Company's Preliminary Fourth Quarter and Fiscal Year 2013 Financial Results**

142. On February 5, 2014, 3D Systems issued a statement announcing preliminary financial results for the full year 2013, which were in the range of the previously raised revenue guidance, "***on over 30% organic revenue growth and over 50% total revenue growth for the fourth quarter of 2013***," and much stronger demand for professional printers and materials.  However, the Company announced substantially compressed earnings and softer demand for on-demand parts and consumer products (which it later blamed on consumers waiting to buy new products recently announced at the 2014 CES).

143. In the statement, Defendant Reichental emphasized that the earnings compression was simply a function of the Company's accelerated growth strategy announced previously, with

required higher expenditures on R&D, manufacturing, and marketing.  He reiterated that the Company was still on track to grow revenue explosively and achieve greater earnings over time:

> As we previously stated, we are willing to tolerate earnings reduction and even slight gross profit margin compression during this period to substantially accelerate our growth rate and market share. We firmly believe that these accelerated investments that already resulted in the announcement of 24 new products over the past nine weeks position the company to **double its revenue** over the next couple of years on **organic growth of at least 30%** going forward and to achieve greater earnings power and profitability over the long term.

### 2.    Stifel, Nicolas Technology, Internet & Media Conference

144.    On February 10, 2014, Defendant Gregoire participated in the Stifel, Nicolaus Technology, Internet & Media Conference on behalf of 3D Systems.  In his opening remarks, Defendant Gregoire expanded on the Company's recent preliminary earnings announcement, once again emphasizing the Company's explosive revenue growth:

> So for the fourth quarter, we expect to announce that revenue growth was over 50% on over 30% organic growth, with our gross profit margin slightly compressed sequentially. . . . We introduced about 24 new products in five weeks, which is a catalyst for growth for us. . . . New product revenue rose 79% versus Q3 of 2012, and new product revenue grew 75% compared to the first nine months of 2012, too. . . . **But we also expect our revenue to double over the next couple of years, too, and remain a plus-30% organic growth rate.**

145.    During the question and answer session that followed, Defendant Gregoire responded to a question concerning the Company's goal of achieving 30%-plus annual organic revenue growth and comparative expectations in the broader industry market growth rate, boasting that 3D Systems would reach the organic growth rate while others in the industry would not:   "I don't believe that any -- that they get really to this 30%-plus rate. . . . So I think we believe that we're going to grow faster than the space does and expand our leadership position out there with that."

146.    Defendant Gregoire responded to a question concerning the Company's acquisition strategy, touting the purchase of Phenix and its ability to produce:  "We said already that after we bought them, we're in the process of tripling capacity. And that's what's really pacing our growth in

Phenix right now, is the ability to produce. We sold out last quarter, we announced, of all of our capacity." Defendant Gregoire added that the Company was "very happy with what we've done" with respect to its acquisitions strategy.

### 3. Press Release and Conference Call Regarding the Company's Fourth Quarter and Year End 2013 Financial Results

147.    On February 28, 2014, 3D Systems issued a press release announcing the Company's financial results for the fourth quarter and year ended 2013.  In the press release, Defendant Reichental boasted about "another record revenue quarter on robust professional and advanced manufacturing printers' demand, increased materials' growth rate and total unit sales that ***more than tripled last year's units***."  The press release also announced continued expansion of its manufacturing capacity "to accommodate increasing demand," and expectations that the Company would achieve 30% organic revenue growth in 2014 ($680-$720 million expected revenue) and double revenue over the next two years.  Defendant Reichental added that revenue would have been even higher, but a "stronger order book" resulted in increased backlog.

148.    On the same day, February 28, 2014, 3D Systems filed with the SEC a Form 10-K reporting its financial results for the fiscal year ended December 31, 2013, as discussed in the Company's press release and earnings conference call on February 28, 2014 summarized herein. The Form 10-K detailed financial results including increased revenue growth and gross profit.  It also stated that the Company was "continuing to expand our global facilities and increase manufacturing capacity to meet demand for our products and services. . . . We are also expanding manufacturing capacity in our other facilities for printers, including at least tripling our direct metals printers' production output."  The Company stated that it was "pursuing a growth strategy" and "working to accomplish our growth initiatives organically and, as opportunities arise, through selective acquisitions," including the building of consumer products.

149.    The Company's 2013 Form 10-K also contained SOX certifications by Defendants Reichental and Gregoire that were materially similar to those identified above in ¶125.

150.    Also on February 28, 2014, the Company held a conference call to discuss its financial results.  Defendants Reichental and Gregoire participated on the call on behalf of the Company, again touting record revenue, triple unit sales, and new product introductions expected to accelerate organic revenue growth.

151.    In particular, Defendant Reichental highlighted rising demand for the Company's direct metal printers, resulting in a "healthy" backlog of orders to be addressed by a rapid expansion of manufacturing capacity, and importance of direct metal printers to the Company's growth:

> Demand for our direct metals 3D printers continues to rise. Major OEMs and service providers alike are investing in our ProX direct metals printers because of their capability the most demanding industrial-grade precision metal parts. In the fourth quarter, we again sold out our direct metal printers manufacturing capacity and exited the quarter with a healthy backlog of metal printers ordered.
>
> *                *                *
>
> Based on our current lineup of direct metal printers, customer demand, and planned capacity expansions, we expect our direct metals business to generate between $25 million and $50 million of revenue in 2014, and for metals, this represents the beginning. ***Some may view this as a small niche; however, we believe that direct metal printing represents one of the most important and exciting advanced manufacturing growth opportunities over the next few years, and our plan is to as much as quadruple sales over the next 12 to 18 months.*** We believe that plan is fully consistent with the growing demand of our expanding direct metal lineup.

152.    Defendant Reichental emphasized that the anticipated direct metal printer growth would be organic in nature, based on the attractiveness of the current product line:

> Jim, clearly the growth in metal that we anticipate is going to be based on our organic efforts to grow that product line. . . . And what gets us there is basically the attractiveness of the current product line. It is very attractive because of the unique capabilities and differentiating output that it delivers. And based on the current funnel of opportunities in the order book and also based on our plans to fast-track a larger format direct metal business, we think that the combination of the product and the extended channel that we have, ***we can continue to drive those kinds of growth rates just on our own volition, without any assistance from any other activities.***

- 53 -

153.    Defendant Gregoire also discussed direct metal printers, and the ability to quickly expand capacity to meet demand, stating that "[w]e are in the process of tripling capacity over -- from that period over this next year. And if metals continues to do what we would expect and everything, you can expect additional expansion, and that's a good thing."

154.    In addition to direct metal printers, Defendants Reichental and Gregoire heavily trumpeted the Company's consumer printers.   Promoting the demand, revenue generation, and quality of consumer printers, Defendant Reichental stated:

> We believe that the consumer opportunity is nascent. It's in its early innings, and during 2013, we conducted a series of experiments and built the channels, the retail presence, and product line. It is worth noting that despite some quarterly bumps, largely of our own making, we managed to *triple our consumer revenue* for the full year and have sold over 22,000 consumer printers since the 2010 inception of our consumer initiative.
>
> And we are just beginning. At CES 2014, we unveiled 20 new prosumer, consumer, and retail products, and we came away from CES believing that *we have the most comprehensive and attractive consumer portfolio available today at the right performance levels and price points to accelerate adoption*.
>
> \*        \*        \*
>
> We believe that starting in the second half of this year, consumer product could represent a substantial upside to our growth. Armed with our new powerful product lineup, our expanded retail channels, and our new exclusive co-ventures and alliances, we believe that we have the necessary muscle in place to *as much as triple revenue again*, and we accordingly expect our 2014 consumer revenue to grow substantially and be in the range of between $80 million to $120 million, primarily driven by 3D printer sales.

155.    Defendant Gregoire blamed a drop in consumer products revenue on its decision to preannounce its new lineup of consumer products at the 2014 CES, causing customers and channel partners to delay orders in anticipation of new products.  He disavowed any notion that consumer demand is slowing, citing an "*overwhelmingly positive reception* that our powerful CES 2014 lineup received, and subsequent channel opportunities and brand partnerships we attracted."

156.     During the call, Defendants downplayed a rise in operating expenses announced by the Company.  In response to an analyst's question on operating expenses, Defendant Reichental reassured analysts that "we fully expect operating leverage to return in 2015. ***So we - based on our planned product lineups, technology, and execution, we don't see any obstacles to success, unless the world collapses somehow***."  Supporting these comments, Defendant Gregoire characterized the elevated expenses as merely "discretionary costs," based primarily on R&D sales and marketing, that Defendants could "scale back and not affect the business further" if desired, and stated that the Company was "willing to tolerate earnings reductions to substantially accelerate our growth rate in market share."  Defendant Reichental added that the Company had "generated a significant number of new products based on a much lower level of spending" and that such spending was "preparing us for the next chapter of growth. . . . We think that it is necessary as we plan to double revenue again in the next couple of years. And it's completely discretionary."

157.     Defendant Gregoire also downplayed the Company's high level of finished-goods inventory, attributed in part "all the new products we announced, the 24 new products between EuroMold and CES, getting ready for the manufacturing and building those printers and inventory is also one of the areas that we are planning for this next year."  Defendant Reichental added to such comments, stating that an increase partly resulted from customer printer orders "that didn't timely convert to shipped revenue" and instead shifted to backlog.

158.     Analysts reacted positively to the Defendants' statements.  For example:

(a)     Canaccord stated:

We reiterate a BUY for DDD following an earnings call that demonstrated management's confidence in accelerating organic growth for consumer, metals and legacy products and services. With an expectation to deliver operating leverage in 2015, coupled with an outlook to roughly double revenue through that period, we are introducing 2015 estimates and raising

our price target to $100 as we believe management's comments on positive leverage in 2015 will drive multiple expansion;

(b)      RBC noted the Company's "solid demand momentum and a healthy backlog," stating that the Company "should benefit and gain market share going forward" and "thrive within the industrial manufacturing markets while consumer growth remains an incremental catalyst"; and

(c)      Deutsche Bank remained positive on 3D Systems' growth opportunities and commended the Company's "[s]trong results and growth initiatives" noting that the Company "remains a top pick for 2014" with a focus on the "number of growth opportunities, which indicate revenue can double over the next two years to reach $1B in FY-15. Consumer, Healthcare and Direct Metals are particular areas where DDD sees growth."

### 4.      Piper Jaffray Technology, Media and Telecommunications Conference

159.      On March 12, 2014, Hugh Evans, the Company's Vice President of Corporate Development and Ventures ("Evans"), and Witten, the Company's Investor Relations Director, represented the Company at the Piper Jaffray Technology, Media and Telecommunications Conference.  During the Company's presentation, Evans focused on 3D Systems' numerous acquisitions, noting that the Company had "41 acquisitions over the last six years" and "actively may do 5, 6 a year."

160.      Evans responded to a question concerning the Company's metal 3D printing technology, highlighting the quality of direct metal printers and indicating that capacity constraints would not be an ongoing problem:

So we are very excited about our metals technology. We don't think there's any holes in our portfolio. The ProX 200, 300, 500, which is the old PHENIX, is a, we think, really a winner. And it's got great density; chemically pure. It has high resolution. It makes -- it's fast. It's really -- it's feedback we are getting on that machine is very encouraging. So we are capacity constrained. *We don't think there's anything we need to do in metals; we are there. We think we've really got a winning platform.* And it's not to say that if there was something else to drop in, to

add to our portfolio, we wouldn't do it. But we don't need to do anything. So we are more opportunistic at this point. And so now we've looked at some more drop-ins, but it's not urgent.

161.    Witten responded to a question concerning the integration of the 41 companies acquired by 3D Systems, assuring that the Company was successfully integrating and managing its acquisitions, "bring[ing] them completely in the Company and we are all one Company right away." She added that a "core team" comprising Defendants Reichental and Gregoire and Andy Johnson, the Company's General Counsel ("Johnson"), was responsible for identifying, negotiating, and bringing in new companies:

> ***So we have -- we've done most of it internally. We have a core team that does the identification, the negotiation, made up of Avi, Damon, and Andy -- our CFO, CEO, and General Counsel.*** And then they bring in, depending on the acquisition, the other senior management teams to look at the business, to look at what's the underlying components of it. And then, once we move forward, we have a core team that does the integration: IT, HR, customer service, finance type people. And then, depending on what the acquisition size and scale and area is, we will bring in others.

> So it's not a team that's just doing the M&A and then throwing it over the wall. So it's just people that they are going to be working with on a regular basis that have a vested interest in making it a success.

> And then -- and ***we do all of that integration*** in the back-office in the first couple of weeks. So the first day of close, we have already gotten a lot of information. We have put them onto our system. They are in Oracle within that first couple weeks. So we have the control; we have the visibility.

> And then we do some of the customer-facing stuff -- the brands, the things would potentially be disruptive to the business over time. And so sometimes that operational integration can take a little bit longer than the financial.

> And then we have that team that did the training. They end up making additional visits that we bring people into Rock Hill. And we bring the acquired team on board fully. They're not -- no one is out there as a stand-alone company operating on their own. In a lot of cases, they are working -- helping work on the next deal. And it gives them a little bit of perspective, ***but it also brings them completely in the Company and we are all one Company right away.***

162.    Evans then confirmed an analyst's comment that Defendant Reichental "had done 100 acquisitions prior to joining 3D Systems." Witten further boasted about both Defendant Reichental

- 57 -

and Defendant Gregoire's strength and experience in accomplishing acquisitions: "He has got a background. And Damon came from an M&A background as well, both -- on both sides of being the one making the acquisitions and being acquired. So definitely have some strength and experience there."

163.     The above statements from the Company's press release, Form 10-Q, and conference call on February 28, 2014, and the Piper Jaffray Technology, Media and Telecommunications Conference on March 12, 2014, were materially false and misleading and omitted material facts because:

(a)     Defendants struggled to integrate systems and operations of the many new and disparate acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies. Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded by the costly introductions of dozens of new products at the same time. This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to boost growth through acquisitions and new product introductions was successfully growing the Company's revenue (*e.g.*, "over 30% organic revenue growth and over 50% total revenue growth for the fourth quarter of 2013"; "certainly for 2014, we expected organic growth to be at or above 30%, so just to preface that again for clarity"), increasing its market share, and maintaining its leadership position, while presenting little downside other than "temporary" earnings and margin compression, and temporary increases in investment-related operating expenses (*e.g.*, "based on

our planned product lineups, technology, and execution, we don't see any obstacles to success, unless the world collapses") (¶¶142-157, 159-162);

(c)    Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers. Specifically, the Company did not have adequate manufacturing capacity to produce direct metal printers on a scale sufficient to meet consumer demand. Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

(d)    Defendants failed to reveal these manufacturing capacity and quality problems to investors. Instead, they misleadingly stated that the Company would be able to meet strong customer demand by dramatically increasing manufacturing capacity during the Class Period (*e.g.*, "[w]e are in the process of tripling capacity" in a single year). They also misleadingly boasted of the positive attributes, successful introduction, and strong customer reception of such printers (*e.g.*, "we have the most comprehensive and attractive consumer portfolio available today at the right performance levels and price points to accelerate adoption") (¶¶142-157, 159-162);

(e)    Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and achieving such projections. Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)    Poor inventory control was an additional consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release

new products to fuel aggressive revenue growth. In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems. These problems contributed to the Company's operating inefficiencies and elevated operating expenses. However, Defendants failed to fully disclose these inventory-related problems to the market (¶¶67-79);

(g)     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters, to meet Defendants' aggressive revenue projections. This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters. These problems contributed to the Company's operating inefficiencies and elevated operating expenses (¶¶80-91);

(h)     Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period, and claimed that such projections were justified by customer demand (*e.g.*, "[b]ased on our current lineup of direct metal printers, customer demand, and planned capacity expansions, we expect our direct metals business to generate between $25 million and $50 million of revenue in 2014"). Defendants did not have a reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶142-157, 159-162); and

(i)     The Company's Form 10-K for fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

C.     **Defendants' False and Misleading Statements and Omissions from April 29, 2014 Through July 30, 2014**

1.     **Press Release, SEC Filing, and Conference Call Regarding the Company's First Quarter 2014 Financial Results**

164.     On April 29, 2014, 3D Systems issued a press release regarding the Company's first quarter 2014 financial results, announcing record revenue and "[i]ncreased demand across the board for products and services," including 76% unit sales growth of design and manufacturing printers.  In particular, the press release highlighted demand for direct metal printers, stating that the Company was "increasing its manufacturing capacity to accommodate rising demand."  The Company stated that the "full impact" of its new products and services was expected to materialize in the second half of 2014 with respect to revenue and earnings, resulting in expected 2014 revenue of $680-$720 million and "double revenue over the next couple of years" (reiterating previous guidance).

165.     On the same day, April 29, 2014, 3D Systems filed a Form 10-Q with the SEC reporting its financial results for its first fiscal quarter ended March 31, 2014, as discussed in the Company's press release and earnings conference call on April 29, 2014, which are detailed in pertinent part herein.  The Form 10-Q detailed financial results including increased revenue growth and gross profit, and expansion both organically and through acquisitions.  The Company's Form 10-Q also contained SOX certifications by Defendants Reichental and Gregoire that were materially similar to those identified above in ¶125.

166.     Also on April 29, 2014, 3D Systems hosted a conference call to discuss its first quarter results.  Defendants Reichental and Gregoire participated in the call on behalf of the Company, boasting of continued robust demand for design and manufacturing printers and organic sales growth (28% overall organic growth, 54% unit growth).  Defendant Reichental stated that the Company expected accelerating revenue growth through the second half of the year, citing "strong

demand for advanced manufacturing activities," and its "new, faster, and more advanced 3D printers and materials."

167.     In particular, Defendant Reichental emphasized the importance of direct metal printers and the Company's plan to "quadruple" sales of such printers over the next 12 to 18 months:

> We entered the second quarter of 2014 with positive sales momentum and increased backlog, driven by continued strong demand for advanced manufacturing activities across all of our categories. As our new, faster, and more advanced 3D printers and materials gain traction, we expect accelerating revenue growth through the second half of this year. ***We continue to view Direct Metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple Direct Metal printer sales over the next 12 to 18 months.***

168.     Defendant Gregoire also boasted of strong direct metal printer demand: "All our printer categories experienced strong demand and our effective sales and marketing Direct Metal printers campaign continue to produce greater demand, once again outpacing our manufacturing capacity even as we continue to add capacity."

169.     While Defendants stated that direct metal printer demand was higher than manufacturing capacity, they assured the market that this was a short term issue and that the Company would ultimately be able to quadruple the sales of these printers.  Defendant Reichental said that capacity increases continued to increase on a quarterly basis, "which we see as very positive," and the Company was making significant inroads by shipping direct metal systems to major manufacturing customers:

> So as we said on the Metals machines, although our sales are increasing, we are unable to catch up, as of yet, ***even as we continue to add capacity on a quarterly basis, which we see as very positive.*** And what is also very positive, Troy, on the anecdotal side of it is that over the last several periods we have made significant inroads into automotive applications and specifically tire manufacturing applications. And I can share with you this morning that just over the last several periods we shipped over two dozen Direct Metals systems just into major tire design and manufacturing applications.

- 62 -

170.    In addition to growth in direct metal printers, Defendant Reichental stated that the Company generated "an impressive 48% growth in our consumer unit, notwithstanding slowing demand for the current consumer printer models in anticipation of the commercial release of our new 2014 models."  He added as follows, highlighting shipments of new consumer products:

> We expect accelerated growth in our consumer category in the second half of this year as we begin shipping the recently announced Cube 3, CubePro and iSense scanners late in the second quarter and as we open completely new consumer and [prosumer] applications with ChefJet, CeraJet and CubeJet 3D printers that are slated for commercial shipment during the second half of this year.
>
> *        *        *
>
> While we expect most of the benefits from this investment to accrue in later periods, we already announced nine new products in the first quarter of 2014. And total new products revenue rose 71% to $65.4 million. Just as a reminder here, products are considered new by us only for the first three years of a product's commercial life.
>
> Based on marketplace feedback of our recent new products and our plans for future products, we fully expect our new products to accelerate our organic revenue growth later in the year.

171.    Defendant Gregoire noted that "our anticipated gross profit margin expansion was delayed as a result of our compressed new products transition period and mix."  However, he emphasized this as a short term problem, based on the Company's growing printer sales:  "we are pleased that our 3D printers growth continues to surpass all other product categories. And as we place more printers faster, we expect an overall gross profit margin expansion trend over the next few periods . . . ."

172.    When Defendant Gregoire stated that inventory has been up significantly over the last few periods "in anticipation of new product releases."  He downplayed this by citing "the new products that are coming out or being commercialized at the end of this quarter and into the second half of the year" and stating, "we expect that inventory to come down because those deliveries are in

- 63 -

anticipation of the sales and building the supply chain." Separately, Defendant Gregoire added that the inventory buildup had concluded:

> Cash from operations was impacted by our continued inventory buildup in anticipation of new product releases. We believe that we **concluded this buildup** during the first quarter and expect to begin to liquidate a portion of our finished goods inventories as we commence commercial shipments of our new products later in the second quarter.

173.     Defendant Reichental added to Defendant Gregoire's comments on the inventory build, stating that it derived from the Company's heavy investments in bringing new products to market. However, he said the buildup phase was over and finished goods inventory would be liquidated starting in the second quarter and into the second half of 2014.

174.     In reaction to Defendants' positive statements, analysts retained their buy ratings and positive outlook for the Company's stock. For example, Deutsche Bank remained "positive on the growth opportunities" based on "DDD's solid positioning." Similarly, Brean Capital reiterated their buy rating, noting that the risk-reward for the Company was "very attractive." Canaccord also maintained a buy rating on the stock based on "strong top line growth."

175.     The above statements from the Company's first quarter 2014 press release, Form 10-Q, and conference call on April 29, 2014, were materially false and misleading and omitted material facts because:

(a)     Defendants struggled to integrate systems and operations of the many new and disparate acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies. Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded by the costly introductions of dozens of new products at the same time. This created critical operating

inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

(b)    Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to boost growth through acquisitions and new product introductions was successfully growing the Company's revenue, increasing its market share, and maintaining its leadership position (*e.g.*, "[w]e continue to focus on accelerating our growing and expanding market share . . . to double revenue over the next couple years"), while presenting little downside other than temporary earnings and margin compression, and temporary increases in investment-related operating expenses (¶¶164-173);

(c)    Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  Specifically, the Company did not have adequate manufacturing capacity to produce direct metal printers on a scale sufficient to meet consumer demand.  Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

(d)    Defendants failed to reveal these manufacturing capacity and quality problems to investors.  Instead, they misleadingly stated that the Company would be able to meet strong customer demand by dramatically increasing manufacturing capacity and sales during the Class Period (*e.g.*, "We continue to view Direct Metal printing as a very important and exciting manufacturing growth opportunity and plan to quadruple Direct Metal printer sales over the next 12 to 18 months.").  They also misleadingly boasted of the positive attributes, successful introduction, and strong customer reception of such printers (¶¶164-173);

(e)     Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and achieving such projections.   Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)     Poor inventory control was an additional consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth.   In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems.   These problems contributed to the Company's operating inefficiencies and elevated operating expenses, and ultimately resulted in inventory write-offs (¶¶67-79);

(g)     The Company failed to fully disclose these inventory-related problems to the market, and instead misleadingly revealed only a temporary increase in inventory due to new product introductions (*e.g.*, "we expect . . . inventory to come down") (¶¶172-173);

(h)     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters to meet Defendants' aggressive revenue projections.   This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters.   These problems contributed to the Company's operating inefficiencies and elevated operating expenses (¶¶80-91);

(i)     Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period,

and claimed that such projections were justified by customer demand. Defendants did not have a reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶164-173); and

(j) The Company's Form 10-Q for the first quarter of its fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

## VI. THE TRUTH BEGINS TO EMERGE BUT DEFENDANTS CONTINUE TO MISLEAD THE MARKET

### A. Defendants' Partial Revelations and False and Misleading Statements and Omissions from July 31, 2014 Through October 21, 2014

#### 1. Press Release, SEC Filing, and Conference Call Regarding the Company's Second Quarter 2014 Financial Results

176. On July 31, 2014, investors were stunned by Defendants' partial revelations of material problems facing the Company during a conference call to discuss its second quarter financial results. Defendants Reichental and Gregoire attended the conference call on behalf of the Company. During the call, Defendant Reichental announced that the Company was unable to meet demand for direct metal printers and consumer products due to manufacturing capacity and quality issues, respectively, which significantly reduced the Company's organic growth rate (down to 10% for the quarter) and compressed gross margins:

> Several factors contributed to the expansion of our order book. First, *higher demand for our Direct Metals printers that continue to rise faster than we could add manufacturing capacity.* Second, booked orders for polymer printers that were scheduled for labor deliveries by our customers, And finally, *our decision to postpone shipments of new consumer products to improve user experience* led to an extended backlog of our consumer orders.

> These factors shifted a portion of our organic bookings into future periods, and *temporarily suppressed our organic growth rate to 10% during the quarter*. Our growth profit margin shouldered the transitional effect of concentrated new product launches, as well as the absorption of legacy product obsolescence and manufacturing expansion cost.

Together, these factors and changed mix **compressed gross margins from 400 basis points** from the prior-year's quarter to 47.8%.

177.     Separately, despite prior assurances regarding the Company's ability to quickly increase manufacturing capacity at Phenix, Defendant Gregoire stated that the Company's demand for direct metal printers continued to outstrip capacity, Phenix manufacturing facility was "max[ed] out," the Company would need to bring in a new U.S. facility, and the Company would not have ample production until 2015:

> Demand for our Direct Metals printers continues to rise faster than we can add manufacturing capacity. After maxing out our Phenix manufacturing facility, we are bringing a sister manufacturing facility online in the United States during the third quarter, and expect to enter 2015 with ample production capacity for metals printers.

178.     Defendant Gregoire also announced a one-time inventory write-off, resulting in a decrease in gross profit margin, which he blamed on the Company's aggressive shift to multiple new products:

> The decrease in gross profit margin reflects the absorption of a one-time inventory write off from our aggressive shift to multiple new products, which accounted for a 1.3 percentage points compression, and a change in mix of sales which amounted to another 2 percentage points.

> During the first half of the year, our gross profit margin shouldered a number of factors. The impact of a concentrated number of new product launches that bring additional start-up costs, the end of life for legacy products, including a one-time inventory write down in the second quarter, the incremental costs to bringing several manufacturing facilities online, and first-half sales mix.

179.     3D Systems issued a press release on the same day of the conference call, before the market opened, regarding the Company's second quarter 2014 financial results.  As in the conference call, the press release announced the Company's depressed organic revenue growth and gross profit margins, increased order backlog, and delayed consumer product availability, but attempted to deemphasize this negative news by presenting a positive spin on the Company's results and expectations.  Quoting Defendant Reichental, the press release highlighted "[r]ecord bookings

for our design and manufacturing printers together with rising orders for our consumer products," higher revenue expectations in the second half, and gross profit margins "poised to rebound and resume their expansion trajectory." In fact, despite the negative news partially revealed by the Company, 3D Systems *raised* its 2014 revenue guidance to be in the range of $700 to $740 million.

180.    On the same day, July 31, 2014, 3D Systems filed a Form 10-Q with the SEC reporting its financial results for its first fiscal quarter ended June 30, 2014, as discussed in the Company's press release and earnings conference call on July 31, 2014 summarized herein. The Form 10-Q detailed financial results including increased revenue growth and gross profit, but announced a decrease "primarily driven by delayed orders as customers awaited the availability of announced new products," and continued inadequate manufacturing capacity to meet demand for direct metal printers. The Company's Form 10-Q also contained SOX certifications by Defendants Reichental and Gregoire that were materially similar to those identified above in ¶125.

181.    In response to the negative news, the Company's stock price fell sharply. After closing at $56.07 per share on July 30, 2014, the stock closed at $50.13 per share on July 31, 2014, on unusually high trading volume of nearly 13 million shares. The stock dropped further on the following day, as the market continued to digest the news, and numerous analysts, including J.P.Morgan, Piper Jaffray, and RBC, downgraded their ratings or lowered their price targets for the stock. The stock closed at $47.93 per share on August 1, 2014, on unusually high trading volume of nearly 6.5 million shares. The total stock price decline over this period was 14.5%, or $8.14 per share.

182.    3D Systems' stock price would have declined further had Defendants not raised guidance and touted strong financial results and expectations in the Company's July 31, 2014 press release, discussed above, and had Defendants not downplayed and de-emphasized the negative news

during its conference call with analysts on the same day. For example, on the conference call, Defendant Reichental reassured analysts that the Company would have "ample manufacturing capacity" to fulfill increasing demand for direct metal printers by the first quarter of 2015, including a new larger model printer to be unveiled later in the year:

> It's true that metal printers revenue increased on a sequential basis 55%, and we're bringing a second manufacturing facility online. So we certainly expect to be able to have sufficient capacity to be in the range of the $25 million to $50 million that we guided to earlier in the year.
>
> And, as Damon said earlier this morning, going into Q1 of next year, *we expect ample manufacturing capacity, so that we, once and for all, catch up and have spare capacity to fulfill what we expect to be an increasing demand for metal printers.* And, finally, remember that our larger Direct Metal printer that we've been developing all year is going to debut at EuroMold 2014 and be available for sale in the first quarter of next year. And that is on track to be completed timely and commercialized.

183.    Defendant Reichental also stated that the Company's delay in shipping consumer products due to quality issues was supported by Defendants' "extended data testing" and the "right call." Moreover, he implied that the quality issues were resolved, announcing that the Company had commenced shipping the CubePro and would be shipping the Cube 3 over the next few weeks:

> I am glad you asked that question. We conducted an extended data testing because we are focusing on how to mainstream, particularly the adoption of the new Cube 3 and the CubePro. And in the process, in very close communications with dozens of beta testers, we identified several user experience enhancements that we believe had the potential to competitively enhance our brand, and we decided to take time to incorporate them even at the expense of short-term revenue pressure. And we are happy to report that our rising orders suggest that we made the right call. . . . As I said, we have commenced shipments of the CubePro and we now anticipate shipping the Cube 3 over the next few weeks, and we believe that we made the right decision.

184.    Defendant Reichental also downplayed any lasting impact of the order backlog on organic revenue, stating that "we expect to generate higher revenue in the second half than in the first half. . . . I don't think that we lost any organic growth trajectory in the quarter. Some of it just ended up in our order book, not in our recognized revenue." In particular, he emphasized that the

Company expected greater consumer revenue contribution in the second half, justifying the Company's increased revenue guidance:

> Yes, but importantly with that, ***what we want to say is we certainly expect greater consumer revenue contribution in the second half than the first half.*** You already know that we exited the first half with higher consumer bookings than we actually revenued in the quarter, and that continued to rise in the July month.
>
> But I wanted to emphasize that, to reach the raised revenue guidance that we provided this morning, we don't need a great deal of consumer revenue contribution. So we think that, even with just an incremental consumer revenue contribution, ***we will hit our revenue guidance range.***
>
> ***Of course, we are not slowing down. We're actually speeding up.***

185.    Defendant Reichental went on to explain why the Company had confidence that margins would "rebound and resume their expansion trajectory," based on a "careful analysis" he had conducted on the matter.  He explained that the Company's "concentrated new product launch period," drove cost of goods temporarily, which would be normalized "very quickly" when the new products were launched.  He added he was confident that "margins not only will rebound, but will continue to expand" and that "we together conducted under Damon [Gregoire]'s leadership, a very careful and complete analysis" of gross profit margins, and concluded that "fundamentals are intact."

186.    Defendant Gregoire provided further information on 3D Systems' inventory write down, stating that inventory was now "properly aligned":

> And we do believe that our inventory is ***properly aligned*** for what the demand is, and what we see again as backlog. And that is part of this. Our inventory increase that we have, part of it has to do it backlog.
>
> Part of it's not -- and it's the timing of deliveries and revenue recognition where when it comes out, goes into backlog, if you're not able to recognize in this period, it goes back in inventory. And the other part is supply-chain logistics for the manufacturing of these printers and all of the new products that we've had and the demand that we forecast for the second half of the year.

187.    Defendant Reichental further commented that inventory would be aligned in the second half, based on shipments of new products including the CubePro and Cube 3:

And, remember, Wamsi, that in the second half is part of the alignment in inventory. We're shipping now the CubePro. We're beginning to ship the Cube 3 in the next few weeks. We expect to ship the Touch in a few weeks. Then the EKOCYCLE and the 3DMe Booth and the ChefJet in the fourth quarter. And, in addition to that, we have several large frame systems that we're also in development of that will come into play, probably sometime in the fourth quarter.

So *we think that our inventory is fairly well aligned the way of what's to come.* And as we mentioned in our prepared remarks this morning, there is a rise in inventory of about $15.1 million that we expect to liquidate as these products are shipping. So, expect additional cash generation from operations in the coming period.

### 2.    Needham Advanced Industrial Technologies Conference

188.    On August 7, 2014, Defendant Gregoire and Witten attended the Needham Advanced Industrial Technologies Conference on behalf of 3D Systems.  Defendant Gregoire responded to the first question of the conference concerning the Company's less-than-expected organic growth rate, reassuring investors that achieving 30% organic growth was still on track for the full year and that the Company would turn its backlog into revenue:

Yes. Well, talking specifically about organic growth at 10%. A lot of this is really a lot of timing issues around this and you mentioned our bookings, our backlog was over $31 million, which is a record high, and the mix of backlog was also over $23 million in printers, which really stepped up in that regard. So we believe we have a lot of what would have been growth that fell into backlog for just various reasons of timing didn't come in for sales for this period.

On the other hand, now if you look at our growth in other areas that we guided to before, our materials growth was 30% and that's primarily organic in itself. We have Phenix, which is the metal printers -- metal machines we bought, that's a very small amount of our materials business right now.

So that definitely happens. We believe we (inaudible) that. *So our organic growth rates where we said we were before and we said that we would be a 30% plus for the year.* And with Stratasys, their announcement, they did a very strong quarter and strong organic growth and I think they up their organic growth projections for the remainder of the year to match what we have been. So we also -- and finally, *when we look at that as an indication in a way or a validation of where we think we're going to be, it's not the industry is slowing, it's not that we lost market share either, it's a timing shift, that's really what it is.*

189.     In response to a separate question, Defendant Gregoire confirmed that the Company was assuming a step-up in organic growth in the second half of the year, citing the recent and forthcoming releases of consumer printers, among other backlogged orders:

> We have the consumer printers that we have the product launch is starting in July that we have, the CubePro that's out already. The Cube which is expected in August and then a number of other printers expected at the end of the third quarter and then into the fourth quarter.

190.     Defendant Gregoire also confirmed that the consumer business had underperformed, resulting in delayed product launches to fix quality problems.  He admitted that the problems "pushed off" previously projected 2014 run rates to the beginning half of 2015, but claimed that the Company did not give up any opportunity to achieve its $80-$120 million in consumer sales notwithstanding this delay:

> Yes, I would -- I think more than fair to say. I'm not going to say it's what we wanted. The decisions we made that did slow it down, we believe what the right decisions to make though in delaying a couple of the product launches that we had, because this type of business to us is new or getting into the consumer, but it's much different than the professional and industrial side where you can troubleshoot, fix problems in the field sometimes with new products and things. We wanted to make sure we are going out with the new products with a very strong consumer experience or customer experience that people have, and we didn't feel the products were exactly there. So it's definitely pushed us off. And at the beginning of the year, we said our expectations were $80 million to $120 million in consumer for this year.
>
> And although we still think that is where we can be and where the market for us is at this point, *we believe it's pushed off the couple of quarters due to the push out and things. So we still think sort of the beginning half of next year -- the second quarter of next year that we hit those run rates.*
>
> Did we give up the opportunity? We don't believe so. We believe we have differentiated products that are going to get us there, but we wanted to make sure we were putting something out there that would meet the customer expectations.

191.     Defendant Gregoire then spoke about the Company's competitive position in the metals market, assuring analysts that demand continued to be strong, that the Company continued to add manufacturing capacity to meet such demand, that capacity would reach about $100 million a

year as of January 2015, that the Company "won't be capacity constrained in the next year," that the

printers were of high quality and experiencing "great customer adoption," and that the Company was

poised to develop new and innovative direct metal printers:

> We're very excited about our metals opportunity and where we are. First of all, our metal sales have been faced by our manufacturing concerns until now and we expect that to continue through this year. We've been expanding our metals capability since we bought Phenix last year and we end up with some of these in backlog because we can't sell them fast. And even with that, we've been able to, in the first half of this year, double what we wanted when we bought Phenix and sequentially from Q1 to Q2, actually sold 55% more than we had there. ***We expect that to continue to grow through the remainder of this year and that we will be on pace to have our added manufacturing capability to be at about $100 million a year of capacity as of January. And I think that's what our forecast is, not guidance yet. So we won't be capacity constrained in the next year.***
>
> So where we think it -- all of this is really showing we had ***great customer adoption*** as we brought these on, we believe that our machines are -- we bought a company that was a hidden gem. And we paid about $20 million for it compared to -- at the run rates of revenue compared to what hundreds of million market caps some of these other companies have at this point. ***We have the finest particle size that's favorable to print very fine definitions, we're very fast and we were able to quickly through -- bring into our sales channels and into our company, bring it into applications and part -- places that Phenix was never able to go.*** We can still be part of the consideration at GE for their expansion, which -- that wasn't before they have to be continued to expand into different aerospace and automotive applications, to be -- to totally be sold out of capacity, which Phenix wasn't before. ***And we continue then to do what we've always done with all of our other products is innovate and come up with new ones. In fact, just by we get -- how we get to your models, which is 18 months after we bought Phenix, we expect to be showcased in a new larger format*** (inaudible).

192.    When asked about the operational challenges generated by the Company's

acquisitions, Defendant Gregoire stated operationally, integration "happens very easily, very

quickly.  And operationally, we have a roadmap to get there quickly."  He added that the hardest

aspect is usually culture (bringing people into 3D Systems' culture and under the same Company

mentality) but "we spent a lot of time focused on that to achieve that."

193.    The above statements from the Company's press release, SEC filing, and conference call on July 31, 2014, and the Needham Advanced Industrial Technologies Conference on August 7, 2014, were materially false and misleading and omitted material facts because:

(a)    Defendants struggled to integrate systems and operations of the many new and disparate acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies.  Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded by the costly introductions of dozens of new products at the same time.  This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

(b)    Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to boost growth through acquisitions and new product introductions was successfully growing the Company's revenue, increasing its market share, and maintaining its leadership position (*e.g.*, "the record order book that we exited the quarter with reflects the vibrancy of our business and our organic growth trajectory"), while presenting little downside other than temporary earnings and margin compression, and temporary increases in investment-related operating expenses (*e.g.*, gross profit margins "poised to rebound").  Indeed, the Company even increased its 2014 revenue guidance despite these problems (¶¶179, 182-192);

(c)    Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  Specifically, the Company did not have adequate manufacturing capacity to produce direct

metal printers on a scale sufficient to meet consumer demand.  Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

(d)     Defendants failed to fully reveal these manufacturing capacity and quality problems to investors.  Instead, they misleadingly stated that the Company would be able to meet strong customer demand by dramatically increasing manufacturing capacity during the Class Period. They also misleadingly boasted of the positive attributes, successful introduction, and "great customer adoption" of such printers (¶¶179, 182-192);

(e)     Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and achieving such projections.  Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)     Poor inventory control was an additional consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth.  In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems.  These problems contributed to the Company's operating inefficiencies and elevated operating expenses, and led to inventory write-offs (¶¶67-79);

(g)     The Company failed to fully disclose these inventory-related problems to the market, and instead misleadingly revealed only a temporary increase in inventory due to new product introductions and a "one-time" inventory write-off, and reassured investors that inventory was "properly aligned" (¶186);

(h)     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters, to meet Defendants' aggressive revenue projections.  This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters.  These problems contributed to the Company's operating inefficiencies and elevated operating expenses (¶¶80-91);

(i)     Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period, and claimed that such projections were justified by customer demand.  Defendants did not have a reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶179, 182-192); and

(j)     The Company's Form 10-Q for the second quarter of its fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

**B.     Defendants' Partial Revelations and False and Misleading Statements and Omissions from October 22, 2014 Through February 25, 2015**

**1.     Press Release and Conference Call Regarding the Company's Preliminary Third Quarter 2014 Financial Results**

194.     On October 22, 2014, just three months after raising its guidance, 3D Systems issued a press release setting forth preliminary financial results for its third quarter ended September 30, 2014 (including lower-than-expected third quarter revenue of $164-$169 million), and revising its full year 2014 guidance *downward* (from a range of $700-$740 million to a range of $650-$690 million).  According to the press release:

Strengthening sales of the company's design, manufacturing and healthcare products and services were not enough to overcome the *revenue shortfall from the continued manufacturing capacity constraints for its direct metals printers and delayed availability of its newest consumer products.*

\*        \*        \*

Our accelerated investments in new products and acquisitions contributed to a record order book in every period of this year, but disrupted revenue generation and pressured our gross profit margins.

195.    Defendant Reichental added that "[w]e are disappointed that we failed to fully capitalize on the robust demand for our direct metal and consumer products during the quarter. While we worked very hard to deliver these products sooner, achieving manufacturing scale, quality and user experience targets took significantly longer than we had anticipated."

196.    Also on October 22, 2014, the Company held a conference call to discuss the results of the preliminary results for the third quarter of 2014.  Defendants Reichental and Gregoire participated in the call on behalf of the Company.  On the call, Defendant Reichental stated that "[q]uite frankly, we were very disappointed that we failed to fully capitalize on the robust demand for our direct metals and consumer products during the quarter."  He cited these problems as a cause of the Company's revenue shortfall and reduced earnings guidance, explaining as follows:

Clearly when you look at our remarks today, *our greatest disappointment is that we were not able to deliver during the third quarter on the robust demand for metals and consumer products.* And what we are saying is that given that we have a fairly short window between now and the end of the year, we are not going to be able to make up all the shortfall in one reporting period. Hence, we trimmed the guidance by the amount that we did.

Notwithstanding that, as we go forward we have very high expectations from our direct metal printers and our consumer printers. We are -- we have entered the fourth quarter with an all-time record order book that has in it at least 4 million more printer orders than we did in the third -- exiting the second quarter. Notwithstanding the fact that sequentially we have sold more product in the third quarter than in the second quarter.

*And our sense is that while the opportunity shifted forward a few periods the magnitude that it represents in terms of revenue generation potential, both in*

- 78 -

*metals and in consumer product, remains relevant and available, the period shifted forward a couple of periods.* And that has to do with our inability to bring the second line up to par and fully ramp in time to benefit from it in the third quarter.

Although we worked really, really hard, it was a much more challenging and complex undertaking. And the second part, quite frankly, had to do with our disciplined decision not to ship consumer product before we determined that they fully met our user experience criteria. We believe that that will pay huge dividends for us in future periods.

197.    On this news, the price of 3D Systems stock plummeted once again and analysts such as Deutsche Bank and Needham downgraded their ratings for 3D Systems stock.  After closing at $43.38 per share on October 21, 2014, the stock dropped 15.5% ($6.71) to close at $36.67 per share on October 22, 2014, on unusually high trading volume of more than 15 million shares.

198.    Once again, however, the stock decline would have been larger had the Company revealed the full truth to investors.  But Defendants continued to downplay and mislead investors about the Company's operating and financial problems, suggesting they had resolved the issues affecting its consumer and direct metal printers, and would soon be in position to fully capitalize on demand.  For example, in the Company's October 22, 2014 press release, Defendant Reichental downplayed the severity of the negative news by stating that, at the end of the third quarter, the Company brought online a second direct metal printer manufacturing line and began commercial shipments of its latest consumer printers (including the Cube 3 and CubePro).  He added that "*[n]ow that we have closed these availability gaps*, we expect our revenue growth rate to increase."

199.    Defendants continued to downplay the extent and severity of the problems on their October 22, 2014 conference call with analysts.  Defendant Reichental cast a positive spin on the Company's revenue shortfall, calling it a "temporary speed bump" related to "short-term execution" rather than fundamental structural or marketplace issues.

200.    On the call, Defendant Reichental assured the market that the Company was on track to meet demand for direct metal printers, and that it would "have all the capacity that we need" in the fourth quarter:

> We -- to be crystal clear on the metals side, *we believe that we are back on track*, we obviously are very disappointed even though we worked really, really hard that we couldn't achieve it during the third quarter. *And we believe that in the fourth quarter we will have all the capacity that we need to deliver direct metal 3D printers to the market.* As well as into 2016 we believe that with two facilities fully online we will be able to deliver orders and satisfy increased demands for 3D metal printers.

201.    When Defendant Reichental was asked to comment on the annual revenue opportunity in the metals business, he provided a positive outlook going forward: "We have had a very strong demand year for metals. In every reported period so far this year we have sold more metal printers than we could manufacture. *Now that we remediated this we believe that we are positioning ourselves extremely well for 2015*."

202.    Defendant Reichental also boasted of "very strong demand" for consumer printers, their "incredibly positive reviews" and their availability on the market:

> We also see a great deal of interest and demand for our latest consumer printers, they have gotten incredibly positive reviews from a very discerning group of customers that tend to think that we have something really, really exciting here. So we expect that demand to continue to grow and to influence our results in the future.

> \*       \*       \*

> The [consumer] systems are now available and shipping and we expect them to contribute starting in the fourth quarter to revenue generation. We are not ready to provide a percentage of revenue. But we have received very favorable user responses that validate the decision. *And we expect, not just in the fourth quarter, but going into next year we expect to realize increasingly growing revenue from our Consumer Products.*

203.    Defendant Reichental then denied any negativity from sales partners concerning the delay in consumer products, emphasizing that the quality of such products would be worth the wait. He admitted that the problems caused the Company to "forfeit some opportunities" for sales, but said

that its sale partners are "happy to wait for superior products even though in the short term it means passing by some opportunities. . . . [W]e think that we have a few award-winning products on our hands."

204.     Also on the conference, Defendant Reichental assured analysts that 3D Systems was effectively integrating its newly acquired companies: "[T]he integration is going extremely well. And all of these companies have been completely on boarded as per usual."

### 2.     Press Release, SEC Filing, and Conference Call Regarding the Company's Third Quarter 2014 Financial Results

205.     On November 10, 2014, the Company issued a press release setting forth the Company's results of operations for its third quarter and nine months ended September 30, 2014. Echoing the Company's preliminary earnings announcements on October 28, 2014, the press release stated that "[s]trengthening demand for the company's leading design and manufacturing products was not enough to overcome the revenue shortfall that resulted from the company's continued manufacturing constraints for direct metal printers and the delayed availability of its newest consumer products."  Once again, however, Defendant Reichental tempered this bad news by citing robust and strengthening demand for direct metal and consumer products, which was expected to increase the Company's revenue growth rate "*[n]ow that these availability gaps have been resolved*."

206.     On the same day, November 10, 2014, 3D Systems filed a Form 10-Q with the SEC reporting its financial results for its first fiscal quarter ended June 30, 2014, as discussed in the Company's press release and earnings conference call on November 10, 2014 summarized herein. The Form 10-Q detailed financial results including increased revenue growth and gross profit, but announced a decrease "primarily driven by delayed shipments of newer consumer products," and continued inadequate manufacturing capacity to meet demand for direct metal printers.

207.    The Company's third quarter 2014 Form 10-Q also contained SOX certifications by Defendants Reichental and Gregoire that were materially similar to those identified above in ¶125.

208.    Also on November 10, 2014, the Company hosted a conference call to discuss its third quarter 2014 financial results.  Defendants Reichental and Gregoire participated on the call on behalf of the Company.   On the call, Defendant Reichental also emphasized the Company's remediation of "performance gaps" with respect to direct metal and consumer printers, stating that the Company would be in position to meet rising demand in the fourth quarter and beyond:

> We're very disappointed that we were not able to monetize all the available demand for our metal printers, and capture a greater portion of the consumer printers opportunity during the quarter. Having said that, ***during the quarter we took decisive measures to remediate these remaining performance gaps.*** Specifically, we brought on line a second manufacturing line that ***now allows us to fulfill the increasing metal printers demand***, and we commenced shipment of our latest consumer printers, and believe that the ***immediate positive user response*** that these products already received validates our decision to wait until these products were ready.
>
> *            *            *
>
> Our bold investments in acquiring and developing proprietary direct metal printing technology contributed revenue growth of 241% in the first nine months of this year, compared to the pro forma results over the same period last year. In fact, we out-sold our growing manufacturing capacity in every reporting period since we acquired Phenix Systems, and sales to add incremental capacity fast enough to meet rising demand for our metals printers.
>
> Now that we are ramping up production in a second direct metals facility, ***we expect to be able to meet this rising demand during the fourth quarter and beyond.*** We believe that industrial-grade, direct metal printing represents significant growth opportunities in the manufacturing of flight-ready aerospace parts, functional automotive assemblies, production tire molds, and ready-to-use medical devices. Armed with the complementary direct metal printing technology that we have acquired from both LayerWise and Phenix, we believe we are best-positioned to satisfy this open-ended opportunity well into the future.

209.    Similarly, Defendant Reichental stated that the Company had "now closed our recent product availability gaps in consumer and metal printers," and was prepared to capitalize on an "all-time record order book, and positive sales momentum" in the fourth quarter of 2014:

We enter the fourth quarter of 2014 with an all-time record order book, and positive sales momentum. ***We have now closed our recent product availability gaps in consumer and metal printers, and expect those categories to contribute favorably to our growth in the fourth quarter.*** The same accelerated investments that pressured our short-term performance also delivered the most comprehensive portfolio of self-developed and acquired 3D product and services available to date. We believe we are now on a stronger footing as we shift forward towards fine-tuning these investments, and leveraging them into profitable and sustainable growth.

210.    Defendant Reichental added that, based on increased production of direct metal printers, the Company would be able to keep up with demand for the foreseeable future and finish closer to the upper end of revenue guidance for 2014:

We believe that, at this point in time, we are ramping in direct relation to existing demand. We clearly believe that we can, with a second line fully operational, keep up with demand for the foreseeable future. We have been guiding for the year to be somewhere in the range, I believe, of $25 million to $50 million, and we still believe that we will finish closer to the upper end of that guidance as we exit the year.

211.    Defendant Reichental also trumpeted demand trends for consumer printers, citing a "phenomenally positive" early reception for Cube 3 and CubePro printers, and the Company's "succe[ss] in delivering world-class product":

Clearly you can discern, not just from our prepared remarks, but what you can read on blogs and message boards that ***the early reception for our Cube 3 and Cube Pro have been phenomenally positive.*** We believe that we have here a couple of products that represent a giant leap versus the competitive landscape, and, more importantly, matching what customers are really looking for in a plug-and-play capability for the consumer, and in a professional capability for the engineer's desktop.

Even with just very limited late third-quarter availability, we have seen a sequential uptick in consumer revenue of about 60%. Clearly, with some of that pent-up demand in the order book, and with shipments now in full swing***, we expect to see greater contribution from our latest consumer product in the fourth quarter - and, by the way, well into next year.***

We're just beginning. We have lots of activities, activations, and promotions for our consumer product line. We just hired a very experienced senior executive from Bose in Peter Theran to help us lead the expansion of our retail and consumer activities now that we believe that ***we succeeded in delivering world-class product.*** And that is only the beginning of what we believe will become a much more meaningful part of our business going into 2015 and beyond.

212.    In response to a separate analyst question, Defendant Reichental stated that

Company's consolidation and integration of new acquisitions had been a success:

> The nature of consolidation and integration is such that, given that we like to do it in a way that's accretive and profitable, we are shedding unprofitable growth and replacing it with profitable growth.  When you do it, and in every period you continue to add acquisitions, the underlining net progress is not as clear as it would be had we ceased to make those acquisitions. And I think what you should really take note of is that, even in a period that we had a high concentration of acquisitions, we still managed to expand our gross profit margin, which for that particular business right now is our primary objective - to fully integrate, to put it all on the same platform, and to continue to expand margin. *We have done it really well, and we expect that, that will bode well for us in the future.*

213.    Defendant Reichental also stated that inventory was expected to level off or fluctuate

incrementally, suggesting that there were no serious or long term issues:

> As it pertains to inventories specifically, it's true that our inventory increased, primarily on the addition of acquired products - primarily, in this case, Simbionix, which is a product company and has increased our inventories sequentially over the prior quarter - and, to a lesser extent, the support of all the new products that we have added to the portfolio: the second manufacturing line for metals; the new consumer products; et cetera. *Going forward - again, absent significant acquisitions that come with inventory, going forward, expect inventory to level off and to just incrementally fluctuate in support of portfolio additions.*

214.    Defendant Reichental also announced on the call that the Company had appointed

Defendant Hull as 3D Systems' new CFO, effective November 11, 2014, along with other new

appointments to the Company's leadership team.  Defendant Hull succeeded Defendant Gregoire,

who transitioned to the role of Executive Vice President, Mergers and Acquisitions.

### 3.    UBS Global Technology Conference

215.    On November 19, 2014, Defendant Reichental and Witten participated in the UBS

Global Technology Conference on behalf of the Company.  During the conference, Defendant

Reichental commented on 3D Systems' direct metal business:

> Direct metals, we beat ourselves up for not being able to deliver more, but in reality, we have grown this business by 241% from the time that we acquired it over the first nine months of this year. *We now have the capacity in place to fulfill additional*

***orders that we have in our order book.*** And in addition to that a couple of days ago, we announced the availability of even a larger metal system that in our minds open completely new opportunities. It's a system that can operate direct metal part in 500x500 millimeters.

216.     During the question and answer session that followed Defendant Reichental's opening remarks, he responded to a question concerning the Company's numerous acquisitions. He touted 3D Systems' acquisition strategy and ability to effectively integrate and scale newly acquired companies, citing Phenix as an example:

> We've done acquisitions well. We have done them early. We paid low and we extracted significant value before it became overheated and overvalued.
>
> And one good example of that is the acquisition of Phenix. We paid for Phenix about $20 million. We are already at a revenue run rate for Phenix that is within $1 million of $2 million a quarter of Arcam, which is a nice Swedish publicly-traded company that has been doing direct metal for almost 15 years. Their valuation is in the hundreds of millions.
>
> So our ability to take a technology and a company because we know the space well to make an acquisition to integrate it and to scale it is extraordinary, and we've done it time and time again.
>
> So you have to look at the fact and yes, we are not happy that we didn't grow by 400% the metals business and that we couldn't bring on the second manufacturing facility fast enough. But we did take this business in one year from zero to 241% and now we have the facility in place.

### 4.     Stifel, Nicolaus Technology, Internet & Media Conference

217.     On February 9, 2015, Evans participated in the Stifel, Nicolaus Technology, Internet, & Media Conference on behalf of 3D Systems. Evans admitted that the Company did not "fulfill [its] full potential" on selling direct metal and consumer products in 2014, but suggested there were no longer any quality issues with those products, at least on the consumer side. In particular, he called the Cube 3 consumer printer a "dynamite product. . . . getting a lot of good reviews" that was being "adopted at retail, at homes, and in schools":

> Yes. So the organic growth rate has retreated from 20% to most recently 10% level. And if we were in full-bloom on our consumer products and our metals or even half-

bloom, I think we could have maintained our internal growth rate. But some of our highest hit, highest trajectory products, we did not achieve in 2014 our potential.

**And the Cube 3 is a dynamite product. It's getting a lot of good reviews. CNET over the weekend did a review of it -- calls it the best you can expect in home printing from the Cube 3. So it's a dynamite machine that is being adopted at retail, at homes, and in schools.** And in 2014, we are effectively -- had a limited window of opportunity to be in the market with that.

So between the Cube and our metals portfolio, which we were trying to ramp up manufacturing in the US on metals*, we did not fulfill our full potential in 2014 on either of those products. And if we had, I think we could be -- not have missed any of the -- not have throttled back on our internal growth rate like it happened.*

218.     The above statements from the Company's press release and preliminary earnings conference call on October 22, 2014, the Company's press release, SEC Form 10-Q, and earnings conference call on November 10, 2014, the UBS Global Technology Conference on November 19, 2014, and the Stifel, Nicolaus Technology, Internet & Media conference on February 9, 2015 were materially false and misleading and omitted material facts because:

(a)     Defendants struggled to integrate systems and operations of the many new and disparate acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies.  Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded by the costly introductions of dozens of new products at the same time.  This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to boost growth through acquisitions and new product introductions was successfully growing the Company's revenue, increasing its market share, and maintaining its leadership position (*e.g.*, new acquisitions were "being integrated in the ordinary course. . . . the integration is going extremely

- 86 -

well.  And all of these companies have been completely on boarded per usual"), while presenting little downside other than temporary earnings and margin compression, and temporary increases in investment-related operating expenses (¶¶198-213, 215-217);

(c)    Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  Specifically, the Company did not have adequate manufacturing capacity to produce direct metal printers on a scale sufficient to meet consumer demand.  Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

(d)    Defendants failed to fully reveal these manufacturing capacity and quality problems to investors.  Instead, they misleadingly stated that the Company would be able to meet strong customer demand by dramatically increasing manufacturing capacity during the Class Period (*e.g.*, "[n]ow that we have effectively closed th[ese] product availability gaps we expect our revenue growth rates to increase"; "we believe that we are back on track . . . . in the fourth quarter we will have all the capacity that we need to deliver direct metal 3D printers to the market").  They also misleadingly boasted of the positive attributes, successful introduction, and strong customer reception of such printers (*e.g.*, "the early reception for our Cube 3 and Cube Pro have been phenomenally positive"; "we succeeded in delivering world-class product") (¶¶198-213, 215-217);

(e)    Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and

achieving such projections. Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)    Poor inventory control was an additional consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth. In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems. These problems contributed to the Company's operating inefficiencies and elevated operating expenses, and led to inventory write-offs (¶¶67-79);

(g)    The Company failed to fully disclose these inventory-related problems to the market, and instead misleadingly revealed only a temporary increase in inventory due to new product introductions (*e.g.*, "going forward, expect inventory to level off and to just incrementally fluctuate in support of portfolio additions") (¶213);

(h)    The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters, to meet Defendants' aggressive revenue projections. This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters. These problems contributed to the Company's operating inefficiencies, low productivity, lost sales opportunities, and elevated operating expenses (¶¶80-91);

(i)    Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period, and claimed that such projections were justified by customer demand. Defendants did not have a

reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶198-213, 215-217); and

(j)     The Company's Form 10-Q for the third quarter of its fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

### C.     Defendants' False and Misleading Statements and Omissions from February 26, 2015 Through April 23, 2015

#### 1.     Press Release, SEC Filing, and Conference Call Regarding the Company's 2014 Fourth Quarter and Year End Financial Results

219.     On February 26, 2015, 3D Systems issued a press release setting forth the Company's financial results for its fourth quarter and year ended December 31, 2014, reporting "record revenue" for the quarter, direct metal performance that "surpass[e]d industry growth rates," and increases of direct metal and consumer quarterly revenue by 178% and 68%, respectively.  The press release announced 2015 revenue guidance of $850 to $900 million

220.     On the same day, February 26, 2015, 3D Systems filed with the SEC a Form 10-K reporting financial results for its fiscal year ended December 31, 2014, as discussed in the Company's press release and earnings conference call on February 28, 2014, summarized herein. The Form 10-K detailed financial results, including increased revenue growth and gross profit, and stated that the Company was "continu[ing] to develop new products and services and have expanded our technology platform and 3D ecosystem through internal developments, relationships with third parties and acquisitions."

221.     The Company's 2014 Form 10-K also contained SOX certifications by Defendants Reichental and Hull that were materially similar to those identified above in ¶125.

222.     On the same day, 3D Systems hosted a conference call to discuss the Company's financial results.  Defendants Reichental and Hull participated in the call on behalf of the Company. In his opening remarks, Defendant Reichental reiterated prior disclosures that in 2014 the Company was not able to close a revenue gap caused by delayed consumer products and direct metal capacity constraints, but highlighted a consumer revenue increase of 26% ("rebounding strongly later in [2014], as we commenced commercial shipments of our newest consumer printers") and direct metal printing revenue increase of 175%, achieving the higher end of the Company's guidance range of $25-$50 million.

223.     Later in the call, Defendant Reichental stated an expectation for "organic growth for 2015 to increase progressively . . . extending throughout the year progressively, all the way up to 30% for Q4."  He added that the Company was poised to capitalize on the "effective and disciplined" investments it had made over the last 15 months:

> We're in the early innings of mainstreaming adoption for our products and services and believe that the ***effective and disciplined investments*** we have made over the past 15 months position us extremely well for the open-ended opportunities in front of us. Having assembled the technology building blocks, infrastructure, and talents required to scale our business and extend our first mover advantage in key verticals, we believe that we're now poised to leverage all of our fundamental assets and strengthen our execution to create greater value faster.

224.     In particular, Defendant Reichental cited continued high growth expectations for consumer and direct metal products, calling the consumer products "outstanding" and their customer reception "exceptional":

> And in terms of expectations for 2015, look for us, the consumer game is just beginning. We held our powder most of 2014 with, I would say, great discipline to make sure that, when we pulled the trigger, we had the best product on the market.

> For Q4, consumer revenue was up 68%. For the full year, not so much. Because for the full year, we didn't have much by the way of product to sell.

*But the game is just beginning, and the demand is very strong. The reception is exceptional. The product is outstanding -- I should say, the products are outstanding.*

In terms of a bogey for 2015, I would say that the range that we provided a year ago, which was in the range of the $80 million to $120 million, hasn't evaporated. It just moved forward a few periods.

\*          \*          \*

As to direct metals, with the second manufacturing facility online, we enjoyed a sequential unit increase of about 78% for the fourth quarter. For the full year, we had about a 63% increase in units. So we expect that trajectory to continue.

225.    In response to an analyst question, Defendant Hull explained the Company's 2015 revenue guidance of $850-$900 million in optimistic terms, as follows:

We see a lot of positive things as we go through the year, and we expect to be in our typical kind of skew through the quarters -- being more in the back-end loaded, if you will, from a revenue standpoint. And with the actions that we have in place from our product lines and some of the strength that we have, especially with some of the higher-margin products, we're pretty optimistic, in terms of how that will develop through the year. So we basically really wanted to link the Company together, in terms of looking at how we see the guidance coming together and then, go forward and execute against it.

226.    Separately, Defendant Hull added that the Company expected "increased leverage as our revenue growth rates outpace our operating expenses" given that "we're at the end of our stepped-up investment phase and are beginning to tightly integrate our assembled assets." He also said that gross margin was expected to resume its expansion:

Looking beyond these transitional factors, we believe that the fundamentals of our business model remain intact, and *we expect gross margin to resume its expansion* by increasing materials, software, and healthcare revenue contributions at higher gross profit margins; recovering product gross margins following a period of concentrated new products and facilities transition; and continuing operational synergies and greater leverage from tighter integration and operational efficiencies.

227.    The above statements from the Company's press release, SEC Form 10-K, and earnings conference call on February 26, 2015 were materially false and misleading and omitted material facts because:

- 91 -

(a)     Defendants struggled to integrate systems and operations of the many new and disparate acquisitions they had accumulated in a short time period, while grappling with problems and limitations inherited from the new companies.  Thus, 3D Systems was forced to spend tremendous amounts of time, effort, and money integrating such acquisitions, compounded by the costly introductions of dozens of new products at the same time.  This created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company, causing it to lose focus and spread its operations too thin (¶¶44-91);

(b)     Defendants failed to disclose these material problems to the market, and instead gave investors a misleadingly positive perception that the Company's aggressive strategy to boost growth through acquisitions and new product introductions ("27 new products last year alone") was successfully growing the Company's "record revenue," increasing its market share, and maintaining its leadership position, while presenting little downside other than temporary earnings and margin compression, and temporary increases in investment-related operating expenses (*e.g.*, "we anticipate increased leverage as our revenue growth rates outpace our operating expenses") (¶¶219-226);

(c)     Defendants' growth strategy, acquiring and introducing dozens of new companies and products in a short period of time, caused manufacturing problems that prevented the Company from capitalizing on demand for key products, including direct metal and consumer 3D printers.  Specifically, the Company did not have adequate manufacturing capacity to produce direct metal printers on a scale sufficient to meet consumer demand.  Product quality problems caused additional delay, preventing the release of new and heavily promoted direct metal and consumer printers (¶¶52-66);

(d)     Defendants failed to reveal these manufacturing capacity and quality problems to investors.  Instead, they misleadingly stated that the Company would be able to meet strong customer demand by dramatically increasing manufacturing capacity during the Class Period.  They also misleadingly boasted of the positive attributes, successful introduction, and strong customer reception of such printers (*e.g.*, "[Consumer product] demand is very strong.  The reception is exceptional.  The product is outstanding – I should say, the products are outstanding.") (¶¶219-226);

(e)     Moreover, the sales and revenue growth projections touted by Defendants were illusory because severe quality and manufacturing problems delayed the release of their direct metal and consumer printers, thereby preventing the Company from capitalizing on demand and achieving such projections.  Therefore, Defendants did not have a reasonable basis for such projections (¶¶52-66);

(f)     Poor inventory control was an additional consequence of the Company's thinly stretched operations and lack of focus resulting from its acquisition spree and rush to release new products to fuel aggressive revenue growth.  In particular, the Company struggled with costly inventory losses, obsolete inventory, and related problems.  These problems contributed to the Company's operating inefficiencies, low productivity, lost sales opportunities, and elevated operating expenses.  However, the Company failed to fully disclose these inventory-related problems to the market (¶¶67-79);

(g)     The Company's operating problems were exacerbated by intense pressure to boost revenue by shipping and booking as many orders as possible at the ends of quarters, to meet Defendants' aggressive revenue projections.  This caused rushed and incomplete shipments, overworked conditions, customer discounting, relaxed customer approvals and payment arrangements, as well as other questionable shipping practices at the ends of quarters.  These

problems contributed to the Company's operating inefficiencies and elevated operating expenses (¶¶80-91);

(h)     Defendants failed to disclose these quarter-end practices and problems to the market, and instead continued to make aggressive revenue projections throughout the Class Period, and claimed that such projections were justified by customer demand (*e.g.*, progressive organic growth "all the way up to 30% for Q4 [2015]"). Defendants did not have a reasonable basis for such financial forecasts given the Company's operating and product quality problems that prevented it from capturing such demand (¶¶219-226); and

(i)     The Company's Form 10-K for its fiscal year 2014 was materially false and misleading because it failed to disclose to the market (in violation of Item 303 of Regulation S-K) the materially adverse conditions described in this paragraph.

## VII.     THE TRUTH IS MORE FULLY REVEALED

### A.     Press Release and Conference Call Regarding the Company's Preliminary First Quarter 2015 Financial Results

228.     The Company finally began to reveal the full extent of its problems to investors through a combination of statements made on April 24, 2015, when the Company suddenly issued a press release announcing disappointing preliminary financial results for its first quarter ended March 31, 2015, and again on May 6, 2015, when 3D Systems issued its actual financial results for that quarter. In the preliminary press release, Defendants disclosed a revenue shortfall based in part on "***certain metal and nylon applications and performance issues [that] delayed the company's ability to sell additional printers during the quarter***," as well as a sudden decrease in customer demand due to economic factors.

229.     On the same day, 3D Systems hosted a conference call to discuss its preliminary, declining financial results. In his opening remarks, Defendant Reichental again stated that the

combination of an abrupt interruption in customer demand and performance issues affected direct metal (as well as nylon) printers and compressed expected revenue growth.

230.    Defendant Reichental explained 3D Systems' failure to report the Company's organic growth rate as it usually had, noting that the Company did not expect *any* organic growth in the quarter, a far cry from the 30% organic growth that Defendants continually projected throughout the Class Period:

> I think that it should be clear that because our preliminary results clearly reflect revenue shortfall from adverse currency and lower than expected printers and materials revenue, ***we don't expect to report organic growth for the quarter***. That doesn't mean that we have given up on the rest of the year. It's just that the combination of where the shortfall was and the double impact of currency on top of it is not likely to result in organic growth for the first quarter. In terms of assessing the rest of the year, we think that it's premature at this point in time to make any comments about that. We are taking time to do a comprehensive evaluation. We're factoring in what didn't go as planned in the first quarter and also what is beginning to come back. And based on that, we will update you probably on our May 6 scheduled earnings call.

231.    With regard to 3D Systems' direct metal and nylon printer performance issues, Defendant Reichental described the need for extensive corrective measures and expenditures:

> ***Let me start by saying that every time when we have a challenging application or a quality problem, it's disappointing to us because we like to make sure that everything that we deliver works as intended and is as flexible and capable as it could be***, but to put things in perspective before we get into all the causes here, the real impact of this issues in the quarter we estimate to be less than 3% of our total revenue for the quarter. So I want to make sure that we frame it. In terms of what's going on, in the case of direct metal, we believe that about 5% of our metal installed base experience several challenging metal application that centered around the manufacturing of unique geometries with specialty materials. ***And we've isolated these cases, we're working with the identified customers on a proper corrective measures.*** And I believe that with the exception of two or three remaining users, we have the situation well in control.
>
> And even with that, our direct metal printer unit sales for the quarter compared to last year were up 46%. ***We expanded our engineering support capabilities and are working through additional applications and we also implemented several system-wide enhancements to our metal printers as part of enhancing the overall performance of our offering.*** And finally, we have a few more in additional metal printing capabilities that we plan to bring to market as the year progresses to further

strengthen our metal printer portfolio and make sure that it is addressing the widest possible range of applications from the get-go competitively. With regards to nylon printers, we experienced several issues with one of our printer models, with the ProX 500. First, it related to some random out-of-box quality issues that we identified and addressed immediately as part of the manufacturing and quality system. ***In fact, we are investing a great deal to completely step up our quality and control systems as a result of this discovery because it was very upsetting to us.***

And second, we isolated a thermal distribution anomaly on this particular system that we are addressing. We expect remaining issues to be resolved promptly and we're taking additional significant steps to ensure that all of our quality systems are fully in effect. Again, all told, even though we are flagging this as a driver in our results for the quarter and take full and complete responsibility and are taking the necessary actions here, to frame it and to put it in perspective, when all is said and done, we estimate that this accounted for less than 3% of what would have been our estimated revenue for the quarter. ***We're not happy about it. We're taking the corrective actions. There is a lot more of that is being done, but that's the full and complete report.***

232.    During the call, Defendant Hull provided further detail on the factors that negatively impacted 3D Systems' financial results, including additional direct metal and nylon printer issues that delayed sales:

So when we look at the shortfall, it was primarily in printers and materials, specifically from industrial and healthcare customers. To a lesser extent, although it was not material to our total revenue, ***we had certain metal and nylon applications and performance issues that delayed our ability to sell additional printers in the quarter.*** Our channel productivity and coverage initiatives that we launched earlier in the year were muted in the wake of these conditions but are going full speed ahead. Certainly, our resellers were not spared, these adverse impacts, as postponed orders pressured them as well.

233.    When asked about the long-term growth perspective, Defendant Reichental highlighted the Company's steps to enhance quality, performance, and value, and "eliminate some of the duplication and redundancy that we acquired from acquisitions and turn our organization into highly productive and efficient organization," citing below-plan revenue and operating expenses that "got a little bit ahead of us":

We have taken certain steps to continue to improve our channel coverage and productivity and training and the capacity to continue to develop the market. We continued to ***take steps to enhance the quality and performance and value of all of***

- 96 -

*our systems* and we continue to invest in technologies that we believe will give us the advantage in the key markets that we are targeting.

And we believe that we are still in the very early innings of the development of this industry. I think that what we experienced in the first quarter is indicative of periodic pauses in the fast growing industry, some that are out of our control, some that are probably indicative of the ebbs and flows of the whole industry, *and some that are fully in our control and depend on our execution.* As it pertains to making sure that in and not so good cycles, we preserve our financial strength and flexibility. *We had a clear case here in the quarter where our revenue wasn't on plan, but our cash operating expenses were on plan and got a little bit ahead of us.* That is something that can certainly control, plan to control and expect to control, but not at the expense of our future growth plan. So we will continue to invest in R&D, we will continue to add positions that are critical to our success and at the same time, *we're going to continue to eliminate some of the duplication and redundancy that we acquired from acquisitions and turn our organization into highly productive and efficient organization.* That's the plan. And the speed bumps that we encountered in the first quarter gives us even more clarity and impetus about accelerating all of these activities.

234.    Defendant Reichental added that "[w]ith the current conditions, we are actually *accelerating* our ongoing integration productivity and efficiency measures, and expect to see results in the coming periods."

235.    Similarly, when Defendant Hull was asked to speak about changes that he or other new executives at 3D Systems intended to implement, he focused again on "taking a hard look at our acquisition activity," leveraging prior investments, and "controlling" operating expenditures, in addition to growth and margin expansion.  He added that the Company was "*accelerating our productivity and efficiency measures*" disclosed previously "to eke out and squeeze out additional cost efficiencies and synergies from all of our acquisitions last year."

236.    Defendant Reichental added that the Company had decided to "substantially dial down acquisitions," in order to re-focus on refinement, execution and profitability in 2015:

With that in hand, *we're going to substantially dial down acquisitions* for the foreseeable future and we're spending all of our attention now on scaling our organization on organizing it for better growth on realizing the synergies from all these acquisitions and leveraging the technologies that we already assembled and parlaying them into long-term sustained profitable growth. We have done it with

metals, and we plan to introduce more metal capabilities as the year progressive. We've done it with our consumer business and plan to introduce more there. We've done it with our professional and production business and plan to introduce additional capabilities as the year progresses, including taking a leadership role in the whole discussion around speed and what's possible around speed, all the way from your desktop to continuous manufacturing. So this is a year that is all about refinement, execution and profitability for the balance of the year.

237.    In response to an analyst's question regarding the health of the Company's business, given the quarterly "misses" piling up, Defendant Reichental admitted that the Company had been looking at and trying to fix the issues "on a daily basis for quite some time," including the issues affecting direct metal products, which "we believe are critical to our future success":

**Holden Lewis, Oppenheimer Holdings, Inc.:** You commented earlier that you don't believe that anything has changed structurally with regards to your business model in the industry. And I guess the question is, we've had a series of quarters where it seems like the misses pile up and it seems like the reasons behind those misses, it seems like there's something different every quarter, and I guess what I'm wondering is should we be taking this and look at it and say, maybe we should be looking at the structural nature of our business model and asking some questions about complexity, focus, things like that? I'm just wondering, should we be complacent about the overall health of the business model when we've had just this string of issues kind of popping up. Have you given any sort of broader strategic thought to sort of how the model maybe should be looked at in terms of changing?

**Defendant Reichental:** *We have done nothing but look at all these issues on a daily basis for quite some time, Holden.* And it's a good question to ask. There is no question that in the last 24 months, 3D Systems decided to go after the assembly of *several technologies and capabilities that we believe are critical to our future success. Those included the acquisition and proficiency in direct metals* which even though we've only been on the journey for a year and a half, we believe that in terms of the impact, revenue and the results are at the leading edge of revenue generation and profitability, and application coverage, notwithstanding the challenging and difficult applications that we had encountered, and you yourself, Holden, commented on a few days ago.

*                *                *

*So I would certainly take full and complete responsibility for the growing pains and [divvying] pains that we've had over the last several quarters.*

But I would also suggest that to succeed in next few innings of playing for this opportunity, the companies that will be succeed will be companies that can successfully make managing complexity a core competency. And so we have done

several or we've taken several steps to address that head-on as well. We have brought on a very experienced Chief Operating Officer, who is increasingly not only learning the industry and the business but making significant positive impact. We have organized ourselves around categories and activities, and empowered several other senior executives to take a complete ownership of other parts of the business.

We have organized our R&D and manufacturing factoring to be able to support a broader portfolio. We have made a significant investments in the last year and a half in expanding manufacturing capacities, building new facilities, ramping up our IT and infrastructure. And we believe that in all of that we are positioning ourselves for long-term sustainable growth and profitability. So, Holden, *we've been doing nothing, but evaluating self-criticizing and agonizing over the business model and the strategy and I believe that we have in addition to bidding ourselves up and being constructively critical have taken many, many steps to position ourselves to be successful in managing complexity and to be profitable in managing complexity*. And when all is said and done, I believe that we have a great deal more to offer as a company as the result of what we have assembled and as a result of the way that we're organized, the talent that we have, and most importantly, the portfolio and the channel access that we have.

238.    On this news, the price of 3D Systems stock suffered another large decline and additional analysts, including Piper Jaffray, Canaccord, and UBS, downgraded their ratings and lowered their price targets for 3D Systems stock.  After closing at $30.15 per share on April 23, 2015, the stock closed at $27.23 per share on Friday, April 24, 2015, on unusually high trading volume of nearly 7.2 million shares.  As the market continued to digest the news, the stock continued to fall the following trading day, closing at $25.28 per share on Monday, April 27, 2015, on unusually high trading volume of nearly 5.9 million shares.  The total stock price decline over this period was 16.2%, or $4.87 per share.

**B.      Press Release and Conference Call Regarding the Company's First Quarter 2015 Financial Results**

239.    Then, on May 6, 2015, 3D Systems issued a press release setting forth the Company's results of operations for its first quarter ended March 31, 2015.  The press release reiterated and expanded upon some of the information provided on April 24, 2015, citing a weakness in demand attributed to performance issues in certain metal and nylon applications, which further delayed the

Company's ability to sell printers during the first quarter of 2015, as well as certain macroeconomic

factors reducing customer demand.  The press release also withdrew the Company's previously

stated guidance:

> Given marketplace uncertainties, management believes it is prudent at this time to withdraw the company's previously issued annual guidance for 2015. Management continues to rigorously assess the macroeconomic environment and customer demand and plans to provide an update regarding guidance when management has more clarity that sector conditions have stabilized.

240.    On the same day, May 6, 2015, Defendants Reichental and Hull participated in a

conference call with analysts to discuss the Company's financial results for the first quarter of 2015.

During the call, Defendant Reichental expressed disappointment with the Company's results,

particularly its revenue generation.  He blamed certain economic factors (including a sudden

interruption in demand) and "several metal and nylon applications and performance issues," which

"delayed our ability to sell another approximately $5 million worth of printers during the quarter."

241.    Defendant Reichental also discussed the Company's acquisition growth strategy and

its plans going forward.  He stated that the Company had ceased its acquisition spree to focus on

"*accelerat[ing]* our planned integration productivity and efficiency measures," including leveraging

and optimizing infrastructure, driving operational synergies and cost downs and "***enhancing and

expanding our quality processes and organizing our business practices to better align our talents

and technologies with market opportunities***."  He added that the Company was now focusing its

spending on "specific operational initiatives that are designed to deliver greater earnings power" as

opposed to "M&A spending to high-growth sectors within professional products and services."

242.    Defendant Hull added that "[g]iven marketplace uncertainties, including those that we

have discussed on this call, we believe that it is prudent at this time to withdraw our previously

issued annual guidance.  We continue to rigorously assess the macroeconomic environment and we

will provide an update regarding guidance when we have more clarity that sector conditions have stabilized."

243.    During a question-and-answer session with analysts, Defendant Reichental reiterated that the Company's current phase of acquisitions had concluded and the Company would instead be focusing on citing "a series of efficiencies and productivity improvements, and tighter integration of the remaining acquisitions that we made from the December quarter through the March quarter."

244.    Defendant Reichental then spoke about application and performance issues afflicting direct metal printers, stating that the Company was not in denial about the problems and instead was "all over them" and in the process of "enhancing our capabilities and developing additional capabilities that we plan to bring in to the market in the coming periods."

245.    On this news, the price of 3D Systems stock fell once again. After closing at $24.21 per share on May 5, 2015, the stock dropped 5.4% ($1.31) to close at $22.90 per share on May 6, 2015, on unusually high trading volume of approximately 6.4 million shares.

## VIII.  POST-CLASS PERIOD REVELATIONS

246.    Following the Class Period, on May 15, 2015, Defendant Hull, who had served as the Company's CFO for just six months, was replaced by Styka, who had served as the Company's Chief Accounting Officer.

247.    Shortly thereafter, Defendants provided additional information concerning the headwinds 3D Systems was facing as a result of its aggressive acquisition strategy and drive to introduce myriad consumer products within a short time period.

248.    On May 12, 2015, Evans and Witten participated in the Oppenheimer Industrial Growth Conference on behalf of 3D Systems. During the call, Evans acknowledged that the Company halted its acquisition strategy to focus on integration of the acquired companies and stated:

Yes, we are addressing all facets of the Company to effectively -- we've bought 50 companies in the last five years. ***So we are now going to consolidate, integrate, and leverage all of our assets to improve our margins, take costs out, and control what we can control. That's what we can control and so there's initiatives across the whole Company to integrate more effectively and extract the efficiencies that are there,*** so that as the new wave comes, we have a margin structure that's going to be enviable.

And so there's almost too many of them to talk about, but you're exactly -- picking up on Mark Wright, our Chief Operating Officer, he is bringing supply chain scrutiny and efficiencies to everything we're doing on the way we manufacture. He's bringing a very sophisticated, rigorous approach to managing our resellers and the programs we're putting in place with the resellers. ***We have redundancies through office locations. We have redundancies in functional aspects from various acquisitions.*** So we are laying -- we are essentially in the process of laying out the roadmap to go capture all these efficiencies and we think every quarter this year you'll see a little bit more on that score, as we head out to the year. Did I say that right?

249.    Similarly, on June 3, 2015, when 3D Systems participated in the Stephens Inc. New York Conference, Evans confirmed that 3D Systems' focus had turned to integrating the acquired companies:

Still the idea, still the message, still the -- we're working every day to consolidate, integrate, and leverage many of the acquisitions we've made and the new products we've introduced. And as we have captured a lot of hills in the last three years in medical, in metals, in materials. And increasingly in main street. And now really the ability to consolidate all of these plans into a higher margin structure is very much the game plan.

250.    On August 6, 2015, the Company issued a press release announcing negative financial results for the second quarter and first six months ended June 30, 2015, stemming from operating inefficiencies.  As stated in the press release, the "challenging operating environment" resulted in a drop in organic growth to just 2% for the second quarter, as well as an inventory write-off, among many other negative revelations.  Defendant Reichental commented on his disappointment with the overall results, clearly attributing them to the Company having taken on too many acquisitions within a short time period which negatively impacted the quality of 3D Systems' products:

While a period of high growth enabled us to acquire strategic assets and build critical expertise, our rapid expansion permitted certain operating inefficiencies that we are currently addressing. Specifically, we are enhancing the quality of our products and services, accelerating synergy and cost reduction measures, driving process improvements and working closely with our channel partners to improve our sales operations and worldwide coverage.

251.    Also on August 6, 2015, Defendants discussed the Company's negative financial results and operating difficulties during a conference call with analysts.  During the call, Styka reiterated Defendant Reichental's comments in the press release concerning the operating inefficiencies that resulted from 3D Systems' rapid expansion through its acquisition strategy:

As Avi mentioned earlier, *the recent period of high growth allowed us to assemble key assets and expertise, but this phase also permitted certain operating inefficiencies. Therefore, during this challenging period, we are focusing on driving productivity and efficiency measures to achieve greater operational leverage. Specifically, we are continuing to consolidate facilities, shed less profitable activities, accelerate synergy and cost reduction measures, and drive process improvement.* While we are consolidating and implementing cost reduction measures, our operating expenses have not yet leveled off as a result of continued investment in several areas that we believe are critical to success including quality and partner initiatives. Accordingly, we expect that over the next few periods, we will see a leveling off and decline of cash operating expenses.

252.    Defendant Reichental further explained the Company's need to focus on and repair the numerous execution and quality issues it had been experiencing.  As a result of the aggressive acquisition strategy that burdened the Company's operations and performance:

We have come to believe that delivering quality in everything we do can garner a significant competitive advantage. *In line with that, we have recently created a board level quality committee, and have begun implementing a series of company-wide initiatives that impact every stage of our products lifecycle.*

We are enhancing new product delivery processes by fully leveraging our acquired Wilsonville expertise in design, reliability engineering, quality and compliance testing for all products. *We're installing additional process checks and performance metrics designed to improve quality and reduce manufacturing errors throughout our operations.*

\*       \*       \*

- 103 -

In conclusion, we're concentrating our efforts and resources on quality, differentiation, and value creation. We believe that delivering quality in everything that we do from product design and manufacturing processes to partner training and customer support, will strengthen our overall competitiveness.

253.    Defendant Reichental also explained that 3D Systems chose to rein in operating expenses, and shift from its acquisition strategy to "internally developed capabilities, [and] internally enhanced competencies in quality and service":

> **But at the same time, we have taken on additional costs in the last few years, as a result of acquisitions. And at the moment, we believe that our overall cost structure is a little bit ahead of revenue generation.** And so we're doing both. We are realigning our costs with our priorities. We are making sure that we're allocating resources to the varied growth initiatives, and new products, and quality initiatives that we deem to be critical and strategic to the next level of growth.  Because we believe that on the other side of this industry level pause, there is significant growth opportunities for our Company.  But at the same time, we believe that we can bring our overall cost structure to a much more manageable level and get the leverage, and the financial strength, and flexibility, and free cash generation that is worthy of the business that we are running.
>
> *          *          *
>
> I think that for more than a year now, we've been saying that we had a period of accelerated investments and M&A activities.  Because we felt that we needed to assemble all the critical and strategic assets and expertise so that we could begin to execute the next phase of our growth with differentiated technology in-house, both on the printer hardware, the material science and technology, and importantly also the software and services capabilities.
>
> We've been signaling now for quite some time that as we get ourselves to a point where we feel that we amassed all of these expertise, the next phase is going to be about optimizing what we acquired, leveraging it into new products and services, and delivering also the synergies that are available from the combination and consolidation of those businesses. Including potentially new revenue streams that will come from the combination of software and hardware and process technology into various areas. **With that in front of us, we see that the next phase is one of internally developed capabilities, internally enhanced competencies in quality and service. In refined coverage and sales capabilities, and in less M&A and more organic type activities.** And that is completely consistent with what we've said all along.

254.    The stock did not react to the negative earnings announcement because the market already understood the dire situation the Company was facing after the negative announcements in

on April 24, 2015 and May 6, 2015.  UBS issued a report explaining the lack of volatility in the stock price noting that "[e]xpectations leading up to results were extremely bearish."  A Morningstar report aptly summarized the "full plate" facing 3D Systems, stating, "The firm has completed roughly 30 acquisitions since 2012. Management's challenge is to aggressively integrate and streamline acquired assets, remedy lingering product performance issues, and continue investing to strengthen key industry verticals."

255.   On August 13, 2015, Defendant Reichental attended the Canaccord Growth Conference on behalf of 3D Systems during which he repeated his mantra of focusing on efficient integration of the acquired companies stating,  "for the remain[der] of this year and well into through next year, we are really focusing on how do we tightly integrate and leverage all these assets. . . . So definitely more of a fine-tuning, efficiency and harvesting, and primary a focus on organic initiatives going forward."

256.   Defendant Reichental also spoke about the consumer segment, referred to by an analyst as "a pretty controversial segment."  Defendant Reichental tried to downplay the issues facing 3D Systems' consumer products, and explained the delay in introducing consumer products:

> You call it a controversial segment. I call it a challenging opportunity in the sense that, unlike some of the other players in the space, we have been very disciplined in refraining from releasing our products prematurely. Last year, we actually delayed the introduction of our Cube 3 and CubePro by nearly nine months, because we were not happy with the out-of-the-box plug and play aspects of it. We launched it to great reception, and while we are not pleased with the outright consumer at-home adoption of the product for a variety of reasons, we believe that the products are ideal today for K-12 EDU and for the engineers' desktop.

257.   Defendant Reichental also spoke about the challenges 3D Systems faced in the metal division:

> We did have our challenges with certain performance and application-related issues, with one of our metal printers, specifically with the ProX 300.  And most of those were related to consistent powder feed and refresh and very long build. We understand it, we have taken measures to correct it and we are working with all of the

impacted customers. It certainly negatively affected repeat sales from customers that were queued up to buy additional units. Even with that, year-over-year for the first six months of this year, units still increased I believe something like 37%, which means that we have sold more of the smaller and midrange printers and not as many of the large printers that were impacted by these performance issues.

258.    Just a few days later, on October 29, 2015, the Company announced that Defendant Reichental had abruptly stepped down from his position as President and CEO of the Company, making him the third executive to leave 3D Systems during the Class Period. No explanation for his resignation was given, although 3D Systems said it was a "mutual agreement" with the board. S&P Capital IQ analyst Angelo Zino said the outgoing CEO was "pushed out" due to the Company's struggles and investor frustration over the last couple of years.

259.    Further, an article posted on 3Dprint.com on the same day, speculated that the Company would be forced to close its Andover facility, which houses, among other divisions, the Projet and Cubejet engineering team and the Projet manufacturing team, as a cost-saving measure.[1] The article stated:

> Anonymous sources tell us that yesterday morning several 3D Systems executives and representatives from the human resources department advised several departments in the Andover, Massachusetts facility that they were being closed down as a cost-saving measure. . . .
>
> *              *              *
>
> The Frankensteinian nature of 3D Systems has always been a worry to many in the industry. The company, seemingly desperate for innovation and a desire to meet impossible promises to investors and an eager public, tried to simply buy their way to success. Over the last few years the company has made more than a dozen high-profile purchases of startups, several of them completely untested with no plan for commercialization. As the spending spree started to add up and 3D Systems stock dipped lower and lower many investors had enough and filed a class action lawsuit, claiming that they were misled by company leadership about the their production capabilities and the long-term growth potential of 3D Systems.

---

[1]    Scott J. Grunewald, *Rumors of Facility Closures and Looming Layoffs Paint a Bleak Picture for 3D Systems*, 3DPRINT.COM, Oct. 29, 2015, http://3dprint.com/102998/3ds-rumors-of-closures-layoffs/.

Integrating acquired companies into an existing one is always difficult and often leads to growing pains as they settle into their new roles. But it seems like adding so many companies so quickly made it virtually impossible to pull together a unified corporate culture. Many of 3D Systems' recent acquisitions included high-paid executive or management positions, making the already top-heavy company even more unbalanced. . . .

*     *     *

Many will place the blame squarely on now-former-CEO Avi Reichental, and that isn't entirely unjustified. He has always been known as a bit of a micromanager, and his public persona will do little to stem accusations that he's oversold what 3D Systems and their technology can do. But if he was the only executive making poor decisions for the company, why hasn't anyone on the board stepped in before now?

It is doubtful that 3D Systems as a company will die or dissolve; companies that size rarely do. But to keep the company from coming apart at the seams, stem the high turnover rate and loss of top level talent who often quickly flee to better paying companies and maintain the integrity of their worldwide resale and distribution network, they are going to have to lose a lot of dead weight. Going forward it is clear that 3D Systems needs a massive restructuring at the executive level, and while this is simply speculation on my part I seriously doubt that Reichental will be the only top level executive to step down in the coming weeks.

260.    The Company's revenue growth failed to rebound after the Class Period.  On November 4, 2015, 3D Systems announced financial results for the third quarter 2015.  During a conference call to discuss the results, both Johnson, the Company's Chief Legal Officer and Interim President and CEO, and Mark Wright ("Wright"), the Company's Executive Vice President and Chief Operating Officer, expressed their disappointment with lower revenue from 3D printing products and services.  Though no surprise to the market by this date, Wright summed up the state of the Company's issues by attributing the negative results to, among other things, the "residual reputational damage as a result of our earlier printer performance issues" as well as "printer performance and quality issues in the field."

261.    During the same call, a Company representative stated:  "But with respect to the organic growth, we did have a – organic growth was a *negative 22% this quarter*, it.  It was a

negative 15% decrease on a constant currency basis.  And to be honest, we saw negative organic growth in all of our regions, Americas, EMEA, and APAC."

## IX.    LOSS CAUSATION

262.    As detailed herein, Defendants' fraudulent scheme artificially inflated the Company's stock price by misrepresenting and concealing the true nature of the Company's operations, financial results, and business prospects, and, in particular, the fact that 3D Systems was unable to effectively integrate the large number of businesses that it had acquired during its ambitious acquisition spree, rendering its bullish growth and revenue expectations unreasonable and illusory.

263.    Defendants' false and misleading statements and omissions, individually and collectively, concealed 3D Systems' true business prospects, resulting in the Company's stock being artificially inflated until, as indicated herein, the relevant truth about the Company's financial and operational condition and future business prospects was revealed.  While each of Defendants' misrepresentations and omissions was independently fraudulent, they were all motivated by Defendants' desire to artificially inflate the Company's stock price and give the market the false notion that 3D Systems' aggressive acquisition strategy would expand the Company's product offerings, accelerate organic growth, increase market share, and further bolster revenue growth. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping the Company's stock price artificially inflated throughout the Class Period.  Indeed, Defendants' false and misleading statements and omissions had the intended effect and caused, or were a substantial contributing cause of, the Company's stock trading at artificially inflated levels, reaching as high as $96.42 during the Class Period, on January 3, 2014.

264.    As stated in ¶¶176-245, a truer picture of the Company's financial and operating conditions was not revealed to the market all at once, but rather the truth began to emerge, and the

risk caused by Defendants' fraud materialized, through partial revelations that cast doubt on the veracity of the Company's Class Period statements, as set forth below.

A.     **July 31, 2014 Disclosure**

265.     The truth began to emerge before the market opened on July 31, 2014, when, as detailed in ¶¶176-181 above, the Company surprised investors by issuing disappointing financial results for the second quarter of 2014.  In its press release and earnings call, Defendants revealed the Company's inability to increase manufacturing capacity quickly enough to meet demand for direct metal printers, as well as a delay in the release of its new Cube 3 and CubePro consumer printers to "improve user experience."   The Company also announced a slide in gross margin due to an inventory write-off resulting from "our aggressive shift to multiple new products."  Further, organic growth for the quarter was just 10%, a far cry from the 30% organic revenue growth trajectory consistently touted by the Company. As a result of the information revealed to the market, the Company's stock dropped approximately 10.6% ($5.94), falling from a close of $56.07 per share on July 30, 2014, to a close of $50.13 per share on July 31, 2014, on unusually high trading volume of nearly 13 million shares.  The stock dropped further on the following day, as the market continued to digest the news, and numerous analysts, including J.P.Morgan, Piper Jaffray, and RBC, downgraded their ratings or lowered their price targets for the stock, causing the Company's stock to drop another approximately 4.6% ($2.20) to a close of $47.93 per share on August 1, 2014, on unusually high trading volume of nearly 6.5 million shares.  The total stock price decline over this period was 14.5%, or $8.14 per share.  The market's negative reaction to the Company's July 31, 2014 revelation is demonstrated in the following chart:



266.    The declines in the Company's stock price by approximately 10.6% on July 31, 2014, and an additional 4.6% on August 1, 2014, were the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing the Company that had been concealed or misrepresented by Defendants.  The drop would have been more dramatic had Defendants disclosed the true extent of the financial and operational difficulties facing the Company.  A more significant drop in the stock price was also tempered by Defendants' decision to increase the Company's revenue guidance touting "strong business fundamentals."

267.    The timing and magnitude of the Company's stock price declines on July 31, 2014 and August 1, 2014 negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to

Defendants' fraudulent conduct. This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices[2] as the revelation of the truth became known to the market:

**3D Systems**
**vs NYSE Composite Index, S&P 500 Information Technology Index,**
**S&P Mid-Cap 400 Index, and Peer Comparison Group**
**July 30, 2014 - August 1, 2014**



### B. October 22, 2014 Disclosure

268. The Company revealed continuing manufacturing problems before the market opened on October 22, 2014, when, as detailed in ¶¶194-197 above, it disclosed preliminary earnings for the

_____

[2]    3D Systems has identified the NYSE Composite Index, the S&P 500 Information Technology Index, and the S&P Mid-Cap 400 Index as benchmarks for its common stock performance. *See* 3D Systems Form 10-K filed with the SEC on Feb. 26, 2015, *available at* http://www.sec.gov/Archives/edgar/data/910638/000091063815000003/ddd-20141231x10k.htm (last visited Nov. 27, 2015). The peer comparison is based on the stock prices of the following 3D printing industry competitors of 3D Systems: Stratasys, Ltd. (NASDAQ: SSYS), FARO Technologies Inc. (NASDAQ: FARO), and MKS Instruments, Inc. (NASDAQ: MKSI).

third quarter of 2014 in a press release and conference call with analysts.  In these statements, Defendants announced a "revenue shortfall from the continued manufacturing capacity constraints for our direct metal printers and delayed availability of our newest consumer products [the Cube 3 and CubePro printers]."  These problems caused the Company to miss Wall Street expectations for revenue and EPS, and required a cut in its full-year revenue and profit outlook.  As a result of the information revealed to the market, the Company's stock dropped approximately 15.5% ($6.71), falling from a close of $43.38 per share on October 21, 2014, to a close of $36.67 per share on October 22, 2014, on unusually high trading volume of more than 15 million shares.  The market's negative reaction to the Company's October 22, 2014 revelation is demonstrated in the following chart:



269.    The decline in the Company's stock price by approximately 15.5% on October 22, 2014 was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing the Company that had been concealed or misrepresented by Defendants. The drop would have been more dramatic had Defendants disclosed the true extent of the financial and operational difficulties facing the Company.

270.    The timing and magnitude of the Company's stock price decline on October 22, 2014 negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



**C.    April 24, 2015 Disclosure**

271.    The Company revealed additional problems before the market opened on April 24, 2015, when, as detailed in ¶¶228-238 above, it released a press release and conference call announcing preliminary financial results for the first quarter of 2015.   In these statements, Defendants revealed more problems affecting the Company's direct metal printers, slowing revenue growth, rising operating costs, and problems stemming from the Company's acquisition strategy. On this news, the price of 3D Systems stock suffered another large decline of approximately 10.7% ($2.92), falling from a close of $30.15 per share on April 23, 2015, to a close of $27.23 per share on Friday, April 24, 2015, on unusually high trading volume of nearly 7.2 million shares.   As the market continued to digest the news, the stock continued to fall the following trading day, closing at

$25.28 per share on Monday, April 27, 2015, on unusually high trading volume of nearly 5.9 million shares.  The total stock price decline over this period was 16.2%, or $4.87 per share.  The market's negative reaction to the Company's April 24, 2015 revelations is demonstrated in the following chart:



**3D Systems**
**Stock Price & Volume**
**April 23, 2015 - April 27, 2015**

272.    The decline in the Company's stock price by approximately 16.2% between April 24-27, 2015 was the direct result of the nature and extent of the revelations made to the market regarding the financial and operational problems facing the Company that had been concealed or misrepresented by Defendants. The drop would have been more dramatic had Defendants disclosed the true extent of the financial and operational difficulties facing the Company.

273.    The timing and magnitude of the Company's stock price decline between April 24-27, 2015, negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



**3D Systems**
vs NYSE Composite Index, S&P 500 Information Technology Index,
S&P Mid-Cap 400 Index, and Peer Comparison Group
April 23, 2015 - April 27, 2015

D.    **May 6, 2015 Disclosure**

274.    Finally, as detailed in ¶¶239-245 above, the Company announced its first quarter 2015 earnings before the market opened on May 6, 2015.  Defendants disclosed that they would finally kill their ill-fated acquisition strategy and shift their focus to integrating the Company's

myriad acquisitions, improving operational productivity and efficiency, and cutting operating expenses.  Defendants also disclosed a decline in organic revenue and, for the first time, revealed that they had decided to withdraw financial guidance for the remainder of 2015, leaving investors in the dark about the Company's financial prospects.  On this news, the price of 3D Systems stock fell once again.  After closing at $24.21 per share on May 5, 2015, the stock dropped 5.4% ($1.31) to close at $22.90 per share on May 6, 2015, on unusually high trading volume of approximately 6.4 million shares.  The market's negative reaction to the Company's May 6, 2015 revelations is demonstrated in the following chart:



275.    The decline in the Company's stock price by approximately 5.4% on May 6, 2015 was the direct result of the nature and extent of the revelations made to the market regarding the

financial and operational problems facing the Company that had been concealed or misrepresented by Defendants. The drop would have been more dramatic had Defendants disclosed the true extent of the financial and operational difficulties facing the Company.

276.    The timing and magnitude of the Company's stock price decline on May 6, 2015 negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct.  This point is evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



277.    The timing and magnitude of the Company's stock price declines on July 31-August 1, 2014, October 22, 2014, April 24-27, 2015, and May 6, 2015 negate any inference that the losses suffered by Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct, are further evidenced by the chart below, which demonstrates the clear divergence of the Company's stock price from its benchmark indices and peer company stock prices as the revelation of the truth became known to the market:



278.    In sum, as detailed in the charts above, the rapid declines in the Company's stock price on July 31-August 1, 2014, October 22, 2014, April 24-27, 2015, and May 6, 2015 were direct and foreseeable consequences of the revelation of the falsity of Defendants' Class Period

misrepresentations and omissions to the market. Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood the Company's prior statements were false and misleading. In short, as the truth about Defendants' prior misrepresentations and concealments was revealed, the Company's stock price quickly sank, the artificial inflation came out of the stock, and Plaintiff was damaged, suffering true economic losses.

279.    Accordingly, the economic losses, *i.e.*, damages, suffered by Plaintiff on July 31-August 1, 2014, October 22, 2014, April 24-27, 2015, and May 6, 2015 were direct and proximate results of Defendants' misrepresentations and omissions that artificially inflated the Company's stock price and the subsequent significant declines in the value of the Company's stock when the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## X.    ADDITIONAL SCIENTER

280.    The Individual Defendants acted with scienter in that they knew or recklessly disregarded that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading, and knowingly or recklessly substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violators of the federal securities laws.

281.    The Individual Defendants, by virtue of their receipt of information reflecting the true facts regarding 3D Systems, its operations, and its business practices, and their control over and/or receipt of the Company's materially misleading misstatements and/or their associations with the Company that made them privy to confidential proprietary information concerning 3D Systems, were active and culpable participants in the fraudulent scheme alleged herein.  The Individual Defendants knew of and/or recklessly disregarded the falsity and misleading nature of the information, which they caused to be disseminated to the investing public.  The ongoing fraud as

described herein could not have been perpetrated without the knowledge and/or recklessness and complicity of personnel at the highest level of the Company, including the Individual Defendants.

282.     These facts, in conjunction with the additional indicia of scienter alleged in ¶¶32-36 and ¶¶49-108 detailed herein, collectively support a strong inference of each Individual Defendant's scienter.

   **A.     Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Price to Profit from Insider Sales of 3D Systems Stock**

283.     The Individual Defendants were motivated to misrepresent the Company's true financial condition and future business prospects so that they could artificially increase the price of 3D Systems stock to profit from insider sales of 3D Systems stock.  Not coincidentally, as Defendants began to orchestrate their acquisition spree in 2012 and 2013, they sold significant amounts of their 3D Systems stock for massive insider proceeds.  And, during the Class Period, at the height of the Company's rapid expansion, while they were in possession of material adverse information regarding the Company's significant operational issues, Defendants Reichental, Gregoire, and Hull collectively sold a total of 321,500 shares of 3D Systems stock, generating insider proceeds totaling $39,631,558.

284.     In particular, Defendant Reichental sold a total of 144,000 shares of 3D Systems stock during the Class Period generating proceeds of $8,814,447.  These insider sales were executed at times calculated to maximize his personal benefit from the artificial inflation of 3D Systems' stock price.  For example, on December 13, 2013, just days after the stock reached a Class Period high, Defendant Reichental sold 25,000 shares of 3D Systems stock at a price of $80.91, generating proceeds of $2,782,360.  Similarly, Defendant Reichental sold 52,300 shares of 3D Systems stock on August 29, 2014, just four weeks after the Company raised guidance on July 31, 2014, which

generated proceeds totaling $2,022,750.  None of Defendant Reichental's Class Period stock sales were made pursuant to a 10b5-1 trading plan.

285.     Similarly, Defendant Gregoire sold a total of 162,500 shares of 3D Systems stock during the Class Period generating proceeds of $8,927,815.  Defendant Gregoire's insider sales were executed at times calculated to maximize his personal benefit from the artificial inflation of 3D Systems' stock price.  For example, on November 15, 2013, just two weeks after the Company's positive earnings announcement boasting of unprecedented consumer demand, acceleration of manufacturing capacity, and an increase in revenue guidance, Defendant Gregoire sold a total of 45,000 shares of 3D Systems stock generating proceeds of $3,599,448.  In addition, Defendant Gregoire sold 50,000 shares of 3D Systems stock on August 27, 2014, less than four weeks after the Company raised its guidance on July 31, 2014, generating proceeds of $2,636,000.  Finally, on November 19, 2014, after stepping down as CFO of 3D Systems, Defendant Gregoire sold 45,000 shares of 3D Systems stock, generating proceeds of $1,589,850.  None of Defendant Gregoire's Class Period stock sales were made pursuant to a 10b5-1 trading plan.

286.     Defendant Hull also sold 95,000 shares of 3D Systems stock during the Class Period, generating proceeds of $3,787,491.  These insider sales were executed at times calculated to maximize his personal benefit from the artificial inflation of 3D Systems' stock price.  For example, Defendant Hull sold 7,500 shares of 3D Systems stock on August 18, 2014, within weeks of the Company raising guidance on July 31, 2014, generating proceeds of $368,025.

**B.     Defendants Were Motivated and Acted with Scienter to Artificially Inflate the Company's Stock Price to Maximize the Company's Secondary Public Stock Offering**

287.     Defendants were also motivated to conceal the Company's significant operational and financial problems to artificially inflate the price of 3D Systems stock in order to maximize proceeds from a secondary public stock offering that occurred during the Class Period.  On May 30, 2014, the

Company sold 5,950,000 shares of common stock for artificially inflated proceeds of approximately $299.7 million, net of operating expenses (approximately $50.65 per share).  Defendants stated that they would use the proceeds to finance additional acquisitions (along with working capital and general corporate purposes).  Defendants' secondary public stock offering to raise funds for use in perpetuating the Company's acquisition spree is probative of scienter. The proceeds from this offering would have been much lower if the shares had not been artificially inflated by Defendants' misrepresentations and omissions.

## XI.     PRESUMPTION OF RELIANCE

288.     A Class-wide presumption of reliance is appropriate in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because the Class's claims are grounded on Defendants' material omissions.  Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery.  All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.  Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

289.     A Class-wide presumption of reliance is also appropriate in this action under the fraud-on-the-market doctrine.  As a result of Defendants' materially false and misleading statements, the Company's publicly traded securities traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times.  Plaintiff and other members of the Class purchased or otherwise acquired the Company's publicly traded securities relying upon the integrity of the market price of those securities and the market information relating to 3D Systems, and have been damaged thereby.

290.    At all relevant times, the market for the Company's securities was an efficient market for the following reasons, among others:

(a)    The Company's stock met the requirements for listing and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)    As a regulated issuer, 3D Systems regularly made public filings with the SEC and related press releases;

(c)    3D Systems regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services; and

(d)    3D Systems was followed by several securities analysts employed by major brokerage firms, such as Janney Capital Markets, Canaccord, BB&T, and RBC among others, who wrote research reports that were distributed to the brokerage firms' sales force and the public at large.  Each of these reports was publicly available and entered the public marketplace.

291.    As a result of the foregoing, the market for the Company's securities promptly digested current information regarding 3D Systems from all publicly available sources and reflected such information in the prices of the Company's securities.

292.    Under these circumstances, all purchasers of the Company's securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices.

293.    At the times they purchased or otherwise acquired the Company's securities, Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

294.    As a result of the above circumstances, the presumption of reliance applies.

295.    In sum, Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations during the Class Period;

(b)    The misrepresentations were material;

(c)    The Company's securities traded in an efficient market;

(d)    The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

(e)    Plaintiff and other members of the Class purchased or otherwise acquired the Company's securities between the time Defendants misrepresented material facts and the time true facts were disclosed, without knowledge that the facts were misrepresented.

## XII.    NO SAFE HARBOR

296.    The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from 3D Systems' Class Period filings.

297.    For example, 3D Systems' 2014 Form 10-K filed with the SEC on February 28, 2014, contained the following boilerplate "caution":

*We have made, and expect to continue to make, strategic acquisitions that may involve significant risks and uncertainties.  We may not realize the anticipated*

*benefits of past or future acquisitions and integration of these acquisitions may disrupt our business and divert management.*

(Emphasis in original.)

298.    This supposed risk warning failed to warn the market of the known problems that 3D Systems was then currently experiencing with the incorporation and integration of the dozens of new and disparate acquisitions picked up in the Company's ambitious acquisition spree, which created critical operating inefficiencies, hurt productivity, and inflated operating costs at the Company. Rather, this "caution" was untethered to the known problems at hand, rendering it meaningless.

299.    The generic nature of this disclosure is further illustrated by the fact that it was repeated in the Company's 2015 Form 10-K filed with the SEC on February 26, 2015, a point in time in which the problems plaguing the Company's integration efforts were well known internally.

300.    Accordingly, the risk warnings provided by Defendants in their Class Period statements were not meaningful, were themselves false and misleading, and did not shield Defendants from liability on the basis that such statements were "forward-looking."

301.    Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false and misleading forward-looking statements because, at the time each of those forward-looking statements were made, as detailed above in the Substantive Allegations section, the particular speaker knew that the particular forward-looking statement was false or misleading and/or the forward-looking statement was authorized and/or approved by an executive officer of 3D Systems who knew that those statements were false or misleading when made. Moreover, to the extent that Defendants issued any disclosures designed to "warn" or "caution" investors of certain "risks," those disclosures were also false and misleading since they did not disclose that Defendants were actually engaging in the very actions

about which they purportedly warned and/or had actual knowledge of material adverse facts undermining such disclosures.

## XIII.  PLAINTIFF'S CLASS ACTION ALLEGATIONS

302.    Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all those who purchased or otherwise acquired the publicly traded common stock of 3D Systems between October 29, 2013 and May 5, 2015, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

303.    Because 3D Systems has millions of shares of stock outstanding and because the Company's shares were actively traded on the NYSE, members of the Class are so numerous that joinder of all members is impracticable.  According to the Company's SEC filings, on February 18, 2015, 3D Systems had more than 111 million shares outstanding.  While the exact number of Class members can only be determined by appropriate discovery, Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

304.    Plaintiff's claims are typical of the claims of the members of the Class because Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

305.    Plaintiff will fairly and adequately protect the interests of the Class members and have retained counsel experienced and competent in class actions and securities litigation.  Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class Plaintiff seeks to represent.

306.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

307.     Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)     whether Defendants violated the federal securities laws as alleged herein;

(b)     whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)     whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)     whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)     whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(f)     whether the market prices of the Company's securities during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(g)     whether the members of the Class have sustained damages as a result of the decline in value of the Company's stock when the truth was revealed and the artificial inflation came out, and, if so, what is the appropriate measure of damages.

## COUNT I

### VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST ALL DEFENDANTS

308.     Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.  This claim is asserted against all Defendants.

309.     During the Class Period, 3D Systems and the Individual Defendants, and each of them, carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did:  (a) deceive the investing public, Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded securities; and (c) cause Plaintiff and other members of the Class to purchase the Company's publicly traded securities at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, 3D Systems and the Individual Defendants, and each of them, took the actions set forth herein.

310.     These Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Company's securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  These Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of 3D Systems, as alleged below.

311.     In addition to the duties of full disclosure imposed on Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq.*) and S-K (17 C.F.R. §229.10, *et seq.*) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded securities would be based on truthful, complete, and accurate information.

312.     3D Systems and the Individual Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

313.     These Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's value, performance, and continued substantial sales and financial growth, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects  not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities during the Class Period.

314.    The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others:  (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's projections, and financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

315.    Each of the Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. Such Defendants' material misrepresentations and/or omissions were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its securities.  As demonstrated by the Individual Defendants and the misstatements and omissions throughout the Class Period regarding the Company's true financial and operational results and prospects, the Individual Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

316.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market prices of the Company's securities were artificially inflated during the Class Period.  In ignorance of the fact that market prices of the Company's publicly traded securities were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the securities trade, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by Defendants, but not disclosed in public statements by Defendants during the Class Period, Plaintiff and other members of the Class acquired the Company's securities during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines above.

317.     At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Plaintiff and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by Defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their 3D Systems' publicly traded securities during the Class Period; or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

318.     By virtue of the foregoing, 3D Systems and the Individual Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

319.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their respective purchases and sales of

the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was removed from the Company's stock.

**COUNT II**

**FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE
ACT AGAINST THE INDIVIDUAL DEFENDANTS**

320.    Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.  This claim is asserted against the Individual Defendants.

321.    The Individual Defendants acted as controlling persons of 3D Systems within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements which Plaintiff contends are false and misleading.  The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

322.    In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

323.    As set forth above, 3D Systems and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period, as evidenced by, among others, the stock price declines discussed above, when the artificial inflation was released from the Company's stock.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel for the proposed Class;

B.    Awarding compensatory damages in favor of Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees;

D.    Awarding rescission or a rescissionary measure of damages; and

E.    Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Plaintiff hereby demands a trial by jury.

DATED: December 9, 2015                    MOTLEY RICE LLC
                                           DAVID P. ABEL


                                   _____
                                           *s/ David P. Abel*
                                   DAVID P. ABEL (D.S.C. Bar No. 11395)

- 134 -

JAMES M. HUGHES
MARLON E. KIMPSON
28 Bridgeside Blvd.
Mount Pleasant, SC  29464
Telephone:  843/216-9000
843/216-9450 (fax)
dabel@motleyrice.com
jhughes@motleyrice.com
mkimpson@motleyrice.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE (*pro hac vice*)
ROBERT J. ROBBINS (*pro hac vice*)
ELIZABETH A. SHONSON (*pro hac vice*)
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
rrobbins@rgrdlaw.com
eshonson@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
JOHN C. HERMAN
Monarch Centre, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA  30326
Telephone:  404/504-6500
404/504-6501 (fax)

*Lead Counsel for Plaintiff*

<u>**CERTIFICATE OF SERVICE**</u>

I HEREBY CERTIFY that on December 9, 2015, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a Notice of Electronic Filing to all counsel of record.

*s/ David P. Abel*
DAVID P. ABEL (D.S.C. Bar No. 11395)