

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

| | | |
|---|---|---|
| KBC ASSET MANAGEMENT NV, Individually and on Behalf of All Others Similarly Situated, | § § § | |
| Plaintiff, | § | |
| | § | CIVIL ACTION NO. 0:15-CV-02393-MGL |
| vs. | § | |
| | § | |
| 3D SYSTEMS CORPORATION, | § | |
| ABRAHAM N. REICHENTAL, DAMON | § | |
| J. GREGOIRE, and TED HULL, | § | |
| Defendants. | § | |

MEMORANDUM OPINION AND ORDER
DENYING DEFENDANTS' MOTION TO DISMISS
THE AMENDED CONSOLIDATED COMPLAINT

## I.    INTRODUCTION

Plaintiff filed this case as a federal securities class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (Exchange Act), 15 U.S.C. §§ 78j(b) and 78t(a), and Security Exchange Commission (SEC) Rule 10b-5, promulgated thereunder. *See* 17 C.F.R. § 240.10b-5. The Court has jurisdiction over the matter under 28 U.S.C. § 1331 and Section 26 of the Exchange Act, 15 U.S.C. § 78aa. Pending before this Court is Defendant 3D Systems Corporation (3D Systems or the Company) and Defendants Abraham N. Reichental, Damon J. Gregoire, and Ted Hull's (collectively Individual Defendants) motion to dismiss Plaintiff's amended consolidated complaint brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure.  ECF No. 80.  Having considered the motion, the response, the reply, the record, and the relevant law, it is the judgment of the Court that Defendants' motion to dismiss will be denied.

## II.    FACTUAL AND PROCEDRUAL BACKGROUND

This case arises out of allegations by Plaintiff against 3D Systems and Individual Defendants regarding the manner in which they represented the state of the Company to investors during a rapid acquisition strategy undertaken by the management of 3D Systems.  ECF No. 78 at 1; ECF No. 90 at 1.  The Company is a 3D printer manufacturer with its principal place of business in Rock Hill, South Carolina.  ECF No. 78 at 8.  Starting in 2008, 3D Systems embarked on a plan to make several acquisitions of other 3D printing companies so it could expand its product line and maintain its position as the leader in the market.  ECF No. 90 at 4.  During this time, and specifically during the Class Period, October 29, 2013, through May 5, 2015, Individual Defendants made several statements to investors and analysts about the progress of the strategy and the strength of 3D Systems.  *See generally* ECF No. 78 at 41-107.  Although the specific comments are numerous, and elaborated on further below, the complaint's main focus is statements Individual Defendants made to the market. These statements allegedly misrepresented or withheld the effects that 3D System's acquisition strategy had on the strength and revenues of the Company. *Id.* at 4-5.  According to Plaintiff, the reports made prior to July 31, 2014, painted an optimistic picture of 3D Systems—record-breaking profits, successful acquisition of multiple new companies, and high organic growth rates, which is company growth not resulting from mergers and acquisitions.  *See id.* 41-67.  Plaintiff claims that behind the scenes, though, 3D Systems experienced significant problems with the integration process, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping

practices. Plaintiff contends that these are all core operations of 3D Systems that Individual Defendants failed to disclose or misrepresented to the market. *See e.g. id.*, at 47-50.

Plaintiff avers that statements Defendants made from July 31, 2014, until May 5, 2015, the end of the Class Period, incrementally revealed the problems plaguing 3D Systems in these core operations. Plaintiff avows that these issues ultimately resulted in 3D Systems reporting underwhelming profits, failing to meet previously stated financial projections, a stunting of its organic growth rate, and an ending of 3D Systems' acquisition strategy so that the Company could focus on cost reduction. *Id.* at 67-108. According to Plaintiff, by the end of the Class Period, 3D System's stock price had dropped from its high of $96.42 on January 3, 2014, down to $22.90 per share on May 6, 2015, a decrease of over seventy-six percent. ECF No. 90 at 7.

Plaintiff advances that, throughout the entire Class Period, Individual Defendants all held executive roles in 3D Systems, giving them access to confidential internal information. ECF No. 78 at 8-9. Plaintiff avers that they were also involved in numerous aspects of 3D Systems, including actively participating in quarter-end meetings regarding shipping, determining what the Company could recognize as revenue, and visiting production areas. *Id.* at 30-31. Plaintiffs state that Individual Defendants also drafted and delivered many of the statements alleged by Plaintiff to be misleading and discussed at least one of the core operations of 3D Systems during each quarter. *Id.* at 31-34. In addition, during this Class Period, Defendants Reichental and Gregoire made several stock sales. ECF No. 90 at 28-32.

Because of these alleged misrepresentations and the subsequent stock price drop, several investors filed securities fraud claims against 3D Systems. On October 1, 2015, the Court consolidated the cases and appointed KBC Asset Management as the lead Plaintiff. ECF No. 65. Plaintiff filed an amended class action complaint on November 30, 2015, alleging that during the

Class Period, 3D Systems, as well as Individual Defendants as agents of the Company, participated in a fraudulent scheme that artificially inflated 3D Systems' stock price by misrepresenting and concealing information about its business practices. ECF No. 78.

Defendants filed this motion to dismiss the amended complaint on January 14, 2016. ECF No. 80. Plaintiff filed a response in opposition to Defendants' motion to dismiss on February 29, 2016, ECF No. 90, and Defendants filed their reply to that response on March 25, 2016, ECF No. 91. The Court has considered the motions, memoranda, and arguments of the parties, and now turns to discussing the merits of Defendants' motion.

## III.    STANDARD OF REVIEW

Defendants move to dismiss this putative securities fraud class action lawsuit under Federal Rule of Civil Procedure 12(b)(6) on the grounds that the amended complaint fails to satisfy the heightened pleading standards of the Private Securities Litigation Reform Act (PSLRA) and Federal Rule of Civil Procedure 9(b). Therefore, according to Defendants, Plaintiff fails to state a claim for which relief may be granted. To survive a motion to dismiss, a complaint must contain factual allegations sufficient to provide the defendant with "notice of what the . . . claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In considering the motion, a court accepts all of a plaintiff's well-pled allegations as true and liberally construes all reasonable inferences in the plaintiff's favor. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). The court may consider only the facts alleged in the complaint, which may include any documents referenced, and matters of which the court may take judicial notice. *Tellabs, Inc. v. Make Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007).

To establish liability under Section 10(b) of the Exchange Act and under Rule 10b-5, a plaintiff must allege: "(1) a material misrepresentation (or omission); (2) scienter, i.e., a wrongful state of mind; (3) a connection with the purchase or sale of a security; (4) reliance… (5) economic loss; and (6) 'loss causation,' i.e., a causal connection between the material misrepresentation and the loss." *Teachers' Ret. Sys. of La. v. Hunter*, 477 F.3d 162, 172 n.2 (4th Cir. 2007) (citing *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005)).  Section 20(a) of the Exchange Act assigns joint and several liability to one in control of another who violates a security regulation under § 10(b).

In a securities fraud case, a plaintiff must also satisfy the heightened pleading standards of Rule 9(b) and the PSLRA.  *See Pub. Emps.' Ret. Ass'n of Colo. v. Deloitte & Touche LLP*, 551 F.3d 305, 311 (4th Cir. 2009).  Rule 9(b), which governs all actions alleging fraud, requires the plaintiff to "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b).  In addition, the PSLRA requires that a securities fraud plaintiff "state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, i.e., the defendants intention to deceive, manipulate, or defraud."  *Tellabs*, 551 U.S. at 213 (internal citations and quotations omitted).  The Fourth Circuit has noted that the PSLRA modifies the traditional Rule 12(b)(6) analysis: "(1) by requiring a plaintiff to plead facts to state a claim and (2) by authorizing the court to assume that the plaintiff has indeed stated all of the facts upon which he bases his allegations of a misrepresentation or omission."  *Hunter*, 477 F.3d at 172 (emphasis omitted).  The PSLRA also requires a plaintiff to plead sufficient facts to raise a "*strong inference*" of scienter.  *Id.*  A district court must dismiss a complaint on motion of any defendant if the plaintiff fails to meet the pleading requirements of the PSLRA.  15 U.S.C. §78u-4(b)(3)(A).

## IV.     CONTENTIONS OF THE PARTIES

In their motion to dismiss, Defendants contend that the complaint fails to meet the heightened pleading standards of the PSLRA as to both the misrepresentation or omission and the scienter elements.  ECF No. 80 at 4.  Regarding the misrepresentation factor, Defendants advance that the alleged misrepresentations in the complaint relate only to corporate mismanagement, which Plaintiff is unable to bring under federal securities law.  *Id.*  Further, Defendants avouch that, even assuming that Defendants' alleged mismanagement is actionable if Defendants were cognizant of the Company's problems, the complaint shows no evidence that they were actually aware.  ECF No. 91 at 2-3.  In addition, Defendants advocate that all of the allegedly misleading statements are forward-looking statements accompanied by meaningful cautionary language warning of the specific problems experienced by 3D Systems.  ECF No. 80 at 16 (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)).  Defendants, therefore, declare that the PSLRA's Safe Harbor Provision protects these forward-looking statements.  *Id.*  Defendants reject any claim that these declarations contain current or historical facts or that the cautionary language fails to meet the standard for meaningfulness simply because it appears to be boilerplate.  ECF No. 91 at 6-9.

Defendants further allege that the complaint insufficiently pleads the scienter element.  *Id.* They asseverate that Plaintiff improperly relied upon group pleading, i.e., that Defendants had a collective intent to defraud instead of pointing out each Defendant's individual intent.  *Id.* at 4-5. In addition, Defendants maintain that the complaint improperly points to the sale of stocks by Defendants Reichental and Gregoire to support their inference of scienter.  According to Defendants, merely claiming that executives sold stock during the Class Period unaccompanied by evidence that these sales were unusual or suspicious fails to meet the heightened pleading requirements of the PSLRA.  *Id.* at 5.  Further, Defendants maintain that Plaintiff is unable to meet

the scienter requirement based on any of the reasons alleged as evidence, even if viewed holistically. ECF No. 91 at 10-14. Defendants also avow that the Court should, at a minimum, disregard any statements after July 31, 2014, under an on-the-market theory. In other words, according to Defendants, 3D Systems' problems were public knowledge after that date, and therefore the market was capable of being informed given the information then available, eliminating any possibility of fraud. *Id.* Finally, Defendants claim that because the § 10(b) charges of the Exchange Act fail, the § 20(a) claim must fail as well.

Plaintiff responds to these arguments by contending it has sufficiently met the pleading standards of both elements laid out in the PSLRA. ECF No. 90 at 2-3. It counters Defendants' assertions regarding mismanagement, claiming that the label of mismanagement is inconsequential because Defendants were nevertheless aware of the problems taking place and failed to disclose them. *Id.* Plaintiff further maintains that Defendants receive no protection under the PSLRA's Safe Harbor Provision because the statements Plaintiff identified as misleading related to current or historical facts instead of being entirely forward-looking. Plaintiff also posits that any statements that were forward-looking lacked meaningful cautionary language, but rather boilerplate risk warnings that failed to convey substantive information regarding the specific problems alleged in the complaint. *Id.*

For the scienter claims, Plaintiff propounds that the group pleading claim by Defendants is unfounded and points to multiple paragraphs in the complaint alleging scienter of each Individual Defendant. Plaintiff claims that these particularized facts, considered holistically, support a strong inference of scienter. *Id.* at 22-23. Plaintiff avouches that, because it properly pled its § 10(b) claim, their § 20(a) claim also meets the proper pleading standard. *Id.* at 35.

## V.     DISCUSSION AND ANALYSIS

### A.     Section 10(b) and Rule 10b-5 Claim

#### 1.     Misrepresentation or Omission of Material Fact

To survive a motion to dismiss, a securities fraud complaint must first allege facts sufficient

to support the plaintiff's information and belief that the statements were misleading, as required

by § 78u-4(b)(1), which provides:

> In any private action arising under this chapter in which the plaintiff alleges that
> the defendant—
>
> (A) made an untrue statement of a material fact; or
> (B) omitted to state a material fact necessary in order to make the statements made,
> in light of the circumstances in which they were made, not misleading;
>
> the complaint shall specify each statement alleged to have been misleading, the
> reason or reasons why the statement is misleading, and, if an allegation regarding
> the statement or omission is made on information and belief, the complaint state
> with particularity all facts on which that belief is formed.

15 U.S.C. §78u-4(b)(1).  In short, to fulfill the element of misrepresentation, a plaintiff "must point

to a factual statement or omission—that is, one that is demonstrable as being true or false,"

*Longman v. Food Lion, Inc.*, 197 F.3d 675, 682 (4th Cir. 1999) (emphasis omitted), and show that

the "statement is false or that the omitted fact renders a public statement misleading."  *Ottmann v.*

*Hanger Orthopedic Grp., Inc.*, 353 F.3d 338, 353 (4th Cir. 2003).  However, "if the plaintiff fails

to allege all facts but does allege sufficient facts to support a reasonable belief in the allegation

that the defendants statement was misleading, the court should deny the Rule 12(b)(6) motion as

to this misrepresentation element."  *Hunter*, 477 F.3d at 174 (emphasis omitted).

Further, as noted above, because § 10(b) claims are fraud claims, the plaintiff must satisfy

the pleading requirements imposed by Rule 9(b) of the Federal Rules of Civil Procedure, which

requires all elements of fraud be stated with particularity.  A plaintiff satisfies this requirement

when it pleads with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby.  *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009), *rev'd on other grounds, Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 (2011).  Additionally, "any statement or omission of fact must be material," meaning objectively significant to a reasonable investor.  *Food Lion, Inc.*, 197 F.3d at 682-83; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1988) (holding misrepresentation or omission is material if "the 'reasonable investor' would have considered [it] significant" in making investment decisions).  The Fourth Circuit has held that in "[d]etermining whether the complaint satisfies the standard necessarily entails a case-by-case assessment of the complaint as a whole."  *Hunter*, 477 F.3d at 174.

The Court has reviewed the complaint and holds that it specifically identifies several alleged misrepresentations and omissions concerning 3D Systems' acquisition strategy, manufacturing capacity, product quality, sales and revenue growth projections, inventory control, and booking and shipping practices.  The complaint also sufficiently sets out the time, place, and content of the statements as well as the identity of the person making them as required by Rule 9 of the Federal Rules of Civil Procedure.  *In re Mut. Funds Inv. Litig.*, 566 F.3d at 120.

For instance, 3D Systems represented its acquisition strategy to investors as positive throughout most of the Class Period.  Speaking at the January 15, 2014, Needham Growth Conference, Defendant Reichental told investors they were able to "quickly leverage" new acquisitions.  ECF No. 78 at 47.  He also stated that they were "very happy" with how the acquisition strategy was going and told investors that most of the new acquisitions were "completely in the Company and [were] all one Company right away."  *Id.* at 52, 57.  Further, Defendants Gregoire and Reichental responded to questions regarding a rise in operating expenses

stating that they were "discretionary costs" that 3D Systems could "scale back and not affect the business further." *Id.* at 55. Defendant Reichental said they "fully expect operating leverage to return in 2015" and that they "don't see any obstacles to success, unless the world collapses somehow." *Id.* When again asked about operational challenges generated by these acquisitions, Defendant Gregoire insisted that integration "happens very easily, very quickly" and that the hardest part is usually with merging culture. *Id.* at 74. Even continuing into the third quarter of 2014, 3D Systems maintained that its strategy was going smoothly, with Defendant Reichental stating "we have done it really well, and we expect that, that will bode well for us in the future." *Id.* at 84.

The statements Individual Defendants made regarding 3D systems towards the end of the Class Period seem to paint a different picture. After the release of the Company's fourth quarter, 2014, results around February 26, 2015, Defendant Hull, who had only recently taken over for Defendant Gregoire in the role of Executive Vice President after Gregoire became the Vice President of Mergers and Acquisitions, announced that they were "at the end of our stepped-up investment phase and are beginning to tightly integrate our assembled assets." *Id.* at 84, 91. Then in announcing the first quarter of 2015's results, Defendant Reichental stated 3D Systems was trying to "eliminate some of the duplication and redundancy that we acquired from acquisitions" and, despite earlier claims that the rise in operating expenses were clearly completely discretionary, announced that these expenses had "got a little bit ahead of us." *Id.* at 96-97. Now, instead of the acquisition strategy going well, Defendant Hull announced that 3D Systems was taking "a hard look at our acquisition activity" and planning to "substantially dial down acquisitions for the foreseeable future." *Id.* at 97. Taking all these statements as true, they appear to allege adequately that 3D Systems experienced some operating inefficiencies related to the

acquisition strategy and failed to disclose them to the market, all the while presenting little downside about the process. *See id.* at 47-48, 58-59, 64-65, 75, 86-87, 92 (detailing Plaintiff's accusations of alleged misrepresentations regarding the acquisition strategy).

For inventory control, since as early as fourth quarter 2013, when the Class Period commenced, 3D Systems began experiencing a backlog of inventory. *Id.* at 53. Defendant Reichental told investors that this was a "healthy" backlog mostly due to new products announced. *Id.* In the first quarter of 2014, he again informed investors that this was in anticipation of new product releases and that inventory buildup had concluded, with the expectation that these inventory levels would come down. *See id.* at 64. Despite these assurances that the inventory backlog was healthy, in the second quarter of 2014, 3D Systems announced an inventory write-off that wound up compressing its gross profit margins. *Id.* at 68. Defendant Gregoire claimed this write-off was due to an aggressive shift towards new products, despite having previously made claims that most of the inventory backlog was in anticipation for shipment of these same new products. *Id.* A press release from 3D Systems and the SEC Form 10-Q, the quarterly report all public companies must file with the SEC that Defendants Reichental and Gregoire signed, echoed these sentiments. *Id.* at 68-69. Assuming these statements as true, on its face, the complaint adequately pled a misrepresentation by 3D Systems regarding the state of its inventory and failure to inform fully investors of its inventory-related difficulties. Plaintiff, therefore, pled sufficient misrepresentations related to inventory problems. *See id.* at 49, 59, 65, 75-76, 87, 92 (containing Plaintiff's accusations of alleged misrepresentation regarding inventory control).

With respect to product quality, Individual Defendants frequently described their products as being "cutting edge" or "breakthrough" at the beginning of the Class Period. *Id.* at 44. As that period progressed, Defendants Reichental and Gregoire both praised their product line, with

Defendant Reichental stating that 3D Systems had "the most comprehensive and attractive consumer portfolio available today at the right performance levels and price points to accelerate adoption." *Id.* at 54. Defendant Gregoire also referred to the "overwhelmingly positive reception" their product lines received. *Id.* On July 31, 2014, however, in announcing a decision to delay product shipments in the second quarter, Defendants Reichental stated in a conference call that the Company's decision to do so was to "improve user experience," after several of its beta testers "identified several . . . enhancements," it felt were needed. *See id.* at 67, 70.

Taken as true, these claims of beta testers identifying improvements seem to stand in stark contrast to the overwhelmingly positive reception Individual Defendants previously claimed 3D Systems was receiving. Also, at the August 7, 2014, Needham Advanced Industrial Technologies Conference, Defendant Gregoire stated that he "didn't feel the products were exactly there" yet in terms of performance, despite earlier claims that the Company's consumer portfolio was at the right performance levels. *Id.* at 73. The product quality issues continued throughout the Class Period, with Defendant Hull revealing in a conference call regarding their first quarter 2015 results that revenue shortfalls were occurring in part due to "certain metal and nylon applications and performance issues that delayed our ability to sell additional printers." *Id.* at 96. From these statements, it appears as if Plaintiff has adequately pled that 3D Systems misrepresented the state of their product quality and customer reception to investors. *See id.* at 48-49, 58-59, 64-65, 75, 86-87, 92 (setting forth Plaintiff's accusations of alleged misrepresentation regarding product quality).

Having now carefully and exhaustively reviewed each statement alleged as misleading in a similar manner as the examples above, the Court holds that Plaintiff's amended complaint adequately pleads that Individual Defendants' statements were misleading and omitted facts.

Plaintiff has plead "each statement alleged to have been misleading, the reason or reasons why the statement is misleading," and the facts on which any beliefs were formed. 15 U.S.C. §78u-4(b)(1). Plaintiff has also sufficiently pled with particularity the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation that is required at this stage of the litigation. *In re Mut. Funds Inv. Litig.*, 566 F.3d 111, 120 (4th Cir. 2009). Further, Plaintiff has adequately alleged "what [Defendants] obtained thereby," an inflated stock price due to the alleged misrepresentations made about the true state of 3D Systems. *Id.* Therefore, Plaintiff has meet all the requirements for a misrepresentation claim.

The Court also holds that these alleged facts were material as they would have "altered the 'total mix'" of information made available to investors. *See Matrix Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 43-44 (2011) (upholding a charge of securities fraud against a pharmaceutical company in part because non-disclosure of a report was a material misrepresentation that altered the total mix of information available to investors when making their decisions). Further, although the Fourth Circuit has explicitly refrained from taking a position on this issue, the "majority rule" indicates that the negative market reaction to the disclosures made by 3D Systems—in which their stock price fell more than seventy-six percent—supports the conclusion that these misrepresentations were material. *See Greenhouse v. MCG Capital Corp.*, 392 F.3d 650, 660-61 (4th Cir. 2004) (noting the majority position is a fall of stock prices can be some evidence of materiality but not dispositive); *see also Oran v. Stafford*, 226 F.3d 275, 282 (3d Cir. 2000) ("[T]he materiality of disclosed information may be measured post hoc by looking to the movement, in the period immediately following disclosure, of the price of the firm's stock."); *In re Burlington Coat Factory Sex. Litig.*, 114 F.3d 1410, 1425 (3d Cir. 1997) ("In the context of an 'efficient' market, the concept of materiality translates into information that alter the price of the firm's stock.").

This Court declines to accept Defendants' mismanagement argument.  *See* ECF No. 80 at 12-15.  Even if mismanagement itself is non-actionable—a question this Court thinks unnecessary to answer—the cases Defendants cite are distinguishable from this one.  For example, Defendants cite to *In re Silicon Storage Technology, Inc. Sec. Litig.*, in which that court says that "[i]ncidents of fiduciary misconduct and internal mismanagement are not by themselves sufficient to trigger liability under the Exchange Act."  No. C05-0295 PJH, 2006 WL 648683 (N.D. Cal. Mar. 10, 2006).  Although this statement might be true, this case is about more than mismanagement.  Here, 3D Systems allegedly mismanaged things like inventory control and product quality, but then purportedly misrepresented the state of those affairs to investors, as discussed above.  Because Plaintiff pled more than just allegations of bad decision-making or mere mismanagement, this case is actionable under § 10(b) of the Exchange Act.

Further, this Court holds Defendants' argument that the misrepresentations were only a "formulaic set of allegations" to be devoid of merit.  Here, Plaintiff does more than simply repeat a set of "allegations [stating] why, upon 'information and belief,' the statement[s] [were] misleading," but rather includes several references to the specific statements listed in the complaint that support the allegations of misrepresentation.  *Cf. Hunter*, 477 F.3d at 175 (upholding dismissal of a securities fraud case in part because the allegedly misleading statements were simply a formulaic set of allegations about why the statements were misleading without any particularity); *see* ECF No. 74 at 47-50, 58-60, 64-67, 75-77, 86-89, 91-94.  The Court holds that the allegations are specifically tailored and stated with particularity regarding the allegations against Defendants and more than just a recitation of why "upon 'information and belief,' the statement[s] [were] misleading," as in *Hunter*.  477 F.3d at 175.

As a final note, this Court declines to rule on the sufficiency of every alleged misrepresentation at this stage of the proceedings as all that is required is for Plaintiff to have pled sufficient facts to permit a reasonable person to find a plausible claim for relief for the misrepresentation element.  *See id.* at 173.  Defendants, of course, deny the allegations in the amended complaint, disagree with Plaintiff's view of the facts, and may have compelling arguments disproving that all or some of the alleged statements were misrepresentations.  At this stage in the litigation though, without proper discovery, this Court is unable to hold with any certainty that these statements are not, as a matter of law, misrepresentations or omissions.  This Court will reserve any judgement on material disagreements about the facts until the appropriate stage in the proceedings.

### 2. "Safe Harbor" Protection for Certain Challenged Statements

The PSLRA includes a "safe harbor" provision,  which  provides protection for "forward-looking" statements made by company representatives when: (1) such statements are identified as forward-looking statements accompanied by meaningful cautionary statements identifying facts that could cause actual results to differ materially from the forward-looking statements; (2) such statements are immaterial; or (3) the plaintiff fails to prove the forward-looking statement was made by an individual or executive officer of a business entity with actual knowledge that the statement was false or misleading.  15 U.S.C. § 78u-5(c)(1)(A)-(B).  The Reform Act defines the term "forward-looking statement" to include, amongst other things, "a statement containing a projection of revenues, incomes . . . earnings . . . or other financial items."  15 U.S.C. § 78u-5(i)(1)(A)-(F).  The safe harbor provision fails to protect representations of current or historical fact.  *Malone v. Microdyne Corp.*, 26 F.3d 471, 479-80 (4th Cir. 1994) ("Misstatements or

omissions regarding actual past or present facts are far more likely to be actionable than statements regarding projections of future performance.") (emphasis omitted).

The Court has considered the statements cited in the complaint and taken note of Defendants' assertions regarding the statements alleged to be forward-looking statements. Defendants specifically aver that all of the statements included in the complaint are forward-looking. ECF No. 80 at 17. They then point to a chart indicating twelve statements advanced as forward-looking as well as what they posit as meaningful cautionary language for each one of these statements. *Id.* at 19-24. Most of these statements included in the chart contain financial items relating to revenue, growth margins, or organic growth. Assuming arguendo that the cautionary language accompanying these statements is meaningful, they would meet one of the definitions included in the safe harbor provision of the Reform Act. Plaintiff correctly points out, however, that despite Defendants claiming all of the statements are forward-looking, Defendants' chart fails to challenge several of the other statements Plaintiff made in the complaint. ECF No. 90 at 18. The statements Defendants neglected to mention contain language relating to product quality, including 3D Systems statement that they have the most "comprehensive and attractive consumer portfolio available today at the right performance levels" and statements about the integration process such as "[t]he integration is going extremely well. And all of these companies have been completely on boarded as per usual." *Id.* at 18 n.9. These statements relate to current or historical facts, discussing the portfolio 3D Systems had available "today" or how the acquisitions "have been completely on boarded," and are therefore unprotected by the safe harbor provision. *See Malone*, 26 F.3d at 479-80; ECF No. 90 at 18 n.9. Because the Court is unable to conclude that all of the statements in the Amended Complaint are forward-looking, the Court

declines Defendants' invitation to hold that the safe harbor provision warrants a full dismissal of the case at this stage in the litigation.

### 3. Strong Inference of Scienter

The PSLRA requires a securities fraud complaint to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). "To demonstrate scienter, a plaintiff must show that the defendant acted with a mental state embracing intent to deceive, manipulate, or defraud." *Zak v. Chelsea Therapeutics Int'l., Ltd.*, 780 F.3d 597, 606 (4th Cir. 2015) (citing *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007)). A strong inference of scienter is one that is "powerful or cogent" and must be more than a "reasonable" or "permissible" inference. *See Tellabs* 551 U.S. at 323. The evidence establishing this inference of scienter, however, "need not be irrefutable, i.e., of the 'smoking-gun' genre, or even the 'most plausible of competing inferences.'" *Id.* at 324.

At this stage "allegations of reckless conduct" can satisfy the scienter requirement. *Zak*, 780 F.3d at 606. Reckless conduct sufficient to establish a strong inference of scienter is described as "severe," *Ottmann*, 353 F.3d at 344, or conduct that is "so highly unreasonable and such an extreme departure from the standard of ordinary care as to present a danger of misleading the plaintiff to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 181 (4th Cir. 2009).

To determine whether a plaintiff's allegations establish a strong inference of scienter, the court should view the evidence "holistically" instead of each piece being scrutinized in isolation. *See id.* at 326. After examining the evidence as a whole, the court then engages in a balancing test to see if the allegations, accepted as true, would create an inference of scienter "at least as strong

as any opposing inferences" of non-fraudulent motives. *Id.* Accordingly, in a motion to dismiss, defendants must demonstrate that the allegations give rise to an inference of non-culpable conduct that is stronger than any inference of scienter. *See id.* at 324.

Finally, if the defendant is a corporation, the plaintiff must allege facts that support scienter "with respect to at least one authorized agent of the corporation, because corporate liability derives from the actions of its agents." *Hunter*, 477 F.3d at 184.

Here, the amended complaint offers several allegations to support Plaintiff's claim of scienter. Specifically, Plaintiff alleges that Individual Defendants: (1) all held high positions within 3D Systems during the Class Period, and therefore had access to confidential information about the state of the Company as a result; (2) must have been aware of the problems facing 3D Systems as the alleged misrepresentations claimed related to the Company's core operations; (3) were intimately involved in the operations of the business and therefore were purportedly aware that the statements they gave to the public about these core operations were misleading or incomplete; and (4) that Defendants Reichental and Gregoire both had the motive to engage in fraud as evidenced by their stock sales during the time, which Plaintiff claims evidences scienter through potential insider trading. *See generally* ECF No. 78 at 30-34, 121-122. Although each of Plaintiff's allegations standing alone may be insufficient to support a strong inference of scienter, looked at holistically, as the law requires the Court to do, the allegations, when viewed as a whole, are enough to suggest a strong inference of scienter at this motion to dismiss stage.

First, Defendants Reichental, Gregoire, and Hull were all senior executives at 3D Systems during the Class Period. ECF No. 78 at 35. Further, they were all part of the acquisitions team that executed the Company's rapid expansion strategy. *See id.* at 57. By nature of these positions, they necessarily had access to confidential information regarding the state of the acquisition

strategy and its effects on the business as it progressed.  Although the Fourth Circuit has rejected

this element as alone establishing an element of scienter, the information is nonetheless "relevant

to the court's holistic analysis of scienter."  *Yates v. Mun. Mortg. & Equity, LLC*, 744 F.3d 874,

890 (4th Cir. 2014).

In addition to the inferences drawn from Individual Defendants' positions, the allegedly

misrepresented issues all related to core operations, which by nature can contribute to a strong

inference of scienter.  *See Yates*, 744 F.3d at 890 (holding misrepresentations about the core

business of a company as "relevant" to a holistic analysis of scienter); *see also South Ferry LP,*

*No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008) ("Allegations that rely on the core-operations

inference are among the allegations that may be considered in the complete PSLRA analysis.").

The amended complaint alleges misrepresentations about 3D System's acquisition strategy, core

product lines, shipping, inventory, and manufacturing capacity.  *See generally* ECF No. 78 at 41-

108.  Bolstering the inference that Individual Defendants knew about these core operations are the

allegations that they repeatedly spoke on these issues at conferences, on conference calls, and in

press releases.  At least once during every quarter, Defendants Reichental, Gregoire, or Hull

purportedly answered questions about these core operations to the media or analysts.  "[T]he most

powerful evidence of scienter is the content and context of [defendants'] statements themselves,"

and when a defendant is "specifically asked, directly and repeatedly" about these core operations,

denials of any issues can support a strong inference of scienter.  *Institutional Investors Group v.*

*Avaya, Inc.*, 564 F.3d 242, 269 (3d Cir. 2009).  As already observed, each of the Individual

Defendants made repeated statements about core operations of 3D Systems, such as the acquisition

strategy, inventory control, and product quality.  Once again, speaking about these core operations,

without more, is insufficient to establish scienter, but they are relevant to a holistic analysis, and contribute to a strong inference of scienter. *Yates*, 744 F.3d at 890.

Further, the amended complaint also alleges Individual Defendants' intimate involvement in the day-to-day operations of the Company, which bolsters Plaintiff's claims of scienter and boosts the inference of "actual" exposure to the problems 3D Systems was experiencing. *Id.* ("[T]o be sure, such allegations [of holding positions in a company] are relevant to the court's holistic analysis of scienter. But without additional detailed allegations establishing the defendants' actual exposure to the accounting problem, the complaint falls short of the PSLRA's particularity requirements."). Here, because there are indeed "additional detailed allegations" establishing Individual Defendants' actual exposure to the problem, the complaint meets PSLRA's particularity requirements. *Id.* For example, the complaint discusses Reichental and Gregoire being physically present for quarter-end sales meetings, making decisions on when to ship goods and directly giving shipping approvals via email. ECF No. 78 at 31. Further, Defendant Gregoire made the final determination as to what sales to recognize as revenue. *Id.* Also, at a Telecommunications conference, a marketing director for 3D Systems revealed that Individual Defendants were on the acquisition team, which was directly responsible for the identification and negotiations for merging new companies. *Id.* at 57. Finally, Individual Defendants themselves made statements about how involved they were in handling the issues facing 3D Systems, such as Defendant Reichental stating that "we together conducted under Damon [Gregoire]'s leadership, a very careful and complete analysis," and "we have done nothing but look at these issues on a daily basis for quite some time." *Id.* at 71, 98. In combination with their positions at 3D Systems, these revelations of personal and intimate involvement with many of the allegedly misrepresented issues allows the Court to

reasonably infer each Individual Defendants' knowledge regarding the true state of affairs at 3D Systems.

Finally, the allegations of insider trading bolster the strong inference of scienter. Allegations of "personal financial gain may weigh heavily in favor of a scienter inference." *Tellabs*, 551 U.S. at 325. These allegations, however, will support an inference of scienter only "if the timing and amount of a defendant's trading were unusual or suspicious." *Id.* (citing *Hunter*, 477 F.3d at 184). To determine whether an insider's sales were "unusual in scope" we consider factors such as "the amount of profit made, the amount of stock traded, the portion of stockholdings sold, or the number of insiders involved." *Id.*

In this case, two of the three Individual Defendants, Reichental and Gregoire, sold stocks during the Class Period. ECF No. 78 at 121-122. Reichental sold 144,000 shares of stock for a total of $8,814,447, and Gregoire sold 162,500 shares for $8,927,815. *Id.* Further, from a review of Defendant Gregoire's Form 4's, incorporated by reference into Plaintiff's complaint, *Tellabs*, 551 U.S. at 322, it appears as if Defendant Gregoire sold a much higher amount of stocks during the Class Period than he did outside of it. *See also Janas v. McCracken (in Re Silicon Graphics Sec. Litig.)*, 183 F.3d 970, 986 (9th Cir. 1999) (upholding the district court's consideration of SEC Filings referenced in the Plaintiff's complaint under the incorporation by reference doctrine). From the beginning of 2012 until the beginning of the Class Period in 2013, a total of twenty-two months, Defendant Gregoire sold only 75,000 shares of stock. From the beginning of the Class Period through the end of 2014, a total of just fourteen months, he sold over 150,000 shares, all within the Class Period. These numbers are certainly consistent with an inference that the insiders who traded during the Class Period had a motive to commit fraud.

Further, the complaint alleges that Defendants Reichental and Gregoire timed these sales to take advantage of particular favorable disclosures, which can boost an inference of insider trading. *Cf. Hunter* 477 F.3d at 184 (finding deficient an allegation of insider trading because it, among other things, failed to "allege that defendants timed their sales to profit from any particular disclosures"). For instance, on December 13, 2013, Defendant Reichental sold 25,000 stocks; just days after 3D Systems stocks reached a high for the Class Period. ECF No. 78 at 121. Also, Defendant Reichental sold 52,300 shares of stock on August 29, 2014; within a month of 3D Systems raising their revenue guidance for that year. *Id.* Defendant Gregoire sold his stock off in a similar pattern, selling 45,000 shares on November 15, 2013; just two weeks after the Company released a positive earnings announcement and boasted of unprecedented consumer demand, acceleration of manufacturing capacity, and an increase in revenue guidance. *Id.* at 122. He also sold another 50,000 shares on August 27, 2014; within a month of the company raising its revenue guidance, just like Defendant Reichental. *Id.* Further, unlike other cases in this Circuit that have failed to find an inference of scienter from insider trading, neither defendant sold their stock under a Rule 10b5-1 plan, a non-discretionary trading plan corporate executives can set up to sell shared as predetermined times to avoid allegations of insider trading, the presence of which in other cases weakened any inferences of scienter. *Yates*, 744 F.3d at 891. Given Defendant Gregoire's doubled stock sales during the Class Period, the large number of stocks sold by both Defendant Greogire and Reichental at times matching up with announcements that caused stock price highs, and the lack of 10b5-1 plans, at this stage of the proceedings, this Court holds that Plaintiff has adequately pled enough facts to infer scienter from these stock sales.

The Court is unpersuaded by Defendants' group pleading argument. The complaint mentions several examples of each Individual Defendant's knowledge or reckless disregard of

adverse undisclosed facts that rendered the statements they made to the market misleading.  *See* ECF No. 90 at 22-23 (citing several paragraphs of the complaint for each Individual Defendant indicating their individual scienter).  These numerous instances pointing to each Individual Defendants' conduct is therefore fatal to Defendants contention of group pleading.

Considering the totality of circumstances alleged above and giving "the inferential weight warranted by context and common sense," the Court concludes that Defendants' have neglected to show that the non-culpable inferences here are stronger than the culpable ones, and therefore holds that Plaintiff has adequately pled scienter to each Individual Defendant separately.  *See Matrix Capital Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 183 (4th Cir. 2009) ("While we ultimately evaluate plaintiffs' allegations of scienter holistically, we only afford their allegations the inferential weight warranted by context and common sense.")  Further, because Plaintiff has adequately pled scienter for each Individual Defendant, they have also pled scienter for 3D Systems, as "corporate liability derives from the actions of its agents."  *Hunter*, 477 F.3d at 184.

### B.    Defendants' Truth-On-the-Market Defense

Alternatively, Defendants argue that the complaint's allegations regarding statements made after July 31, 2014—the date Plaintiffs allege as the date the truth started incrementally revealing itself—warrant dismissal via a "truth-on-the-market" defense.  Under this defense, "a misrepresentation is immaterial if the information is already known to the market because the misrepresentation cannot then defraud the market."  *Ganino v. Citizens Utilities, Co.*, 228 F.3d 154, 167 (2d Cir. 2000).  Defendants must convey this corrective information to the public "with a degree of intensity and credibility sufficient to counter-balance effectively any misleading information created by" the alleged misstatements.  *Id.*  Also, "[t]he truth-on-the-market defense

is intensely fact-specific and is rarely an appropriate basis for dismissing a § 10(b) complaint for failure to plead materiality." *Id.*

Here, this Court is unconvinced that the entire truth was on the market after the disclosures of July 31, 2014. As just one example, as late as November 10, 2014, Defendant Reichental maintained that the Company's integration of the new acquisitions had been done really well, "and we expect that, that will bode well for us in the future." ECF No. 78 at 84. It was not until April 24, 2015, that Defendant Reichental admitted that the operating expenses that resulted from the acquisition strategy had "got a little bit ahead of us" and that it had caused financial problems for 3D Systems. *Id.* at 96. Given that it is questionable whether the truth was on the market after July 31, 2014, and that this defense is intensely fact-specific, at this stage of the proceedings, the Court is unprepared to hold that Defendants made its disclosures with such "intensity and credibility" that it counter-balanced any alleged misleading information given by the Company earlier. *See Ganino*, 228 F.3d at 168 (engaging in a similar dismissal of a truth-on-the-market defense given the stage in the proceedings and the present record).

### C. Control Person Liability Pursuant to Section 20(a)

Section 20(a) of the Exchange Act establishes liability against "control persons." 15 U.S.C. § 78t(a). A claim of control person liability must allege: (1) a predicate violation of § 10(b) and (2) control by the defendant over the primary violator. *In re Mut. Funds Inv. Litig.*, 566 F.3d at 129-30. Because § 20(a) liability is derivative of § 10(b) liability, on a motion to dismiss, a claim may stand or fall based on a decision regarding the § 10(b) claim. *Yates*, 744 F.3d at 894 n.8; *BearingPoint, Inc.*, 576 F.3d at 192.

Here, Defendants move to dismiss Plaintiff's § 20(a) claim solely because the complaint allegedly fails to establish a § 10(b) claim. *See* ECF No. 80 at 34. Because this Court holds that

Plaintiff adequately pled a primary violation under § 10(b) of the Exchange Act, however, the secondary claim that Individual Defendants violated § 20(a) will stand.


## VI.    CONCLUSION

Consequently, based on the foregoing discussion and analysis, Defendants' motion to dismiss is **DENIED**.  As such, Plaintiff's motion to strike is **RENDERED MOOT**.

**IT IS SO ORDERED.**

Signed this day of 25th day of July, 2016, in Columbia, South Carolina.

s/Mary Geiger Lewis_____
MARY G. LEWIS
UNITED STATES DISTRICT JUDGE
