# EXHIBIT "3"

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
ROCK HILL DIVISION

KBC ASSET MANAGEMENT NV,                    )
Individually and on Behalf of All Others    )
Similarly Situated,                         )
                                            )
                         Plaintiff,         )
                                            )
vs.                                         )  No. 0:15-cv-02393-MGL
                                            )
3D SYSTEMS CORPORATION,                     )
ABRAHAM N. REICHENTAL, DAMON J.             )
GREGOIRE, and TED HULL,                     )
                                            )
                         Defendants.        )

## <u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>

**October 31, 2016**

# Table of Contents

**Page**

I.  **INTRODUCTION** ...................................................................................................3

II.  **QUALIFICATIONS** ..............................................................................................3

III.  **SUMMARY OF OPINIONS** ................................................................................4

IV.  **OVERVIEW OF THE COMPANY AND ALLEGATIONS** ................................5

V.  **DISCUSSION OF RELIANCE ELEMENT** .........................................................7

VI.  *CAMMER* **FACTORS** ..........................................................................................9

VII.  **APPLICATION OF EFFICIENCY FACTORS TO 3D COMMON STOCK** ..................11

    A.  OVERVIEW ............................................................................................... 11

    B.  *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME .................... 12

    C.  *CAMMER* FACTOR 2: ANALYST COVERAGE .................................................... 14

    D.  *CAMMER* FACTOR 3: MARKET MAKERS ........................................................ 16

    E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY ........................................ 18

    F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION ............... 19

    G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION .................................. 28

    H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD ........................................... 30

    I.  ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP .............................. 31

    J.  ADDITIONAL FACTOR 4: AUTOCORRELATION ............................................. 32

VIII.  **DAMAGES** ............................................................................................................33

IX.  **CONCLUSION** ....................................................................................................34

## I.    INTRODUCTION

1.    My name is Chad Coffman. I am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiff in this matter to examine and opine on whether the market for 3D Systems Corporation's ("3D," "3D Systems" or the "Company") common stock ("3D Common Stock") was efficient during the Class Period.[1] In addition, I have been asked to opine on whether damages in this matter are subject to a common methodology under Section 10(b) of the Exchange Act of 1934 and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.    The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $600 per hour for my work on this matter, and my compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.    QUALIFICATIONS

3.    I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

---

[1] The putative Class Period identified in the Amended Consolidated Complaint for Violations of the Federal Securities Law ("Complaint") is from October 29, 2013 through May 5, 2015 (Complaint ¶ 1).

4.     I, along with several others, founded Global Economics Group in March 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.     My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.  SUMMARY OF OPINIONS

6.     After analyzing 3D Common Stock throughout the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for 3D Common Stock was efficient throughout the Class Period and that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

7.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of 3D's business operations and the allegations in this case. **Section V** discusses the reliance requirement and the "fraud on the market" theory. **Section VI** introduces

---

[2] Global Economics Group was formerly known as Winnemac Consulting, LLC.

the *Cammer* factors and other factors for evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for 3D Common Stock during the putative Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

8.    I reserve the right to amend this report to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.    OVERVIEW OF THE COMPANY AND ALLEGATIONS

9.    3D Systems is a Delaware incorporated company headquartered in South Carolina which designs, manufactures, and sells 3D printers. The Company describes itself as follows in its Form 10-K for the period ending December 31, 2014:

> [3D Systems is] a leading global provider of 3D printing centric solutions, and [is] pioneering 3D printing for everyone. [3D] provide[s] the most advanced and comprehensive 3D design-to-manufacturing solutions, including 3D printers, print materials and cloud sourced custom parts. [3D's] powerful digital thread, a seamless information exchange across design and manufacturing, empowers professionals and consumers everywhere to bring their ideas to life in material choices including plastics, metals, ceramics and edibles. [3D's] leading healthcare solutions include end-to-end simulation, training and planning and printing of surgical instruments and devices for personalized surgery and patient specific medical and dental devices. [3D's] democratized 3D digital design and inspection products provide seamless interoperability between additive and subtractive manufacturing and incorporate the latest immersive computing technologies. Our products and services replace and complement traditional methods with improved results and reduced time to outcome. These solutions are used to rapidly design, create, communicate, plan, guide, prototype or produce functional parts, devices and assemblies, empowering [customers of 3D] to manufacture the future.[3]

---

[3] 3D 2014 10-K, p. 4.

10.     As of the end of 2014, 3D had three classes of products and services which included the following: (1) Products, (2) Materials and (3) Services. These segments generated $653 million in revenue of which 51% was generated in the Americas with the remaining revenue coming from Germany, Asia, and other EMEA (Europe, Middle East and Africa) countries.[4] As of the end of 2014, 3D employed 2,136 full-time employees, and its shares traded on the New York Stock Exchange ("NYSE").[5]

11.     Plaintiff's Complaint alleges that 3D and Individual Defendants[6] issued false and misleading statements and omitted material information during the Class Period, ultimately causing damages to purchasers of 3D Common Stock who unknowingly bought the stock at artificially inflated prices and were damaged when the stock price ultimately reflected the concealed information and the artificial inflation was removed.[7]

12.     More specifically, the Complaint alleges that false and misleading statements and material omissions were made with respect to 3D's aggressive acquisition and product growth strategies. The Complaint suggests that the Company had extensive material operating, manufacturing, and product quality issues as a consequence of sudden growth, acquisitions and the rapid introduction of new products to the market, which Defendants allegedly failed to disclose to investors. Finally, the Complaint alleges that Defendants mislead the market by repeatedly boasting about the Company's organic revenue to perpetuate the market's perception

---

[4] 3D Systems 2014 10-K, p. F-34, F-35.

[5] 3D Systems 2014 10-K, pp. 12, 26.

[6] The Court denied Defendants' Motion to Dismiss. *See* Memorandum Opinion and Order Denying Defendants' Motion to Dismiss the Amended Consolidated Complaint, *KBC Asset Management NV, v. 3D Systems Corporation*, No. 0:15-CV-02393-MGL, (D.S.C. Jul. 25, 2016).

[7] Complaint ¶¶ 262-264.

of 3D Systems as a leader in the 3D printing industry.[8] Finally, the Complaint argues that when the corrective information came to light, 3D's shares plummeted, causing investor losses as the relevant truth concealed by the misstatements and/or omissions was revealed.[9]

## V.    DISCUSSION OF RELIANCE ELEMENT

13.    Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims. Plaintiff asserts the "fraud on the market" theory of reliance in this matter. The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…. Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…. The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[10]

14.    The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b–5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We

---

[8] Complaint ¶¶ 5-19.

[9] Complaint ¶ 278.

[10] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988).

adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[11]

15.    As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and lack of disclosure by paying the inflated (deflated) price.

16.    Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[12] The esteemed economist Dr. Eugene Fama, in his seminal research, first outlined definitions of an "efficient market."[13] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[14]

---

[11] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2417 (2014) ("*Halliburton II*").

[12] To recognize the presumption of reliance, the Court explained, was not "'conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price.'" *Basic*, 485 U.S. at 248 n.28. The Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Id* at 247 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, rather, market efficiency is a matter of degree.

[13] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[14] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

17.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[15] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

18.    In the next section, I explain the factors that are regularly considered by courts in determining whether the market for a particular security is efficient.

## VI.  *CAMMER* FACTORS

19.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[16]

---

[15] *Basic,* 485 U.S. at 241.

[16] *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989).

20.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency.[17] As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency.[18] For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[19]

21.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics are determinative as to whether a particular market is efficient.

---

[17] *Cammer,* 711 F. Supp. at 1276, n.17.

[18] Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383 (1970).

[19] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988)) (emphasis added).

22.     In the subsequent sections, I evaluate each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, and 4) autocorrelation (meaning whether there is a pattern in a security's returns so that past returns have the ability to predict future returns).

## VII.  APPLICATION OF EFFICIENCY FACTORS TO 3D COMMON STOCK

### A.  OVERVIEW

23.     After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports my opinion that the market for 3D Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that 3D Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays 3D Common Stock closing price and trading volume for each day throughout the Class Period.

24.     In summary, and as discussed more fully below, 3D Common Stock traded in an efficient market. First, the average weekly trading volume of 3D Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for 3D Common Stock was 20,356,055 shares, which represents 19.14% of shares outstanding, higher than the average common stock traded on the New York Stock Exchange. Second, there were a large number of securities analysts following and reporting on 3D. Third, 3D Common Stock was actively traded on the NYSE, fulfilling the *Cammer* factor regarding market makers. Fourth, 3D filed a Form S-3 during the Class Period, met the important eligibility criteria, and was apparently eligible to file Form S-3 throughout the

Class Period since the Company had previously provided sufficiently high levels of public

information to the market in its SEC filings. Fifth, 3D Common Stock had a large market

capitalization relative to all other firms that traded on the NYSE and NASDAQ. Sixth, 3D

Common Stock had a low bid-ask spread relative to other exchange-traded common stocks.

Seventh, institutions, which are considered generally to be well-informed investors, held, on

average, over 42.53% of the public float. Eighth, there was no evidence of consistent

autocorrelation during the Class Period. Finally, there was a strong cause-and-effect relationship

between new Company-specific information and the market price of 3D Common Stock during

the Class Period. These factors all support the conclusion that 3D Common Stock traded in an

open, developed, and efficient market throughout the Class Period.

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

25.    The first *Cammer* Factor is the average weekly trading volume of a security.

According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the
> outstanding shares would justify a strong presumption that the market for the
> security is an efficient one; 1% would justify a substantial presumption.[20]

26.    Volume as a fraction of shares outstanding is an important indicator of market

efficiency. First, volume is objectively quantifiable and comparable across securities. Second,

high volume is generally indicative of continuity, liquidity, and market depth – which are highly

indicative of market efficiency.[21] Third, substantial volume would indicate there is likely a

---

[20] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[21] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 44-45. Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988) as cited by *Cammer*, 711 F. Supp. at 1276 n.17. Market depth refers to the

market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[22]

27.    3D Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for 3D Common Stock during the Class Period was 19.14% of shares outstanding, compared to 1.62% for the NYSE. **Exhibit 3** plots 3D Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[23] Indeed, the average weekly trading volume during the Class Period was 20,356,055 shares.

28.    The volume of trading for 3D Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

29.    Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* Factor expressed in dollar terms.[24] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio

---

number of shares that can be traded at quoted prices. A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Yakov Amihud et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).

[22] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[23] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days (this may not follow the calendar week).

[24] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, 3D Common Stock's turnover velocity can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for 3-D Common Stock was 939.38%, compared with the NYSE average of 84.36% for the period Class Period.[25] Thus, 3D Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE, further supporting that it traded in an efficient market.

30.    In short, the relatively high trading volume in 3D Common Stock throughout the Class Period supports the conclusion that the market for 3D Common Stock was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

31.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[26]

32.    Analyst coverage can be important confirmatory evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

33.    During the Class Period, there was an abundance of analyst coverage for 3D. **Exhibit 4** shows that there were at least 336 reports issued during the Class Period and lists 26 separate firms that had equity analysts issue reports on 3D, including major firms such as Credit

---

[25] Turnover velocity for the NYSE is calculated from data provided by the World Federation of Exchanges. *See* http://www.world-exchanges.org/statistics.

[26] *Cammer*, 711 F. Supp. at 1286.

Suisse, Deutsche Bank, Jefferies, JP Morgan, and RBC Capital Markets.[27] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of 3D by securities analysts supports the conclusion that 3D Common Stock traded in an efficient market throughout the Class Period.

34.    Since 1989, when the *Cammer* decision was rendered, there has been a massive increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[28] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35.    Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of 3D, there were many other sources of public information dissemination. For example, there was substantial public press regarding 3D. A search for articles classified as related to 3D by Factiva over the

---

[27] I obtained 3D analyst reports from Investext and Counsel. The number of analyst reports I identify is likely understated since many are not available through third party data providers such as Investext.

[28] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (http://www.rss-specifications.com/ and http://www.rss-specifications.com/what-is-rss.htm).

eighteen-month Class Period results in 1,083 unique articles.[29] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Class Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding 3D in the public arena throughout the Class Period.

36.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding 3D provides evidence of a robust and active market for public information about 3D and evidence that its common stock traded in an efficient market during the Class Period.

### D. *CAMMER* FACTOR 3: MARKET MAKERS

37.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[30] The third *Cammer* Factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption.[31]

38.    The basic premise that the number of market makers can serve as an efficiency criteria relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is

---

[29] Based on a search for "All Sources" with the company field "3-D Systems Corp" for the period "October 29, 2013 – May 6, 2015." The Factiva search yielded 1,083 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[30] *See* http://www.sec.gov/answers/mktmaker.htm.

[31] *Cammer*, 711 F. Supp. at 1293.

believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[32]

39.    3D Common Stock traded on the NYSE with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[33] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE, which are presumed to be efficient,[34] report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[35]

40.    The NYSE is one of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike an over-the-counter market that relies on decentralized market makers providing liquidity for trading, the NYSE relies on a computerized system to match orders and provide quotes.[36] The minimum requirements to be listed on the NYSE and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

---

[32] Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285, 291 (1994).

[33] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels, Securities Fraud and Commodities Fraud § 8.6 (Aug. 1988): ("We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System.").

[34] Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6 (Aug. 1988).

[35] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market. *See* http://www.nyse.com/equities/nyseequities/1166830723427.html; William F. Sharpe, Gordon J. Alexander, Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995, pp. 45-53; Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010, Chapter 18 – Appendix A.

[36] *See* https://www.nyse.com/market-model/overview#dmms-2; https://www.nyse.com/market-model/dmm-case-studies; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.

41. Nevertheless, according to Bloomberg, throughout the Class Period, there were 182 market makers for 3D Common Stock.[37] Therefore, 3D Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

## E. *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

42. The fourth *Cammer* Factor is SEC Form S-3 Eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[38]

43. Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[39] In order to be eligible to issue a Form S-3, among other things, a company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for more than one year, 2) must have filed all documents in a timely manner for the past twelve months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency, not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

44. I have no reason to believe that 3D was not S-3 eligible throughout the Class Period, and in fact, 3D filed Form S-3's before and during the Class Period. A Form S-3 allows a company to register unspecified amounts of different specified types of securities using a single

---

[37] Bloomberg RANK function.

[38] *Cammer*, 711 F. Supp. at 1287.

[39] For additional information, see www.sec.gov/about/forms/forms-3.pdf.

form. 3D filed Form S-3's on 4/9/2002, 5/15/2002, 2/24/2010, 3/3/2011, 6/12/2012, 5/7/2013, and 5/27/2014.[40] Therefore, 3D meets this *Cammer* efficiency factor, which supports the conclusion that 3D Common Stock traded in an efficient market.

### F. *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.    The fifth *Cammer* Factor relates to how the price of a security reacts to new information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price.[41]

46.    Establishing a causal connection between new company-specific news events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called the "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[42] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[43]

47.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements

---

[40] S&P Capital IQ.

[41] *Cammer,* 711 F. Supp. at 1291.

[42] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997), p. 13.

[43] John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998), p. 111.

conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48. To analyze cause and effect, I performed an event study to determine whether 3D Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with the least amount of 3D-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about 3D and the market price of 3D Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

49. A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[44] I have performed such an analysis in this matter where I evaluate the relationship between 3D Common Stock's daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and a market capitalization weighted peer index, hereafter referred to as the "Peer Index."[45]

---

[44] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent" variable). In this case, the daily percentage change in 3-D Common Stock (the 3D daily "return") is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables. For a general discussion of regression analysis, see Chapters 1-3 in Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.

[45] In my examination of analyst reports issued throughout the Class Period, I identified a small group of firms that were most often viewed as direct competitors of 3D (i.e. The ExOne Company, Voxeljet AG, and Stratasys Ltd.). Defendants also identified these same three firms as peers to 3D Systems *See* Memorandum of Law in Support of Defendant's Motion to Dismiss, filed on January 14, 2016 (pp. 2-3).The returns of the Peer Index are net of the S&P 500 Total Return Index.

50.    For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[46] By using a "rolling" estimation window, it allows for the relationship between 3D common stock, market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[47]

51.    The model indicates that there is a positive correlation between 3D Common Stock and the control variables. In other words, the movement of the Market Index and Peer Index helps explain movements in 3D's stock price. For instance, choosing a day in the Class Period purely as an example, June 3, 2014, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.25 which means that a 1% rise in the S&P 500 predicts a 1.25% increase in returns for 3D Common Stock. The estimated coefficient for the Peer Index is 0.87, meaning that the expected return for 3D Common Stock is about a 0.87% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Class Period. **Exhibit 5** demonstrates there was a consistently positive relationship between the general market, the Peer Index, and 3D's common stock price.

52.    Another important statistic from the regression is the Standard Deviation of the Errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in the price movement

---

[46] *See*, A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE 13, 15 (1997) ("For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event.").

[47] Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575, 1597 (1995).

of 3D Common Stock after controlling for the Market Index and Peer Index. For instance, on the example date, June 3, 2014, the model predicted that absent any new firm-specific information, the price of 3D Common Stock would decrease by 1.45% because the S&P 500 was down 0.03% and the Peer Index was down 1.69%.[48] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of -2.70%. Thus, the "abnormal return" for this day is -1.25% (the actual return of -2.70% minus the predicted return of -1.45%). I then rely on the Standard Deviation of the Errors from the regression model to tell if this abnormal return of -1.25% is sufficiently large that I reject random movement as the explanation.

53.    The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of -1.25% represents 0.52 standard deviations or a t-statistic of -0.52 (abnormal return of -1.25% divided by the Standard Deviation of the Errors of 0.024). Using the standard assumption that, in the absence of new firm-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[49] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of -0.52, the abnormal return is not statistically

---

[48] The expected return of -1.45% is found as follows: 1.25 * -0.03% (Coefficient on Market Index *times* Market Index return) + 0.87 * -1.68% (Coefficient on Peer Index Return *times* Peer Index Return) + 0.06% (constant term from regression).

[49] David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001. The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

54.    **Exhibit 6** shows that the Standard Deviation of the Errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

55.    To analyze cause-and-effect, I examined the price response of 3D Common Stock to earnings announcements that occurred during the Class Period (see **Exhibit 7**). I review ten earnings releases and pre-announcements throughout the Class Period, including the final alleged corrective disclosure on May 6, 2015.

56.    There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[50] Also, newly released earnings reports by the company are an objective set of news to identify and test. Considering the second earnings report listed in **Exhibit 7** as an example (*i.e.* Q4 2013 pre-announcement), the Company pre-announced fourth quarter results for fiscal year

---

[50] *See, e.g.*, William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968, pp. 67-92; Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971, pp. 119-163; Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980, pp. 1-12.

2013 and discussed decreased earnings estimates as compared to the Street consensus, which caused certain analysts to reduce estimates going forward.[51]  In response, the market price of 3D Common Stock decreased 15.39%, compared to the predicted return of negative 4.67%. Thus, the abnormal return on February 5, 2014 was *negative* 10.72%. With a t-statistic of -5.62, this abnormal price movement is statistically significant, and I therefore have scientific evidence that 3D Common Stock reacted rapidly to this new information.[52]

57.    Similar to this example, I analyzed the market reaction to 3D's other earnings and pre-announcements throughout the Class Period. In total, of the ten regular quarterly earnings and pre-announcements 3D issued during the Class Period, six resulted in statistically significant price movements above the 95% confidence level. Specifically, there were four announcements at the 99% confidence level and two announcements at the 98% confidence level.

58.    **Exhibit 7** presents a summary of the earnings releases and pre-announcements, and **Exhibits 8A–8J** depict the intraday price movements for each of these announcement dates.

---

[51] "Adjusting Estimates to Reflect Profit Warning; Price Target Goes to $54," *J.P. Morgan*, February 5, 2014; "Weak FY14 & Q4 guidance on investment step-up, but 30%+ organic growth outlook," *Credit Suisse*, February 5, 2014.

[52] Note that there are other earnings announcements that did not (and would not be expected to) result in statistical significance. This would happen, for instance, in quarters where there was not much surprise and the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information that netted out. For example, this was the case with 3D's earnings release of Q4 2014 results on February 26, 2015 as evidenced by the following analysts:

*See* "First Take: Q4 Results Weak, 2015 Guidance Generally as Expected," *Jefferies*, February 26, 2015: "Q4 results and 2015 guidance provided ammunition for both the bulls and the bears. The new CFO said the right things in terms of a slower pace of M&A, a focus on improved execution, and showing operating leverage. Bears will focus on Q4 organic revenues decelerating further to 7% Y/Y vs. 12% in Q3, worse-than-expected Printer GM, higher opex, and back-end loaded 2015 guidance. We continue to expect the stock to be range-bound and reiterate our Hold."

*See* "Promising Shift to Profits But Back-End Loaded Forecast," *RBC*, February 26, 2015: "We believe investors, particularly the bears in the stock, were positively surprised by 3D Systems' shift to acquisition integration and profitability improvement; however, we believe the back-end loaded 2015 forecast may curb this initial enthusiasm."

59.    I then compared these results against the 158 days during the Class Period[53] where I identified days from a Factiva search with the least amount of 3D-related news and where no identified analyst reports or SEC filings were issued.[54,55] Of these 158 days, there were five statistically significant price movements. Thus, during the Class Period there was a statistically significant price reaction at the 95% confidence level on 60% of the earnings announcements, but when compared to days with the least amount of 3D-related news, I observed a statistically significant reaction only 3.16% of the time.[56] For days with the least amount of news, the fact that I observed 3.16% of the days with significant movements is consistent with what I would expect to observe by randomness alone.[57] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information and changes in the price of 3D Common Stock.

60.    Furthermore, on the 158 days with the least amount of news, the average change in price of 3D Common Stock was 1.41% after controlling for market and industry factors, while the average change in 3D Common Stock on earnings and pre-announcements was 5.55%. In other words, the average magnitude of stock price movement on announcement days was about

---

[53] In order to capture the last corrective disclosure, I expanded my news analysis to the earnings release on the day after the Class Period. *See also* **Exhibit 7** for the event study results on these days.

[54] Based on a search for "All Sources" with the company field "3-D Systems Corp" for the period "October 29, 2013 – May 6, 2015." The Factiva search yielded 1,083 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. There may be other news articles and sources that are not a part of Factiva's database, however, to the extent that are additional news stories not captured by Factiva the treatment of those days as "no news days" would tend to bias toward finding a lack of cause and effect.

[55] From my search, I determined the days with the least amount of news for days in which there were three or fewer news articles, no analyst reports, and no SEC filings.

[56] This difference between 60% and 3.16% is itself statistically significant at the 95% confidence level.

[57] There is no statistically significant difference between 3.16% and 5.00% (this is within the proportion of dates that would be significant by chance alone when using a 95% confidence interval).

3.94 times higher.[58] Again, this demonstrates that on days when important firm-specific information is released to the market, the stock price moves much more than on days where there is no firm-specific news. This provides further evidence of a cause-and-effect relationship between firm-specific news and changes in the price of 3D Common Stock, and thus an efficient market.

61.    The bar charts below summarize this analysis while **Exhibit 9** gives more detail.



---

[58] This difference between 5.55% and 1.41% is itself statistically significant.



62.    Finally, when important firm-specific news is released to the market (e.g. earnings and pre-announcements), the daily trading volume also tends to be much higher than on days where there is a low amount of news. For instance, the average daily trading volume of the ten days with earnings announcements was 12.9 million. Compare this to the average daily trading volume of 3.5 million for days where there is the least amount of news in the Class Period. The bar chart below summarizes this analysis.





63. The bar charts above establish a strong cause-and-effect relationship between new, unexpected news and rapid changes in 3D Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with the least amount of news.

64. In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of 3D Common Stock.

## G. ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

65. In *Krogman v. Sterritt*, the Court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the

*Cammer* factors.[59] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[60] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[61] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.    3D Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 102 million and 112 million shares of 3D Common Stock outstanding throughout the Class Period.[62]

67.    Based on the market price, the market capitalization for 3D Common Stock averaged $5.4 billion during the Class Period. **Exhibit 10** shows 3D's market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, 3D Common Stock's market capitalization fell between the 65th and 86th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[63] In other words, over the Class Period, 3D Common Stock had a higher market capitalization than at least 65% of the firms on the combined NYSE and NASDAQ.

---

[59] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[60] *Krogman*, 202 F.R.D. at 478.

[61] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105, 117 (2000).

[62] S&P Capital IQ.

[63] Thomson Reuters Eikon database.

68.    Given that the market capitalization for 3D Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for 3D Common Stock.

## H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

69.    The *Krogman* Court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[64] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

70.    I analyzed bid-ask spreads for 3D Common Stock during the Class Period. **Exhibit 12A** shows that during this period, the time-weighted average percentage bid-ask spread for 3D Common Stock in each month ranged from 0.03% and 0.08%. This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in April 2015 (the full month during the Class Period when 3D had the largest percentage bid-ask spread).[65,66] **Exhibit 12A** demonstrates that 3D Common stock had a

---

[64] *Krogman*, 202 F.R.D. at 478.

[65] In the last month of the Class Period, May 2015, the bid-ask spread analysis was limited to the trading days in the Class Period.  Based on the full months contained within the Class Period, April 2015 had the largest bid ask spread percentage and thus is used for comparison. Quote data for 3D and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

monthly average bid-ask spread of 0.07% in April 2015, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.59%.[67]

**Exhibit 12B** shows that the monthly average bid-ask dollar spread never exceeded $0.05 per share during the Class Period, while my randomly selected group of 100 common stocks had an average bid-ask spread of $0.17.[68] Accordingly, 3D's bid-ask spread was low during the Class Period in both dollar and percentage terms, and thus this factor further supports market efficiency for 3D Common Stock.

### I.   ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

71.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 13** shows, 695 institutions reported owning 3D Common Stock during the Class Period, holding, on average, 42.53% of public float. This substantial level of institutional

---

[66] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads.  Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ throughout the Class Period and then randomly generated a list of 100 common stock securities.  I then calculated the time-weighted average monthly bid-ask spread for April 2015.

[67] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

[68] I calculated the time-weighted average bid-ask spread for 3D Common Stock for each month from October 2013 to May 2015 using data received from TICK database. *See* www.tickdata.com. October 2013 and May 2015 data are limited to the Class Period.

ownership of 3D Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.   If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if it is persistent and sufficiently large enough that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

73.   Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[69]

74.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[70] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation. Even if the regression shows a significant result for a certain period, then one must ask whether the effect is persistently significant and large enough to suggest a predictable arbitrage opportunity in the next period.

75.   **Exhibit 14** displays the autocorrelation coefficient for 3D Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class

---

[69] Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).

[70] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

Period is not statistically significant meaning there is no evidence of autocorrelation (*i.e.*, throughout the Class Period, the coefficient on the previous day's abnormal return averaged -0.02). This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also supports the conclusion that 3D Common Stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

76.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that can also be applied on a class-wide basis).[71]

77.    The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be

---

[71] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.  CONCLUSION

78.     In sum, every factor analyzed supports my opinion that 3D Common Stock traded in an efficient market. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

79.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


Executed on October 31, 2016.

Chad Coffman

**Exhibit 1**
**Summary of Efficiency Factors for 3D Systems Corporation**

| Factor | Summary of Factor | 3D Systems |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 19.14%, as a percentage of shares outstanding, well exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 20 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 26 securities analysts issued 336 analyst reports, which implies that important information relevant to trading 3D Systems' common stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because 3D Systems' shares were exchange-traded on the NYSE during the class period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were 182 market makers for 3D Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • 3D Systems met the important eligibility criteria for SEC Form S-3 and was apparently S-3 eligible throughout the Class Period. Historically, 3D Systems filed Form S-3 on 4/9/2002, 5/15/2002, 2/24/2010, 3/3/2011, 6/12/2012, 5/7/2013 and 5/27/2014; therefore, this factor is satisfied. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for 3D Systems Common Stock. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | As of 12/31/2013 and 6/30/2015, 3D Systems' market capitalization was $9.55 billion and $2.18 billion, respectively, which is above the 65th percentile of NYSE and NASDAQ stocks. 3D Systems' common stock therefore easily meets this criteria. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the bid-ask spread for 3D Common Stock in each month ranged from 0.03% to 0.08%. DDD's average percentage bid-ask spread was well below the mean bid-ask spread of a random sample of 100 other common stocks trading on the NYSE in April 2015 (the full month when DDD had the largest bid ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 695 institutions held 42.5% of the public float throughout the Class Period, on average, which further supports the finding that 3D Systems' Common Stock traded in an efficient market (Note: Institutions held as much as 45.8% of the public float during the Class Period). |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • No evidence of consistent autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading 3D Systems' Common Stock based solely on its past price movements. |



**Exhibit 2**
**3D Common Stock Price & Volume**
**10/29/2013 - 8/31/2015**

Sources: Complaint and S&P Capital IQ.



**Exhibit 3**
**3D Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**10/29/2013 - 5/5/2015**

Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on October 29, 2013 through May 5, 2015. The last week consists of only one trading day (i.e., 5/5/2015), and therefore, it is excluded from the average and median calculations.

**Exhibit 4**
**Summary of Securities Analyst Reports Issued for 3D Systems**
**During the Class Period[1]**

|  | Analyst Name | Reports Issued During the Class Period: 10/29/2013 - 5/5/2015 |
|---|---|---|
| [1] | BB&T CAPITAL MARKETS | 15 |
| [2] | BLUESHIFT RESEARCH | 1 |
| [3] | BREAN CAPITAL, LLC. | 45 |
| [4] | CANACCORD GENUITY | 25 |
| [5] | CM RESEARCH | 1 |
| [6] | CREDIT SUISSE | 12 |
| [7] | DEUTSCHE BANK RESEARCH | 18 |
| [8] | DIRECTORS DEALS LTD. | 1 |
| [9] | FINTRUST BROKERAGE SERVICES | 4 |
| [10] | GABELLI & COMPANY | 15 |
| [11] | IMPERIAL CAPITAL, LLC | 10 |
| [12] | JANNEY MONTGOMERY SCOTT LLC | 13 |
| [13] | JEFFERIES | 24 |
| [14] | JPMORGAN | 27 |
| [15] | KEYBANC CAPITAL MARKETS | 2 |
| [16] | MAXIM GROUP LLC | 3 |
| [17] | MORGAN STANLEY | 11 |
| [18] | NEW ALBION PARTNERS | 1 |
| [19] | OPPENHEIMER AND CO | 13 |
| [20] | PIPER JAFFRAY - COMPANY REPORT | 23 |
| [21] | RBC CAPITAL MARKETS | 31 |
| [22] | STEPHENS INC. | 12 |
| [23] | SUSQUEHANNA FINANCIAL GROUP LLLP | 1 |
| [24] | UBS RESEARCH | 17 |
| [25] | WEDGE PARTNERS | 1 |
| [26] | WILLIAM BLAIR & COMPANY | 10 |
|  | **Total** | **336** |

Source: Investext.
(1) Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.

**Exhibit 5**
**Coefficients from Rolling Event Study Regression for 3D Systems**
**10/29/2013 - 5/5/2015**



Note: The coefficients for each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. In my examination of analyst reports issued throughout the Class Period, I identified a small group of firms that were most often viewed as direct competitors of 3D (i.e. The ExOne Company, Voxeljet AG, and Stratasys Ltd.). Defendants also identified these same three firms as peers to 3D Systems. Earnings announcements and alleged corrective disclosures have been removed from estimation. The returns of the Peer Index are net of the S&P 500 Total Return Index.



**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for 3D Common Stock**
**10/29/2013 – 5/5/2015**

Note: The standard deviation of the errors on each day are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. In my examination of analyst reports issued throughout the Class Period, I identified a small group of firms that were most often viewed as direct competitors of 3D (i.e. The ExOne Company, Voxeljet AG, and Stratasys Ltd.). Defendants also identified these same three firms as peers to 3D Systems. Earnings announcements and alleged corrective disclosures have been removed from estimation. The returns of the Peer Index are net of the S&P 500 Total Return Index.

## Exhibit 7
## Event Study Analysis of 3D Systems Earnings Dates

| # | Date | Time | Market Date | Event | Headline | DDD Price | DDD Raw Return | Rolling Regression Model (120-day window)[1] | | | | Sig Level[2] |
|---|------|------|-------------|-------|----------|-----------|----------------|-------------------|-------------------------|--------|---------|------|
| | | | | | | | | Abnormal Return | Abnormal Dollar Change | T-Stat | P-Value | |
| 1 | 10/29/2013 | 8:00 AM | 10/29/2013 | Q3 2013 Earnings Release | 3D Systems Reports Q3 2013 Results (GlobeNewswire, 10/29/2013, 8:00 AM) | $59.53 | 4.48% | 2.24% | $1.28 | 1.24 | 0.22 | |
| 2 | 2/5/2014 | 8:45 AM | 2/5/2014 | Q4 2013 Pre-announcement | 3D Systems Announces Preliminary Full Year 2013 Results (GlobeNewswire, 2/5/2014, 8:45 AM) | $64.10 | -15.39% | -10.72% | -$8.12 | -5.62 | 0.00 | * |
| 3 | 2/28/2014 | 8:00 AM | 2/28/2014 | Q4 2013 Earnings Release | 3D Systems Reports Q4 and Full Year 2013 Results (GlobeNewswire, 2/28/2014, 8:00 AM) | $75.96 | 1.74% | 1.15% | $0.86 | 0.58 | 0.56 | |
| 4 | 4/29/2014 | 8:00 AM | 4/29/2014 | Q1 2014 Earnings Release | 3D Systems Reports First Quarter 2014 Financial Results (GlobeNewswire, 4/29/2014, 8:00 AM) | $44.80 | -9.05% | -7.16% | -$3.53 | -3.42 | 0.00 | * |
| 5 | 7/31/2014 | 8:30 AM | 7/31/2014 | Q2 2014 Earnings Release | 3D Systems Reports Second Quarter and Six Months 2014 Financial Results (GlobeNewswire, 7/31/2014, 8:30 AM) | $50.13 | -10.59% | -5.37% | -$3.01 | -2.38 | 0.02 | * |
| 6 | 10/22/2014 | 7:30 AM | 10/22/2014 | Q3 2014 Pre-announcement | 3D Systems Announces Preliminary Third Quarter 2014 Results (GlobeNewswire, 10/22/2014, 7:30 AM) | $36.67 | -15.47% | -12.82% | -$5.56 | -6.14 | 0.00 | * |
| 7 | 11/10/2014 | 8:00 AM | 11/10/2014 | Q3 2014 Earnings Release | 3D Systems Reports Third Quarter and Nine Months 2014 Financial Results (GlobeNewswire, 11/10/2014, 8:00 AM) | $36.22 | 5.08% | 4.15% | $1.43 | 2.09 | 0.04 | * |
| 8 | 2/26/2015 | 8:00 AM | 2/26/2015 | Q4 2014 Earnings Release | 3D Systems Reports Record Revenue for Fourth Quarter and Full Year 2014 (GlobeNewswire, 2/26/2015, 8:00 AM) | $30.06 | 0.13% | 0.12% | $0.04 | 0.06 | 0.96 | |
| 9 | 4/24/2015 | 8:00 AM | 4/24/2015 | Q1 2015 Pre-announcement | 3D Systems Announces Preliminary First Quarter 2015 Results (GlobeNewswire, 4/24/2015, 8:00 AM) | $27.23 | -9.68% | -7.56% | -$2.28 | -3.55 | 0.00 | * |
| 10 | 5/6/2015 | 8:00 AM | 5/6/2015 | Q1 2015 Earnings Release | 3D Systems Reports First Quarter 2015 Results (GlobeNewswire, 5/6/2015, 8:00 AM) | $22.90 | -5.41% | -4.19% | -$1.01 | -1.88 | 0.06 | |

Source: S&P Capital IQ.
Notes:
(1) The results are based upon a regression model over the previous 120 trading days that controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. In my examination of analyst reports issued throughout the Class Period, I identified a small group of firms that were most often viewed as direct competitors of 3D (i.e. The ExOne Company, Voxeljet AG, and Stratasys Ltd.). Defendants also identified these same three firms as peers to 3D Systems. Earnings announcements and alleged corrective disclosures have been removed from estimation. The returns of the Peer Index are net of the S&P 500 Total Return Index.

(2) "*" Denotes statistical significance at the 95% confidence level or greater.



**Exhibit 8A**
**3D Common Stock Intraday Price and Volume**
**10/29/2013**

Source: TICK Data.



**Exhibit 8B**
**3D Common Stock Intraday Price and Volume**
**2/5/2014**

Source: TICK Data.



**Exhibit 8C**
**3D Common Stock Intraday Price and Volume**
**2/28/2014**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| 1.74%  | 1.15%       | 0.58   |

2/28/2014
9:30 am - $76.00
**NYSE Open**

2/28/2014 8:00 AM
DDD reports Q4 2013
earnings.

2/27/2014
4:00 pm - $74.66
**NYSE Close**

2/28/2014
4:00 pm - $75.96
**NYSE Close**

Source: TICK Data.



**Exhibit 8D**
**3D Common Stock Intraday Price and Volume**
**4/29/2014**

Source: TICK Data.



**Exhibit 8E**
**3D Common Stock Intraday Price and Volume**
**7/31/2014**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| -10.59% | -5.37% | -2.38 |

7/30/2014
4:00 pm - $56.07
**NYSE Close**

7/31/2014 8:30 AM
DDD reports Q2 2014
earnings.

7/31/2014
9:30 am - $48.84
**NYSE Open**

7/31/2014
4:00 pm - $50.13
**NYSE Close**

Source: TICK Data.



**Exhibit 8F**
**3D Common Stock Intraday Price and Volume**
**10/22/2014**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| -15.47% | -12.82% | -6.14 |

10/21/2014
4:00 pm - $43.38
**NYSE Close**

10/22/2014 7:30AM
DDD pre-announces
Q3 2014 earnings.

10/22/2014
9:30 am - $36.66
**NYSE Open**

10/22/2014
4:00 pm - $36.67
**NYSE Close**

Source: TICK Data.



**Exhibit 8G**
**3D Common Stock Intraday Price and Volume**
**11/10/2014**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| 5.08% | 4.15% | 2.09 |

11/10/2014 8:00AM
DDD reports Q3 2014
earnings.

11/10/2014
9:30 am - $35.76
**NYSE Open**

11/10/2014
4:00 pm - $36.22
**NYSE Close**

11/7/2014
4:00 pm - $34.47
**NYSE Close**

Source: TICK Data.



**Exhibit 8H**
**3D Common Stock Intraday Price and Volume**
**2/26/2015**

| | Return | Abn. Return | T-Stat |
|---|---|---|---|
| | 0.13% | 0.12% | 0.06 |

2/26/2015 8:00AM
DDD reports Q4 2014 earnings.

2/25/2015
4:00 pm - $30.02
**NYSE Close**

2/26/2015
9:30 am - $29.31
**NYSE Open**

2/26/2015
4:00 pm - $30.06
**NYSE Close**

Source: TICK Data.



**Exhibit 8I**
**3D Common Stock Intraday Price and Volume**
**4/24/2015**

| Return | Abn. Return | T-Stat |
|--------|-------------|--------|
| -9.68% | -7.56% | -3.55 |

4/24/2015 8:00AM
DDD pre-announces
Q1 2015 earnings.

4/23/2015
4:00 pm - $30.15
**NYSE Close**

4/24/2015
4:00 pm - $27.23
**NYSE Close**

4/24/2015
9:30 am - $27.03
**NYSE Open**

Source: TICK Data.



**Exhibit 8J**
**3D Common Stock Intraday Price and Volume**
**5/6/2015**

Source: TICK Data.

**Exhibit 9**

**Comparison of Statistical Significance and Abnormal Returns**
**for 3D Systems Earnings Announcement Dates**
**vs. Days with the Least News**

| Statistic | Earnings Announcement Dates | Days with the Least News, No Analyst Reports, and No SEC Filings |
|---|---|---|
| N | 10[1] | 158[2] |
| Significant Days at 95% Confidence Level | 6 | 5 |
| % Significant Days at 95% Confidence Level | 60.00%[3] | 3.16%[4] |
| Average Absolute Abnormal Return | 5.55%[5] | 1.41% |

Notes:

(1) The last earnings release included in this analysis window was before market hours on May 6, 2015.

(2) For the purposes of this analysis, I selected the 158 days with the least amount of news. From my search, I determined the days with the least news were days that had three or fewer news articles, no analyst reports, and no SEC filings.

(3) 60.00% rate of statistical significance is statistically significantly different than 3.16% at the 95% confidence level.

(4) One would expect to observe 5% based on random chance alone. 3.16% is not significantly different from 5.00% at the 95% confidence level.

(5) 5.55% absolute return is statistically significantly different than 1.41% based on a t-test for difference of means at the 95% confidence level.

**Exhibit 10**
**3D Common Stock Market Capitalization**
**10/29/2013 - 8/31/2015**



Sources: Complaint and S&P Capital IQ.

**Exhibit 11**
**3D Common Stock Market Capitalization**
**Compared to Companies Traded on**
**the NYSE & NASDAQ**

| Last trading day of: | 3D Market Capitalization (billions) | Percentile Rank in NYSE & NASDAQ |
|---|---|---|
| Q3 - 2013 | $5.49 | 81.21% |
| Q4 - 2013 | $9.55 | 86.53% |
| Q1 - 2014 | $6.10 | 81.44% |
| Q2 - 2014 | $6.57 | 82.16% |
| Q3 - 2014 | $5.10 | 79.60% |
| Q4 - 2014 | $3.66 | 74.41% |
| Q1 - 2015 | $3.05 | 70.47% |
| Q2 - 2015 | $2.18 | 65.05% |

Source: Thomson Reuters Eikon.



**Exhibit 12A**
**3D Common Stock Average Monthly Bid-Ask Percentage Spread**
**10/29/2013 - 5/5/2015**

Average Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in April 2015: 0.59%

Median Percentage Bid-Ask Spread for a Randomly Selected Group of 100 Common Stocks Trading on the NYSE and NASDAQ in April 2015: 0.20%

Source: TICK Data.
Note: October 2013 and May 2015 data are limited to the Class Period.



**Exhibit 12B**
**3D Common Stock Average Monthly Bid-Ask Dollar Spread per Share**
**10/29/2013 - 5/5/2015**

Source: TICK Data.
Note: October 2013 and May 2015 data are limited to the Class Period. The average and median dollar bid-ask spread for the randomly-selected sample of 100 common stocks trading on the NYSE and NASDAQ in April 2015 are given by the average and median percentage bid-ask spread for this sample, scaled by $28.89 (the average DDD trading price in April 2015).

**Exhibit 13**
**3D Systems Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float: Shares Outstanding Plus Short Interest (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float |
|---|---|---|---|---|---|---|---|---|---|
| {1} | {2} | {3} | {4} | {5} | {6} = {2} + {5} - {4} | {7} = {4} / {2} | {8} | {9} = {8} / {2} | {10} = {8} / {6} |
| 9/30/2013 | 101,612 | 392 | 5,769 | 27,837 | 123,680 | 5.68% | 61,788 | 60.81% | 49.96% |
| 12/31/2013 | 102,781 | 431 | 5,767 | 16,168 | 113,182 | 5.61% | 51,852 | 50.45% | 45.81% |
| 3/31/2014 | 103,211 | 404 | 4,754 | 26,877 | 125,334 | 4.61% | 54,734 | 53.03% | 43.67% |
| 6/30/2014 | 109,920 | 401 | 5,061 | 33,968 | 138,827 | 4.60% | 58,781 | 53.48% | 42.34% |
| 9/30/2014 | 109,920 | 393 | 5,356 | 35,771 | 140,335 | 4.87% | 56,735 | 51.61% | 40.43% |
| 12/31/2014 | 111,217 | 389 | 5,845 | 37,382 | 142,755 | 5.26% | 59,479 | 53.48% | 41.67% |
| 3/31/2015 | 111,210 | 347 | 5,759 | 38,602 | 144,053 | 5.18% | 59,424 | 53.43% | 41.25% |
| 6/30/2015 | 111,797 | 337 | 5,742 | 35,640 | 141,695 | 5.14% | 60,277 | 53.92% | 42.54% |
| 9/30/2015 | 111,998 | 322 | 5,790 | 36,352 | 142,560 | 5.17% | 59,082 | 52.75% | 41.44% |
| **Total Institutions over Class Period:** | | **695** | | | | **Average:** | 5.04% | 52.77% | 42.53% |

Sources: S&P Capital IQ and SEC filings.

**Exhibit 14**
**3D Common Stock**
**Test for Autocorrelation During the Class Period**

| Quarter | Coefficient on Previous Day Abnormal Return[1] | T-statistic |
|---|---|---|
| 2013Q4 | -0.08 | -0.50 |
| 2014Q1 | -0.04 | -0.28 |
| 2014Q2 | -0.26 | -2.11 |
| 2014Q3 | 0.08 | 0.63 |
| 2014Q4 | -0.06 | -0.43 |
| 2015Q1 | 0.19 | 1.48 |
| 2015Q2 | 0.17 | 0.90 |
| **Class Period** | **-0.02** | **-0.33** |

Source: S&P Capital IQ.
Note: The autocorrelation period runs from 10/29/2013 to 5/5/2015.
(1) For each month I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and alleged corrective disclosures have been removed from estimation.

# Appendix A
# Documents Considered

## Court Documents

- Amended Consolidated Complaint for Violations of the Federal Securities Law, *KBC Asset Management NV, v. 3D Systems Corporation*, filed December 9, 2015.
- Memorandum of Law in Support of Defendants' Motion to Dismiss the Amended Consolidated Complaint, *KBC Asset Management NV, v. 3D Systems Corporation*, filed January 14, 2016.
- Memorandum Opinion and Order Denying Defendants' Motion to Dismiss the Amended Consolidated Complaint, *KBC Asset Management NV, v. 3D Systems Corporation*, filed July 25, 2016.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. (1988).
- Bromberg & Lowenfels, Securities Fraud and Commodities Fraud, § 8.6. (Aug. 1988).
- *Cammer v. Bloom*, 711 F. Supp. (D.N.J. 1989).
- *Halliburton Co. v. Erica P. John Fund, Inc*., 134 S. Ct. (2014).
- *Krogman v. Sterritt* 202 F.R.D. (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings/Forms

- Select 3D 10-K Annual filings submitted to the SEC during the relevant period.
- Select 3D 10-Q Quarterly filings submitted to the SEC during the relevant period.
- Select 3D 8-K Current reports submitted to the SEC during the relevant period.
- Select 3D Def 14A Proxy statements submitted to the SEC during the relevant period.
- Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

## Security Data

- Historical data for 3D Common Stock, members of the Peer Index, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.
- Trade and quote data for 3D during the Class Period and one hundred random companies trading on the New York Stock Exchange and NASDAQ for April 2015 were obtained from Tick Data, *see* www.tickdata.com.
- Market capitalization data for firms trading on the New York Stock Exchange and NASDAQ were obtained from the Thomson Reuters Eikon database.
- Institutional holdings data was obtained from S&P Capital IQ.
- 3D stock options data were obtained from iVolatility, *see* http://www.ivolatility.com.

- Turnover velocity data for NYSE was obtained from the World Federation of Exchanges, *see* http://www.world-exchanges.org/home/index.php/statistics/monthly-reports.
- The number of market makers during the Class Period for 3D Common Stock was obtained from Bloomberg.

## 3D News
- 3D news headlines and select articles downloaded from Factiva for the Class Period.
  - News was obtained by executing a search via Factiva for "All Sources" with the company field "3D Systems Corp" for the period "October 29, 2013 – May 6, 2015." The Factiva search yielded 1,083 unique articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder.
- 3D earnings press releases throughout the Class Period.
- 3D conference call transcripts throughout the Class Period.

## 3D Analyst Reports
- 3D analyst reports supplied by Investext via Thomson Reuters and from Counsel for the period October 2013 to May 2015.
- Analyst reports including, but not limited to:
  - "Adjusting Estimates to Reflect Profit Warning; Price Target Goes to $54 ," *J.P. Morgan*, February 5, 2014.
  - "Weak FY14 & Q4 guidance on investment step-up, but 30%+ organic growth outlook ," *Credit Suisse*, February 5, 2014.
  - "First Take: Q4 Results Weak, 2015 Guidance Generally as Expected," *Jefferies*, February 26, 2015.
  - "Promising Shift to Profits But Back-End Loaded Forecast," *RBC*, February 26, 2015.

## Academic Articles/Texts
- Joseph Aharony and Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Yakov Amihud, et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. (2005).
- Doron Avramov, et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Brad M. Barber, et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. (1994).
- William H. Beaver "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.

- John Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Phillip A. Braun, et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. (1995).
- Frank J. Fabozzi, Franco Modigliani, Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Eugene Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. (1970).
- William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Damodar N. Gujarati, *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Roger D. Huang & Hans R. Stall, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. (1996).
- Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. (1978).
- A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- William F. Sharpe, Gordon J. Alexander, and Jeffery V. Bailey, *Investments*, Prentice Hall, Fifth Edition, 1995.
- David I. Tabak and Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. (2000).

**Other**

- http://www.sec.gov/answers/mktmaker.htm
- http://www.sec.gov/edgar/searchedgar/companysearch.html
- http://www.sec.gov/about/forms/form13f.pdf
- http://www1.nyse.com/equities/nyseequities/1166830723427.html
- https://www.nyse.com/market-model/overview#dmms-2
- https://www.nyse.com/market-model/dmm-case-studies
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf
- http://www.rss-specifications.com/
- http://www.rss-specifications.com/what-is-rss.htm

APPENDIX B

## CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:          (312) 470-6500
Mobile:         (815) 382-0092
Email:          ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**   University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**    Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

  o In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
  o In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
  o Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares. Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>. Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>. Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed rebuttal expert report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed rebuttal expert report December 17, 2008. Deposition January 27, 2009. Filed rebuttal expert report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report on January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed rebuttal expert report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed rebuttal expert report July 8, 2010.  Deposition September 1, 2010. Filed supplemental rebuttal expert report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed rebuttal expert report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed rebuttal expert report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed rebuttal expert report September 26, 2011. Filed expert report March 16, 2012. Filed rebuttal expert report April 9, 2012. Filed rebuttal expert report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February 17, 2012. Deposition March 28, 2012. Filed rebuttal expert report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20,

2012. Deposition September 14, 2012. Filed rebuttal expert report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed rebuttal expert report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee Western Division. Court testimony April 12, 2013.

- Testifying expert in City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware. Filed expert report May 13, 2013. Filed rebuttal expert report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed rebuttal expert report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed rebuttal expert report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York. Filed expert report June 14, 2013. Filed rebuttal expert report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts. Filed expert report October 28, 2013.

- Testifying expert in In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York. Filed expert report November 25, 2013. Filed rebuttal expert report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert report May 13, 2016. Deposition June 10, 2016.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed rebuttal expert report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed rebuttal expert report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed rebuttal expert report December 7, 2015.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed rebuttal expert report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed rebuttal expert report February 2, 2016. Filed expert reply report on March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report on October 18, 2016.


<u>Experience in Labor Economics and Discrimination-Related Cases:</u>

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in <u>Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.</u>– Filed report re: lost wages and benefits.

- Testifying expert in <u>Richard Akins v. NCR Corporation</u>.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.


<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.


**TEACHING EXPERIENCE:**

> KNOX COLLEGE, Teaching Assistant - Statistics, (1995)
> KNOX COLLEGE, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value." *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

Associate Member CFA Society of Chicago
Associate Member CFA Institute
Phi Beta Kappa

**AWARDS:**

1994  Ford Fellowship Recipient for Summer Research.
1993  Arnold Prize for Best Research Proposal.
1995  Knox College Economics Department Award.

**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.